**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:

APPLICATION OF IOV LABS LIMITED
FOR AN ORDER UNDER 28 U.S.C. § 1782
TO TAKE DISCOVERY FROM MARK
LEVIN

Case No. 1:22mc20206

**DECLARATION OF ALEJANDRO ABERG COBO IN SUPPORT OF**
**APPLICATION FOR AN ORDER TO TAKE DISCOVERY UNDER 28 U.S.C. § 1782**

Under 28 U.S.C. § 1746, I declare as follows:

1.      My name is Alejandro Aberg Cobo. I am over 18 years of age and am competent

to make this declaration.

2.      I submit this declaration based on my own personal knowledge and in support of

the application of IOV Labs Limited ("IOV Labs") for an order under 28 U.S.C. § 1782 to take

discovery from Mark Levin (the "Section 1782 Application"). I have reviewed the Section 1782

Application and am familiar with its contents.

3.      I have been a Senior Advisor and Member of the Board of Directors of IOV Labs

since March 2018.

4.      Over the past year, Mark Levin, Esteban van Goor, and Megalodon DMCC

(collectively, the "Complainants") have sent IOV Labs a number of written communications

threatening to initiate civil proceedings against IOV Labs in a variety of jurisdictions, including

the Netherlands, Turkey, and the British Overseas Territory of Gibraltar.

5.      A true and correct copy of a letter sent by the Complainants on February 18, 2021,

is attached to this declaration as **Exhibit 1**.

1

6.      A true and correct copy of a letter sent by the Complainants on March 16, 2021, is attached to this declaration as **Exhibit 2**.

7.      A true and correct copy of a letter sent by the Complainants on April 22, 2021, is attached to this declaration as **Exhibit 3**.

8.      A true and correct copy of a letter sent by DLA Piper Nederland N.V. (which, based on the contents of the letter, I understand acts as counsel to the Complainants) on September 10, 2021 is attached to this declaration as **Exhibit 4**.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this _17_ day of January 2022, in ___Miami, Florida___.

_____

Alejandro Aberg Cobo

2

# EXHIBIT 1

<table>
<tr><td>

**LETTER OF CLAIM          /**

**LETTER BEFORE ACTION**

</td></tr>
</table>

**Megalodon DMCC**
**Megalodon Capital Management B.V.**
**c/o Esteban Arturo Van Goor**
**Mark Levin**
**Kerem Turetgen**
rsk@megalodon.ae

**February 18th , 2021**

**BY EMAIL**

Isolas LLP, info@isolas.gi, debbie.spencer@isolas.gi, Karan.Aswani@isolas.gi, emma.lejeune@isolas.gi
Malcolm Stephen David Pallé, malcolmpalle@coinsilium.com, eddytravia@coinsilium.com
Alejandro Maria Aberg Cobo, alex@iovlabs.org, alex@rifos.org
Wayne Leslie Almeida, wayne@fid.gi, peter@fid.gi
Joseph Peter Garcia, joey.garcia@isolas.gi
Diego Gutierrez Zaldivar, dgz@rsk.co, dgz@iovlabs.org
Sergio Lerner, sergio@iovlabs.org
Gabriel Alejandro Kurman, gk@rsk.co, gk@iovlabs.org
Ruben Ariel Altman, ruben@rsk.co,
Adrian Eidelman, adrian@iovlabs.org
Adrian Garelik, adrian@flixxo.com, legal@flixxo.com,

**Claimant:**

- Esteban Arturo van Goor
- Mark Levin
- Kerem Turetgen
- Megalodon Capital Management B.V.
- Megalodon DMCC

**Defendant:**

- IOV Labs Limited, RIF Labs Limited, Suite 23 Portland House Glacis Road, Gibraltar GX11 1AA Gibraltar, Company Number: 116697.
- Fiduciary Trust Limited, 3, Bell Lane, Gibraltar.
- RSK Labs limited, BVI, 1895440, Morgan & Morgan Building, Pasea Estate, Road Town, Tortola, British Virgin Islands.
- Ginger Developments Limited, 1989326, Pasea Estate p.o. box 958 Road Town Tortola VG1110 Virgin Islands, British.
- Isolas LLP, Portland House, Glacis Rd, GX11 1AA, Gibraltar.
- Malcolm Stephen David, Palle 26 Arlington Midtown, Gibraltar GX11 1AA, Gibraltar, British, flat 65 Aegean apartments, 19 Western Gat Victoria Docks, London, England, United Kingdom E16 1AR.*

- Alejandro Maria Aberg Cobo, Camino De Los Horneros 220, Lomas de la Tahoma Lote 346 Colonia Nicolich Canelones 14000, Uruguay, Argentinian.*
- Wayne Leslie Almeida, 4 Richmond Close Montagu Crescent GX11 1AA Gibraltar, British.*
- Joseph Peter Garcia, 3 Garden Apartment King's Wharf, Gibraltar, British.*
- Diego Gutierrez Zaldivar, 2028 4 R Vidt, Buenos Aires C1425, Buenos Aires, Argentina, Argentinian.*
- Fiduciary Management Limited, 3 Bell Lane GX11 1AA, Gibraltar.
- Sergio Lerner, Jauretche 162 7B (1405), Buenos Aires, Argentina.*
- Gabriel Alejandro Kurman, Roseti 138 PBC (1427), Buenos Aires, Argentina.*
- Ruben Ariel Altman, Salguero 2136 9a (1425), Buenos Aires, Argentina.*
- Adrian Eidelman, Acuña de Figueroa 1470 (1180), Buenos Aires, Argentina.*
- Adrian Garelik, Blanco Encalada 1910 (1430), Buenos Aires, Argentina.*

**\*Please submit latest whereabouts, correct address to Claimant, as the addresses provided by you in official communications and documentations are incorrect!**

**Competent Authorities:**

- **European Securities and Markets Authority (ESMA)**
- **Netherlands Financial Services Complaints Tribunal (Kifid)**
- **Autoriteit Consument & Markt (ACM), The Netherlands**
- **Gibraltar Public Service Ombudsman**
- **Gibraltar Financial Services Commission**
- **Office of Fair Trading Gibraltar**
- **Royal Gibraltar Police**
- **Autoriteit Financiële Markten, The Netherlands**
- **U.S. Securities and Exchange Commission**
- **U.S. Commodity Futures Trading Commission**
- **U.S. Consumer Financial Protection Bureau**
- **U.S. Federal Trade Commission**
- **U.S. Federal Bureau of Investigation**
- **North American Securities Administrators Association**
- **Financial Industry Regulatory Authority, Inc.**
- **Capital Markets Board of Turkey (CMB)**
- **The Turkish Capital Markets Association (TCMA)**
- **INTERPOL General Secretariat**
- **Banco Central De La Republica Argentina**
- **Comisión Nacional de Valores, Argentina**
- **Gendarmeria Nacional, Argentina**

*Complaint to Authorities Worldwide:*

*RSK/IOV/RIF Labs was and is laundering funds from an international fraud scheme that scammed money/bitcoin from individuals and companies, in several US states and EU countries and other foreign countries.*

**LEGAL COMPLAINT FOR VIOLATIONS OF:**

1. Securities Law
2. Money Laundering Law
3. Wire Fraud Law
4. Insider Trading
5. Identity Theft
6. Violation of Money Transmitter Regulation
7. Unjust Enrichment
8. Slander and Defamation
9. Unfair Business Practices
10. International Fraud Scheme
11. Investor Protection Directive 2014/65/EU
12. Regulation (EU) No 1215/2012
13. European Securities and Markets Authority (ESMA)
14. The Prospectus Directive
15. The Transparency Directive
16. The Markets in Financial Instruments Directive Framework
17. The Market Abuse Regulation
18. The Settlement Finality Directive and the Central Securities Depositories Regulation
19. The fifth AMLD on money laundering and terrorist financing
20. Financial Services (Markets in Financial Instruments) Act 2006
21. Prospectuses Act 2005
22. Financial Services (Collective Investment Schemes) Act 2011
23. English Law Act 1962
24. Gibraltar E-Commerce and Consumer Protection Regulations
25. Gibraltar Money Laundering Regulations
26. Misconduct in, or misuse of information relating to, a financial market
27. Misleading, false and fraudulent statements
28. Proceeds of Crime Act
29. Fraud or dishonesty or breach of trust
30. Criminal Justice Act 1993
31. Regulation (EU) No 596/2014
32. Communiqué on Prospectus and Issuance Document No II-5.1, Turkey.
33. Communiqué on Sale of Capital Market Instruments No II-5.2, Turkey.
34. Capital Market Law, NO 6362, Turkey.
35. Sourcing information about investors with third parties, collaboration with third parties leading to an assassination attempt and extortion.
36. Conducting an unregistered securities sale in the United States of America, without an approval of the SEC or applying an Exemption (also referred to as a Reg D).
37. Actively participated in the commission of a crime, i.e. slander and defamation, an assassination attempt, and extortion.
38. Bank Act and Exchange Act

**Pre-action protocols and Alternative Dispute Resolution (ADR)**

Before commencing proceedings, the court will expect us to have exchanged sufficient information to:

- understand each other's position;
- make decisions about how to proceed;
- try to settle the issues without proceedings;
- consider a form of Alternative Dispute Resolution (ADR) to assist with settlement;
- support the efficient management of those proceedings; and
- reduce the costs of resolving the dispute.

Pre-action protocols explain the conduct and set out the steps the court would normally expect Claimant and Defendant to take before commencing proceedings for particular types of civil claims.

The Netherlands Financial Services Complaints Tribunal (Kifid) can act as the competent ADR authority in The Netherlands and the Gibraltar Public Services Ombudsman, as the competent ADR authority for Gibraltar, that wants to encourage the development of ADR.[1]

In article 3 of the Directive on certain aspects of mediation in civil and commercial matters, mediation is defined as: "*a structured process, however named or referred to, whereby two or more parties to a dispute attempt by themselves, on a voluntary basis, to reach an agreement on the settlement of their dispute with the assistance of a mediator. This process may be initiated by the parties or suggested or ordered by a court or prescribed by the law of a Member State.*"[2]

The Dutch Civil Code allows representative actions under article 3:305a. A representative organization may file a claim to protect the interests of others, if the organization's objective, as defined in its articles of association, is to act for the benefit of those interests.
All types of actions may be brought under article 3:305a, including securities, competition and product liability claims.

**Audit Inquiry Letter**

Provide full disclosure and transparency when your accountant prepares the financial statements and issues its opinion on them; the accounting firm must comply with, among other things, Statement of Financial Accounting Standards.

The bitcoin wallet for the token sale of RIF Labs is being **monitored**: 3FiMKffg2kY2Pi2Kebn2HZqN7m6kEcNUMk where a chain analysis is being performed on usage of proceed will need to be matched. An attempt to drain these wallets by the RSK/RIF/IOV Labs team will be **immediately reported** to all Authorities mentioned in the above overview.

---

[1] Principles on the protection and promotion of the ombudsman institution ("the Venice Principles")

[2] Directive 2008/52/EC on certain aspects of mediation in civil and commercial matters (PbEU L 136)

Claimant request RSK Labs Limited, RIF/IOV Labs Limited to provide us with the audited financials of both entities, in order to review the use of proceeds by Defendant for both RSK Labs Limited and RIF/IOV Labs Limited.

Claimant further request an overview of the financials of Ginger Developments Limited and other affiliated companies.

*Consumer and retail protection in Europe*

**Dutch Court, civil matters Mark Levin, Esteban Arturo van Goor, Megalodon Capital Management B.V., jurisdiction where claimant is domiciled, The Netherlands and NOT Gibraltar.**

**Authority in The Netherlands: Autoriteit Consument & Markt (ACM), The Netherlands.**

By way of derogation from Article 4(1) and Article 7(1) of the Brussels la Regulation, [3] Article 18(1) of that regulation provides that a consumer within the meaning of Article 17(1) thereof may sue the other party to a contract, not only in the courts of the Member State where that party is domiciled, but also in the courts for the place where the consumer is domiciled.

Articles 17, 18 and 19 of the Brussels la Regulation, which make up Section 4 of Chapter II thereof, entitled 'Jurisdiction over consumer contracts', serve to ensure adequate protection for the consumer, as the party deemed to be economically weaker and less experienced in legal matters than the other, commercial, party to the contract[4].

Retail clients, like **Megalodon Capital Management BV**, are granted full protection in Europe.[5] In particular as regards the information which the investment firm is required to provide the client with.

According to recital 86 of Directive 2014/65, which repealed and replaced Directive 2004/39, 'it is appropriate to make it clear that principles to act **honestly, fairly and professionally** and the obligation to be **fair, dear and not misleading** apply to the relationship with any clients'. Interpretation of Article 17(1) of Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters[6].

---

[3] Judgments of 20 January 2005, Gruber, C-464/01, EU:C:2005:32, paragraph 34; of 7 December 2010, Pammer and Hotel A/penhof. C-585/08 and C-144/09, EU:C:2010:740, paragraph 53; of 6 September 2012, Mühlleitner, C-190/11, EU:C;2012:542, paragraph 26; and of 14 March 2013, ëeská spofftelna, C-419/11, EU:C:2013:165, paragraph 26.

[4] Judgments of 19 January 1993, Shearson Lehman Hutton, C-89/91, EU:C:1993:15, paragraph 18; of 20 January 2005, Gruber, C-464/01, EU:C;2005:32, paragraph 34; and of 14 March 2013, ëeská spofitelna, C-419/11, EU:C;2013:165, paragraph 33.

[5] Sec, in parlicular, Arliclc 19(J0)(c) of Direclive 2004/39, and Arlicle 24(4)(b) and Article 25(8)(c) of Direclive 2014/65. Sec also Bonneau. T., Pailler, P., Rouaud, A.-C., Tehrani, A., and Vabres, R., Droü financier, LGDJ, 2017, paragraph 312 ss.

[6] OJ 2012 L 351, p. 1

**Regulation No 1215/2012, under recitals 15, 16 and 18 of Regulation No 1215/2012:**

(15) The rules of jurisdiction should be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile.

(16) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close connection between the court and the action or in order to facilitate the sound administration of justice.

(18) In relation to insurance, consumer and employment contracts, the weaker pa1ty should be protected by rules of jurisdiction more favorable to his interests than the general rules.'

Section 4 of Chapter II of that regulation, entitled 'Jurisdiction over consumer contracts', includes Articles 17 to 19 of that regulation. Article 17(1) and (3) of the regulation states:

In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this section, without prejudice to Article 6 and point 5 of Article 7, if:

    a.  it is a contract for the sale of goods on instalment credit terms;
    b.  it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or
    c.  in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

3. This section shall not apply to a contract of transport other than a contract which, for an inclusive price, provides for a combination of travel and accommodation.

Article 18(1) of that regulation provides:

A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or, regardless of the domicile of the other pa1ty, in the courts for the place where the consumer is domiciled.

Article 19 of Regulation No 1215/2012 is worded as follows:

The provisions of this section may be departed from only by an agreement:

    1)  which is entered into after the dispute has arisen;
    2)  which allows the consumer to bring proceedings in courts other than those indicated in this section; or
    3)  which is entered into by the consumer and the other pa1ty to the contract, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which confers jurisdiction on the courts of that Member State, provided that such an agreement is not contrary to the law of that Member State.

Article 25(4) of that regulation provides:

Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 15, 19 or 23, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 24.

**The Rome I Regulation**

Recitals 7, 28 and 30 of Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I) (OJ 2008 L 177, p. 6; 'the Rome I Regulation'):

(7) The substantive scope and the provisions of this regulation should be consistent with Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Brussels I) [(OJ 2001 L 12, p. 1))] and Regulation (EC) No 864/2007 of the [European] Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations ("Rome II") [(OJ 2007 L 199, p. 40))].

It is important to ensure that rights and obligations which constitute a financial instrument are not covered by the general rule applicable to consumer contracts, as that could lead to different laws being applicable to each of the instruments issued, therefore changing their nature and preventing their fungible trading and offering.

For the purposes of this regulation, financial instruments and securities are the instruments referred to in Article 4 of Directive 2004/39/EC [of the European Parliament and of the Council of 21 April 2004 on markets in financial instruments, amending Council Directives 85/611/EEC and 93/6/EEC and Directive 2000/12/EC of the European Parliament and of the Council and repealing Council Directive 93/22/EEC (OJ 2004 L 145, p. 1)).

Article 1 of the Rome I Regulation, entitled 'Material scope', states, in the first subparagraph of paragraph 1 thereof:

This regulation shall apply, in situations involving a conflict of laws, to contractual obligations in civil and commercial matters.

Article 6 of that regulation, entitled 'Consumer contracts', provides:

Without prejudice to Articles 5 and 7, a contract concluded by a natural person for a purpose which can be regarded as being outside his trade or profession (the consumer) with another person acting in the exercise of his trade or profession (the professional) shall be governed by the law of the country where the consumer has his habitual residence, provided that the professional:

(a)      pursues his commercial or professional activities in the country where the consumer has his habitual residence, or

(b)      by any means, directs such activities to that country or to several countries including that country, and the contract falls within the scope of such activities.

Paragraphs 1 and 2 shall not apply to:

(d) rights and obligations which constitute a financial instrument and rights and obligations constituting the terms and conditions governing the issuance or offer to the public and public take-over bids of transferable securities, and the subscription and redemption of units in collective investment undertakings in so far as these activities do not constitute provision of a financial service.

**Directive 2004/39/EU**

Article 4 of Directive 2004/39, which is entitled 'Definitions', provides in paragraph 1: 'For the purposes of this directive:

"client" means any natural or legal person to whom an investment firm provides investment or ancillary services;
"Professional client" means a client meeting the criteria laid down in Annex II;
"Retail client" means a client who is not a professional client;
"Financial instruments" means those instruments specified in Section C of Annex l.

Under the heading 'Financial instruments', Section C of Annex I to Directive 2004/39 set out the list of financial instruments covered by that directive, including, in point 9 of that section, 'financial contracts for differences'.

Under the heading 'Categories of clients considered as professionals', Section I of Annex Il to Directive 2004/39 stated:

The following should all be regarded as professionals in all investment services and activities and financial instruments for the purposes of the directive:

1.      Entities which are required to be authorized or regulated to operate in the financial markets. The list below should be understood as including all authorized entities carrying out the characteristic activities of the entities mentioned:

(a)      Credit institutions
(b)      investment firms
(c)      Other authorized or regulated financial institutions

2.      Large undertakings meeting two of the following size requirements on a company basis:

- balance sheet total: EUR 20 million;
- net turnover: EUR 40 million;
- own funds: EUR 2 million.

3.      National and regional governments, public bodies that manage public debt, Centra!
Banks, international and supranational institutions such as the World Bank, the International
Monetary Fund (IMF), the European Centra! Bank (ECB), the European investment Bank
(EIB) and other similar international organizations.
4.      Other institutional investors.


**Jana Petruchová V FIBO Group Holdings Limited, Case C-208/18**

In the view of the court, a 'retail customer' within the meaning of Article 4(1)(12) of Directive
2004/39 is not necessarily a 'consumer' within the meaning of Article 17(1) of Regulation No
1215/2012, in that those two acts of secondary legislation differ in scope and that a 'retail
customer' within the meaning of the first of those acts may be a professional within the
meaning of the second.

Second, the referring court points out that, even if it is necessary to ensure that the uniformity
of legal regimes relating to rules governing conflict of laws and the determination of
international jurisdiction in matters relating to consumer contracts is maintained, Article 17(1)
of Regulation No 1215/2012 should not be interpreted in the same way as Article 6(1) of the
Rome I Regulation, since those regulations do not have the same purpose, the former
governing procedural matters and the latter dealing with the problem of conflict of laws in
order to determine the applicable substantive law.

Thus, the provisions of Section 4 of Chapter II of Regulation No 1215/2012 apply to contracts
relating to financial and investment instruments, since only certain transport contracts are
excluded from the scope of that section.

In that regard, it also fellows from the Court's judgment of 28 January 2015, Kolassa, (C-
375/13, EU:C:2015:37), that Article 17(1) of Regulation No 1215/2012 does not restrict
consumer protection in respect of financial and investment instruments.

It is irrelevant, for the purposes of classifying a person as a 'consumer' within the meaning of
Article 17(1) of Regulation No 1215/2012, whether the transactions carried out involve a
substantial amount, whether the person concerned has special knowledge and expertise, or
whether the contract in question is complex, atypical or gives rise to risks for that person of
which he has been informed.

In accordance with the case-law of the Court, Article 17(1) of Regulation No 1215/2012
applies if three conditions are met: first, a party to a contract is a consumer who is acting in a
context which can be regarded as being outside his trade or profession; second, the contract
between such a consumer and a professional has actually been concluded; and, third, such a
contract falls within one of the categories referred to in Article l 7(1)(a) to (c).

For the purposes of that classification, of the fact that that person is a 'retail customer' within
the meaning of Article 4(1)(12) of Directive 2004/39, it is appropriate to bear in mind that that
provision defines a 'retail customer' as 'a customer who is not a professional customer'. Under
Article 4(1)(11), a professional client is 'any client who meets the criteria set out in Annex II'
to that Directive.

In accordance with Section I of Annex Il to Directive 2004/39, for the purposes of that directive, for all investment services and activities and financial instruments, first, entities that are required to be authorized or regulated to operate in financial markets, such as credit institutions or investment firms; second, large companies meeting two of the three criteria, namely a balance sheet total of EUR 20 million, a net turnover of EUR 40 million and own funds of up to EUR 2 million; third, public entities or institutions such as national governments, centra! banks or the World Bank, and, fourth, other institutional investors are regarded as professionals. However, entities falling into one of those four categories may request to be treated as non-professionals.

A 'retail client', within the meaning of Article 4(1)(12) of Directive 2004/39, may also be a legal person.

It also follows therefrom that the classification of 'retail customer' within the meaning of Article 4(1)(10) and (12) of Directive 2004/39 is not subject to the lack of commercial activity of the person concerned, unlike the classification of 'consumer' within the meaning of Article 17(1) of Regulation No 1215/2012.

In addition, the classification of 'consumer' and that of 'retail client', provided for in those provisions, pursue different objectives.

The first of those classifications, affords protection when the court competent to rule on a dispute in civil and commercial matters is determined, while the second, as is apparent from the provisions of Section I of Annex II to Directive 2004/39, seeks to protect an investor, in pa1ticular as regards the scope of the information that the investment firm is required to provide to him.

Consequently, although it cannot be excluded that a 'retail client' within the meaning of Article 4(1)(12) of Directive 2004/39 may be classified as a 'consumer' within the meaning of Article 17(1) of Regulation No 1215/2012 if it is a natural person acting outside any commercial activity, those two concepts, having regard to the differences in their scope and in the objectives pursued by the provisions providing for them, do not fully overlap.

It follows that a person's status as a 'retail client' within the meaning of Article 4(1)(12) of Directive 2004/39 is, as such, in principle irrelevant for the purpose of classifying him as a 'consumer' within the meaning of Article 17(1) of Regulation No 1215/2012.

### Ramona Ang v Reliantco Investments Limited [2019] EWHC 879

An individual investor, with substantial means and more knowledge and experience than the average person, can still be considered a 'consumer' for the purposes of Article 17 of Regulation (EU) No 1215/2012 on jurisdiction and enforcement of judgments in civil and commercial matters ("Recast Brussels Regulation"), even when contracting to trade a specialized product such as cryptocurrency.

The question is whether a private individual committing capital to speculative currency transactions in the hope of making investment gains is, or can be, a 'consumer' in that definition. Wealthy consumers are consumers nonetheless and the amounts involved in this case do not mean Ms Ang was not a consumer. For example, in Case C-585/08, Pammer v Reederei Karl Schluter GmbH and Case C-177/09, Hotel Alpenhof GesmbH v Heller [2010] ECR I-12527, contracts for an ocean cruise and an alpine holiday were held to be consumer contracts. The investment by a private individual of her surplus wealth, in the hope of generating good returns (whether in the form of income on capital, capital growth, or a mix of the two), is not a business activity, generally speaking. It is a private consumption need, in the sense intended by the ECJ in BeniNCASa, to invest such wealth with such an aim.

Consumer investors may choose to handle their own investments and investment choices; many investment businesses routinely engage intermediaries or advisers. How any individual deals with the investment of her private wealth is an intensely personal matter. The use, or not, of intermediaries or advisers, as an aspect of the personal investment choices and arrangements of any given individual, should rightly be taken into account, but only as part of considering that individual's particular case on the whole of the available evidence, not under any presumption that the use of intermediaries or advisers makes an investor (more likely to be) a consumer or that their absence makes her (more likely to be) an investment business.

**European Securities and Markets Authority (ESMA)**

RSK/IOV/RIF Labs needs to comply with a full set of EU financial rules, including the Prospectus Directive, the Transparency Directive, MiFID II, the Market Abuse Directive, the Short Selling Regulation, the Central Securities Depositories Regulation and the Settlement Finality Directive.

**Risks to investor protection and market integrity**

The total funds raised by ICO's worldwide amounted to between usd 4 billion and usd 6 billion in 2017 (the funds raised mainly in the last few months of year), compared to usd 100 million in 2016. Since the beginning of 2018, total funds raised between 1 January and 1 June amounted to usd 9.5 billion, or nearly usd 2 billion per month.[7]

Most popular are projects developing B2B decentralised blockchain, hi-tech infrastructure, crypto-related financial services. Other popular ICO startups are not necessarily decentralised: peer-to-peer marketplaces, business services, media (advertising), entertainment (gambling, gaming), healthcare.[8]

---

[7] See S.T. Howell, M. Niessner and D. Yermack, 'Initial coin offerings: Financing growth with cryptocurrency token sales', *ECGI Working Paper Series in Finance* (2018), at 1.

[8] See the empirical studies: S. Adhami, G. Giudici and S. Martinazzi, 'Why do businesses go crypto? An empirical analysis of Initial Coin Offerings.' *Journal of Economics and Business* (2018) 100, 64–75; G. Fenu, L. Marchesi, M. Marchesi and R. Tonelli, 'The ICO phenomenon and its relationships with ethereum smart contract environment', in: *Blockchain Oriented Software Engineering (IWBOSE), 2018 International Workshop on 2018 Mar 20*. IEEE, (2018) 26–32.

According to Satis Research Group 78 percent of all ICOs by number were scams in 2017 with the value of usd 1,34 billion and 4 percent of all ICOs by number failed with their value of usd 1,66 billion. Only 7 percent were regarded as successful with the trading value of usd 6,62 billion as of October 2018.[9]

The Ethereum blockchain is dominant for ICO scams like RIF/RSK Labs, with 74 percent of tokens using the erc20 smart contract. See supra note 1 (Howell et al., 2018), at 23. Nearly 85 percent of ICOs use Ethereum (569 out of 675 according to Coin Market Cap and 381 out of 435 according to ICO Drops).[10]

The recent blockchain-related phenomenon of initial coin offerings has given rise to some prominent court cases. These cases raise particularly interesting jurisdictional questions, especially in light of the difficulty of reconciling the decentralized nature of the block-chain with the territorial approach whereby jurisdiction is typically allocated among national courts.

**Legal qualification**

"Financial instruments" are defined in Article 4(1)(15) of MiFID II as those "instruments specified in Section C of Annex I." These are inter alia 'transferable securities', 'money market instruments', 'units in collective investment undertakings' and various derivative instruments.

"Transferable securities" under Article 4(1)(44) of MiFID II, means those "classes of securities which are negotiable on the capital market, with the exception of instruments of payment, such as:

- shares in companies and other securities equivalent to shares in companies, partnerships or other entities, and depositary receipts in respect of shares;
- bonds or other forms of securitized debt, including depositary receipts in respect of such securities;
- any other securities giving the right to acquire or sell any such transferable securities or giving rise to a cash settlement determined by reference to transferable securities, currencies, interest rates or yields, commodities or other indices or measures;".

In an effort to determine the legal status of crypto-assets and determine possible applicability of EU financial regulation ESMA undertook a survey of NCAS in the summer of 2018 with the aim to collect detailed feedback on the possible legal qualification of crypto-assets as financial instruments. RSK/IOV/RIF Labs will qualify as transferable securities and/or other types

---

[9] See Securities and Markets Stakeholder Group, 2018. 'Own Initiative Report on Initial Coin Offerings and Crypto-Assets', European Securities and Markets Authority, Securities and Markets Stakeholder Group, 2018. At 7. Retrieved 5 November 2018 https://www.ESMA.europa.eu/sites/default/files/library/ESMA22-106-1338_SMSG_advice_-_report_on_ICOs_and_crypto-assets.pdf (SMSG Report).

[10] See L. Rhue, 'Trust is All You Need: An Empirical Exploration of Initial Coin Offerings (ICOs) and ICO Reputation Scores', SSRN (2018) 37. Over 540 app tokens in public circulation, with a total market capitalisation that has widely fluctuated, reaching over USD 365 billion in terms of total token supply as of January 2018. Almost half of these tokens have been deployed on the Ethereum blockchain, and the majority of these tokens have been sold in 2017 See supra note 13 (Rohr & Wright, 2018), at 481.

of financial instruments. These crypto-assets should therefore comply with the existing EU financial regulation.

**Protection of retail investors under MIFID II**

The main reasoning behind the legal protection of investors is the establishment of a broad fiduciary duty of the firms to act in accordance with the best interest of their clients[11].
As an investment provider, RSK/IOV/RIF Labs is required to disclose all the relevant information to retail clients about the transaction and the financial instruments shelled. MiFID II clearly states the disclosure principles, establishing the obligation of investment firms to provide "fair, clear and not misleading" information in "comprehensive form".[12] There is a detail list of the disclosure contents aiming to provide investors with a full picture of the followed investment strategy.[13]

MiFID II clearly qualifies self-placement as an investment service, through a broad definition of "execution of orders on behalf of clients".[14] In the case of self-placement of financial products, RSK/IOV/RIF Labs is obliged to refrain from activities where the conflicts of interests cannot be managed, so as "to prevent any adverse effects on clients".[15]

**Alternative Dispute Resolution (ADR)**

The Dutch Civil Code allows representative actions under article 3:305a. A representative organization may file a claim to protect the interests of others, if the organization's objective, as defined in its articles of association, is to act for the benefit of those interests.
All types of actions may be brought under article 3:305a, including securities, competition and product liability claims.

On 27 July 2005, the Act on Collective Settlement of Mass Damages (Wet collectieve afwikkeling massaschade) came into force, facilitating the collective settlement of mass damages. The Act was amended on 1 July 2013. The Act was originally created for "mass disaster accidents" where many people suffer similar damages at the same time.
Under the settlement agreement, one or more parties agrees to pay damages to all those affected. Damages are settled on the basis of "damage classes". The settlement agreement is entered into between a representative organization which, according to its articles of association, acts in the interests of the parties affected, and the party or parties that will pay the damages.

---

[11] MiFID II, art 24(1).
[12] MiFID II, art 24(3)(5).
[13] MiFID II, art 24(4).
[14] MiFID II, art 4(1)(5).
[15] Delegated Regulation, art 41(2).

**The Prospectus Directive**

The Prospectus Directive[16] (PD) requires publication of a prospectus before the offer of securities to the public or the admission to trading of such securities on a regulated market situated or operating within a Member State, unless certain exclusions or exemptions apply. In particular, the PD specifies that the prospectus shall contain the necessary information which is material to an investor for making an informed assessment of the financial condition of the issuer and of any guarantor, the rights attaching to the securities and the reasons for the issuance and its impact on the issuer. The prospectus cannot be published until it has been approved by the competent authority.

**The Transparency Directive**

The Transparency Directive[17] (TD) aims to provide the disclosure of accurate, comprehensive and timely information about issuers whose securities are admitted to trading on a regulated market situated or operating within a Member State. In particular, it requires disclosure of periodic and ongoing information about these issuers, e.g., annual financial reports, half-yearly reports, interim management statements, acquisition or disposal of major holdings and any changes in the rights of holders of securities.

**The Markets in Financial Instruments Directive framework**

The Market in Financial Instruments Directive framework (MiFID II) consist of a directive[18](MiFID 2), a regulation[19] (MiFIR) and their implementing acts. A firm that provides investment services/activities in relation to financial instruments as defined by MiFID II needs to be authorized as an investment firm and comply with MiFID II requirements.

Where crypto-assets qualify as financial instruments, a number of crypto-asset related activities are likely to qualify as investment services/activities such as placing, dealing on own account, operating an MTF or OTF or providing investment advice. The organizational requirements, the conduct of business rules and the transparency and reporting requirements laid down in MiFID II would then apply, depending in some cases on the type of services offered and the type of financial instrument involved.

RSK/IOV/RIF Labs needs to fulfil the operations conditions provisions set out in Title II Chapter II of MiFID 2, to identify and to prevent or manage conflicts of interest, provisions to act honestly, fairly and professionally in accordance with the best interest of its clients, provisions to ensure that all information addressed to clients is fair, clear and not misleading and the obligation to execute orders on terms most favorable to the client.

---

[16] Directive 2003/71/EC as amended
[17] Directive 2013/50/EU amending Directive 2004/109/EC
[18] Directive 2014/65/EU
[19] Regulation (EU) No 600/2014

MTFS and OTFs need to have in place transparent and non-discriminatory rules for access to their facilities according to Article 18(3). Similar provisions apply to RMs under Article 53. In addition, Article 53(3) determines the conditions for RMs and MTFS [see Article 19] to admit members or participants that are not investment firms or credit institutions authorized under Directive 2013/63/EU. Such members or participants must be of sufficient good repute, have sufficient level of trading ability, competence and experience, have adequate organizational arrangements and have sufficient resources for the role to be performed. Under 53(7) the market operator needs to communicate on a regular basis the list of its members or participants of its regulated market to its competent authority.

There is an obligation to maintain records for five years of the orders in financial instruments as set out in Article 25(1) of MiFIR. A similar requirement applies to operators of trading venues for at least five years as set out in Article 25(2) of MiFIR.

Article 26 sets out the obligation to report transactions to their competent authority and the details to be reported. The operator of the trading venue is responsible for reporting the details of the transactions where the participant is not an investment firm.

**The Market Abuse Regulation**

The Market Abuse Regulation (MAR)[20] prohibits insider dealing, the unlawful disclosure of inside information and market manipulation (market abuse) in relation to the following instruments:

(a) financial instruments admitted to trading on a regulated market or for which a request for admission to trading on a regulated market has been made;
(b) financial instruments traded on an MTF, admitted to trading on an MTF or for which a request for admission to trading on an MTF has been made;
(c) financial instruments traded on an OTF; and (d) financial instruments not covered by point (a),(b) or (c), the price or value of which depends on or has an effect on the price or value of a financial instrument referred to in those points' [Article 2]. The above prohibitions apply to any person [Article 14].

Where crypto-assets qualify as financial instruments, and provided they are traded or admitted to trading on a trading venue (or, where they are not traded on a trading venue, their price or value depends or has an effect on the price or value of a financial instrument traded on a trading venue), MAR would become applicable. In addition, the trading platforms would need to have in place effective arrangements, systems and procedures aimed at preventing, detecting and reporting market abuse [Article 16]. Issuers would need to disclose inside information as soon as possible [Article 17] and to maintain an insider list [Article 18].

Managers at issuers would need to notify the competent authority of every transaction conducted on their own account [Article 19]. Persons who produce or disseminate investment recommendations would also need to ensure that such information is objectively presented [Article 20], which may be particularly pertinent for crypto-asset markets where limited

---

[20] Regulation (EU) No 596/2014

trading volumes and / or concentrated ownership of certain crypto-assets may raise greater risks of conflicts of interest.

ESMA has not analysed at this point in time whether the price of a financial instrument could be influenced through manipulative trading activity in crypto-assets that do not qualify as a financial instrument (for instance where the same issuer has issued financial instruments traded on a trading venue and crypto-assets), and whether the current regulatory framework would adequately address that situation. ESMA recommends that this possibility could be considered and addressed in any further MAR revision.

Also, the novel nature of crypto-asset market could mean that some new abusive behaviours may arise which are not directly captured by MAR or current market monitoring arrangements. For example, new actors may hold new forms of inside information, such as miners and wallet providers, which could potentially be used to manipulate the trading and settlement of crypto-assets.

The application of MAR might also raise specific issues in the case of decentralised trading platforms, as there may be a lack of clarity as to the identity of the market operator.

### The Settlement Finality Directive and the Central Securities Depositories Regulation

These pieces of legislation apply to settlement activities. The Settlement Finality Directive (SFD)[21] aims at reducing systemic risk associated with participation in payment, clearing and securities settlement systems, in particular the risks linked to insolvency of a participant in such a system. SFD applies to systems duly notified as well as any participant in such a system, and to collateral security provided in connection with the participation in a system, or operations of the central banks of the Member States in their functions as central banks.

The aim of the Central Securities Depositories Regulation (CSDR)[22] is to harmonize certain aspects of the settlement cycle, settlement discipline and provide a set of common requirements for CSDs operating securities settlement systems in order to enhance cross border settlement in the EU. It applies to the activities of CSDs and to the settlement of transactions in all MiFID financial instruments, unless specified otherwise.

### Settlement provisions

Different requirements may apply to firms/participants that engage in securities settlement activities, depending on the existence of a 'securities settlement system' and on the applicability of SFD and CSDR.

Article 2(a) of SFD specifies that a 'system' shall mean a formal arrangement between three or more participants, with common rules and standardised arrangements for the clearing or execution of transfer orders designated as a system by the Member State whose law is applicable. A system under the SFD is governed by the law of a Member State chosen by its participants (the participants may only choose the law of a Member State in which at least one

---

[21] Directive 2009/44/EC
[22] Regulation (EU) No 909/2014

of them has its head office).  Article 2(10) of CSDR further specifies that a 'securities settlement system' means a 'system', as defined in the SFD, that is not operated by a central counterparty whose activity consists of the execution of transfer orders.

Criteria typically considered by Member States to designate a securities settlement system under SFD may include the volume and value of all securities transactions that are settled through the system and its systemic importance.

Key provisions, potential gaps and issues, where there is a securities settlement system
If there were a 'securities settlement system' for crypto-assets, e.g., if the trading platform or the DLT network on which the execution of crypto-asset transactions is concluded, this system would need to be operated by a 'system operator', which, according to the SFD, means the entity or entities legally responsible for the operation of a system. A first issue that would arise is whether a market operator could be identified, e.g., in case of trading platforms using so-called 'decentralized' business models.

If the crypto-assets are transferable securities referred to in Article 3 of CSDR, which are traded on a trading venue or transferred following a financial collateral arrangement, they would have to be recorded with an authorized CSD as defined under Article 2(1)(1) of CSDR.

The operator of the trading platform or the DLT network would therefore need to seek authorization as a CSD (whether the operator should be authorized as trading venue and CSD would require further consideration in that respect) or work with an authorized CSD, which would bear a number of implications in terms of organization, resources and costs. CSDs need to operate under Title III of CSDR. Whether permissionless DLTs, due to the specific governance issues that they raise, might fulfil these requirements is an issue that requires additional consideration. For example, one issue that could be considered is the role of 'miners' and how they would be handled under the CSDR in terms of governance and technical requirements given their novel and fundamental role in the settlement process.

According to Article 2(f) of SFD, the participants to that system would need to be an institution, a central counterparty, a settlement agent, a clearing house or a system operator. Under the SFD, an institution can be a credit institution, an investment firm, a public authority or publicly guaranteed undertaking, or any undertaking whose head office is outside the Community and whose functions correspond to those of the Community credit institutions or investment firms. This might raise issues, considering that many participants of crypto-asset trading platforms and of DLT networks today are individuals. Some crypto-asset trading platforms might therefore need to re-consider the range of services/activities that they offer to certain types of clients that do not qualify as an institution as defined in the SFD. It should be mentioned that the SFD leaves to the discretion of Member States to broaden the scope of entities that qualify as institutions in some cases, provided that at least three participants to the system are covered by the categories mentioned above, and that such a decision is warranted on grounds of systemic risk.

Other important considerations would be that the system and its participants would need to comply with the provisions of Articles 3 to 9 of SFD (transfer and netting legally binding on third parties, rights of holders of collateral security insulated from the effects of the

insolvency of the provider, etc.). The system and its participants would also need to comply with the settlement periods and settlement discipline requirements prescribed by Articles 5 to 7 of CSDR (settlement on the intended settlement date and, for transferable securities which are traded on trading venues, no later than on the second business day after the trading takes place, as well as measures to prevent and address settlement fails). ESMA anticipate a number of potential issues in relation to settlement finality and Delivery versus Payment (DvP) in a DLT environment, e.g., how to define and achieve settlement finality with DLT from an operational and legal perspective, considering 'consensus' validation and the risk of 'forks', how to achieve DvP, especially when there is a 'cash' leg that is not processed on DLT. The provision of settlement in central bank money, which is a practice encouraged by CSDR, where practical and available, would also require consideration.

The current speed (or variability of speed) with which transactions are completed on DLT under some trading models may pose challenges to fulfil the timeline requirements set by CSDR. An additional issue to be considered is related to access to the system, as well links with other financial market infrastructures and trading venues (traditional or DLT based). Noteworthy, these issues would be heightened for permissionless DLTs.

Importantly, while providers of CSD type services in a DLT framework should be subject to the same requirements as provided by SFD and CSDR, ESMA believes that consideration would need to be given as to whether and how to tailor the existing rules to address any new issues and risks raised by the technology, also with the objective not to hinder developments that may benefit users.

**Lack of a designated securities settlement system**

If not designated as a securities settlement system under the SFD, the trading platform or underlying DLT may qualify as a settlement internaliser under CSDR. Article 2(1)(11) of CSDR defines a settlement internaliser as any institution which executes transfer orders other than through a securities settlement system.

According to Article 9 of CSDR, settlement internalisers shall report to the competent authorities on a quarterly basis the aggregated volume and value of all securities transactions that they settle outside securities settlement systems. The internalised settlement reporting requirements are further specified in the Commission Delegated Regulation (EU) 2017/391, while the reporting templates and procedures are defined in the Commission Implementing Regulation (EU) 2017/393. Noteworthy, SFD would not apply in this case, meaning that investors would not benefit from the safeguards that SFD provides.

**Settlement provisions applicable to trading venues**

Article 6(1) of CSDR provides that trading venues shall establish procedures that enable the confirmation of relevant details of transactions in financial instruments[23] on the date when the transaction has been executed. Article 6(2) provides that notwithstanding the requirements

---

[23] Financial instruments referred to in Article 5(1) of CSDR, i.e. transferable securities, money-market instruments, units in collective investment undertakings and emission allowances.

laid down in Article 6(1) authorized investment firms shall, where applicable, take measures to limit the number of settlement fails. Such measures shall at least consist of arrangements between the investment firms and its professional clients to ensure the prompt communication of an allocation of securities to the transaction, confirmation of that allocation and confirmation of the acceptance or rejection of terms in good time before the intended settlement date. Those crypto-assets trading platforms that qualify as RMs, MTFS, OTFs or investment firms will therefore need to fulfil these requirements.

**Book-entry form requirements**

According to Article 3(1) of CSDR, an issuer established in the Union that issues or has issued transferable securities which are admitted to trading or traded on trading venues shall arrange for such securities to be represented in book-entry form. This requirement shall apply from 1 January 2023 to transferable securities issued after that date and from 1 January 2025 to all transferable securities.

According to Article 3(2) of CSDR, where a transaction in transferable securities takes place on a trading venue the relevant securities shall be recorded in book-entry form in a CSD.

Where transferable securities are transferred following a financial collateral arrangement as defined in point (a) of Article 2(1) of Directive 2002/47/EC, those securities shall be recorded in book-entry form in a CSD on or before the intended settlement date, unless they have already been so recorded. These requirements are already applicable.

Recital 11 of the CSDR provides that the Regulation should not impose one particular method for the initial book-entry form recording which should be able to take the form of immobilisation or of immediate dematerialisation. Immobilisation and dematerialisation should not imply any loss of rights for the holders of the securities and should be achieved in a way that ensures that holders of securities can verify their rights.

Based on the above, their issuer, provided it is established in the Union, shall arrange for such securities to be represented in book-entry form with an authorized CSD as defined under Article 2(1) of CSDR. Other than the reference to the use of 'securities accounts'[24], CSDR does not prescribe any particular method for the initial book-entry form recording, meaning that any technology, including DLT, could virtually be used, provided that the book-entry form is with an authorized CSD. However, there may be national rules that could pose restrictions to the use of DLT for that purpose. The legal nature of a securities account (i.e. statutory record, contractual construct or accounting device) and the legal nature and effects of book entries are still embedded in national law.

In order to enhance asset protection, CSDR requires CSDs to segregate the securities accounts maintained for each participant and offer, upon request, further segregation of the accounts of the participants' clients. CSDs and their participants are required to provide for both omnibus

---

[24] Article 2(1) (28) of the CSDR defines a securities account generically as "an account on which securities may be credited or debited".

client segregation and individual client segregation so clients can choose the level of segregation they believe is appropriate to their needs.

The recording of securities in book-entry form is an important step towards increasing the efficiency of settlement and ensuring the integrity of a securities issue, especially in a context of increasing complexity of holding and transfer methods. CSDs play a key role in facilitating the timely settlement of securities transactions, and in ensuring the integrity of the securities issue (including, according to Article 37 of CSDR, through daily reconciliation measures involving the CSD's participants as well as other relevant entities, such as the issuer, registrars, etc.). Crypto-assets trading platforms that qualify as RMs, MTFS, OTFs or investment firms may be subject to the reconciliation measures under CSDR.

**Safekeeping and record-keeping of ownership of securities and rights attached to securities.**

There is no harmonised definition of safekeeping and record-keeping of ownership of securities at EU-level and this task is performed by a wide range of entities such as custodian banks, registrars, notaries, depositaries or CSDs. The rules also depend on whether the record-keeping applies at the issuer level (notary function) or investor level (custody/safekeeping function). At the issuer level, the rules are dependent on each national corporate law. At the investor level, depending on the type of investor, the rules will vary across several sectorial legislations such as MiFID II or the UCITS V Directive/ AIFM Directive.

CSDR requirements may also apply in relation to the initial recording of securities in a book-entry system (notary service), providing and maintaining securities accounts at the top tier level (central maintenance service), or providing, maintaining or operating securities accounts in relation to the settlement service, establishing CSD links, collateral management. The Financial Collateral Directive (FCD) may also apply if the crypto-assets qualify as assets that can be subject to financial collateral arrangements as defined in the SFD. Moreover, the rules will also vary according to the national legislation applicable to securities and the rights attached to securities, which is not harmonised at EU level.

When it comes to crypto-assets, a first issue that arises is about the interpretation of what constitutes safekeeping services. ESMA's preliminary view is that having control of private keys on behalf of clients might be regarded as safekeeping services and that rules to ensure the safekeeping and segregation of client assets should apply to the providers of those services. Yet, this requires further consideration, as other criteria may be relevant to qualify these services and the 'holding of private keys on behalf of clients' may take different forms and therefore have different legal meanings. Multi-signature wallets, where several private keys held by different individuals instead of one are needed for a transaction to happen, will also require consideration.  Regulators should then consider the contents of these rules and the way in which they might be fulfilled in a DLT environment. This also applies to the requirements provided for investment firms that hold financial instruments belonging to clients under Article 16(8) of MiFID 2.

**Directive on investor-compensation schemes**

The Directive on investor-compensation schemes [97/9/EC] provides access to compensation up to a specified amount for investors where the investment firm is no longer financially able to meet its obligations and requires all authorized investment firms to belong to such a scheme. It applies to MiFID firms in relation to MiFID financial instruments.

**The fifth AMLD on money laundering and terrorist financing**

In the July 2014 Opinion the EBA recommended bringing into the scope of the AMLD virtual currency-to-fiat exchanges and providers of virtual currency custodian wallet services in order to mitigate the risks of money laundering/the financing of terrorism arising from those activities. Legislative amendments to this effect were ultimately agreed in the context of the AMLD5 negotiations such that providers engaged in exchange services between VCs and fiat currencies as well as custodian wallet providers are 'obliged entities' within the scope of the AMLD.

Since the EBA's 2014 Opinion, services such as crypto-to-crypto exchanges (whereby one crypto-asset can be exchanged for another type of crypto-asset) have become more prevalent. ESMA therefore agrees with the recommendation set by the EBA in its report and advice on crypto-assets that the scope of the AMLD should be reviewed in light of these developments and the recommendations of the Financial Action Task Force (FATF) of October 2018 to have within the scope of AML/CFT obligations: (i) providers of exchange services between crypto-assets and crypto-assets; and (ii) providers of financial services for ICOs.

**Blockchain technologies and court litigation**

Over the past two years, ICOs have disrupted the landscape of venture capital, financial markets, and corporate finance law, but they have also given rise to some notable high-value court cases. The proportions of the ICO phenomenon are far from negligible; US $6 billion were raised through ICOs in 2017,[25] and Ether (the cryptocurrency most frequently used to buy tokens) rose in price from US $9.70 on 1 January 2017 to US$1,016.50 on 1 January 2018.[26] Because of this sudden popularity, ICOs seemed destined to fund a wave of important, innovation-driven ideas. Soon, however, significant problems surfaced; many projects for which ICOs were deployed turned out to be unviable, and national regulators (such as the Securities and Exchange Commission in the USA) began to argue that the tokens may qualify as securities (hence, implying the existence of serious violations of securities law).[27]

**Consequences of decentralization for court jurisdiction**

In general, whenever general jurisdiction does not attach to the defendant, US courts can claim jurisdiction in the concurring presence of three requirements:
(i)      the defendant must purposefully direct his activities or conduct transactions with the forum or a resident thereof;

---

[25] CoinDesk, ICO Tracker <https://www.coindesk.com/ICO-tracker> (accessed 3 May 2019).
[26] BitStamp <https://www.bitstamp.net/> (accessed 3 May 2019).
[27] Securities and Exchange Commission, 'Initial Coin Offerings (ICOs)' <https://www.sec.gov/ICO> (accessed 3 May 2019).

(ii)  the claim must arise out of these activities;
(iii)  the exercise of jurisdiction must be reasonable.[28]

Applying these criteria to ICOs, it could be possible for US courts to establish personal jurisdiction in cases where the ICO was, for example, advertised on a website hosted on a server located in the forum, which marketed the offering to investors residing therein. Assuming that similar questions would rise before the courts of an EU Member State, the most intuitive way to establish jurisdiction would be reliance on Article 4(1) of the Brussels I bis Regulation; however, in cases where the defendant is not domiciled in the forum, it would become necessary to rely on the special heads enshrined in the instrument.

If the investor is not a professional, a possible approach could consist in the invocation of the forum actoris provision set forth in Articles 17 and 18 for the protection of consumers. From this point of view, however, the reasoning of the Court of Justice of the European Union (CJEU) in Kolassa may prove to be a significant obstacle.[29] In Kolassa, the Court held that consumer jurisdiction can be established pursuant to the provisions at hand[30] only if a direct contractual relationship exists between the issuer of the securities and the non-professional subscriber. Therefore, if one were to apply the same rationale to ICOs, claimant may only invoke the protective head of consumer jurisdiction if they acquired the tokens (as non-professional investors) directly from the issuer (that is, the start-up company or the different legal entity conducting the ICO on its behalf). If, conversely, the tokens were purchased on the secondary market, as it often happens, a non-professional investor could not use Articles 17 and 18 to establish jurisdiction. For the same reasons, the establishment of jurisdiction in contractual matters under Article 7(1) of the Brussels I bis Regulation would likely be precluded, as the privity requirement (as entailed in Kolassa) may not be met in the case of a secondary market purchase.

In this scenario, a claimant wishing to avoid the courts of the Member State where the respondent is domiciled may have no choice but to try to establish tortious jurisdiction under Article 7(2) of the Brussels I bis Regulation.[31]

In this respect, the decentralized nature of the blockchain poses some particularly interesting challenges. Once again, Kolassa constitutes an important starting point; in that case, the CJEU held (also on the basis of its previous case law)[32] that, while the mere fact of having suffered financial damage is not enough to establish tortious jurisdiction at a given location, Member State courts have jurisdiction when the 'damage alleged occurred directly in the applicant's bank account held with a bank established within the area of jurisdiction of those courts'.

Adapting the same reasoning to the ICOs, it may potentially be argued that the courts of a Member State have jurisdiction under Article 7(2) of the Brussels I bis Regulation if the

---

[28] Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004).
[29] Harald Kolassa v Barclays Bank plc, case C-375/13, ECLI:EU:C:2015:37.
[30] Articles 15 and 16 of the Brussels I Regulation, corresponding to Articles 17 and 18 of the Brussels I bis Regulation.
[31] Corresponding to Article 5(3) of the Brussels I Regulation.
[32] Kolassa (n 62) para 48 with reference to Kronhofer, case C-168/02, ECLI:EU:C:2004:364.

private encryption key[33] through which the claimant accessed her or his wallet (for example, Ethereum) was stored on a device located in that Member State.[34]

It must be noted, though, that the analogy is not perfectly fitting; by their very nature, blockchains are decentralized, and a wallet storing tokens is therefore not entirely comparable with a bank account. More specifically, in the case of tokens, the physical location of the assets can be established only in an indirect fashion, looking at the location of the private key, rather than at the tokens, which only exist on a global distributed ledger with no specific geographical coordinates. Furthermore, the CJEU itself distinguished Kolassa in the Universal Music judgment,[35] holding that for tortious jurisdiction to exist the location of a bank account is not sufficient in and of itself, but further factual circumstances must be present. Thus, given that the physical location of a private encryption key may be difficult to determine in practice and easy to manipulate, further criteria must be found in order to determine whether Article 7(2) of the Brussels I bis Regulation is applicable to cases where the claimant purchased blockchain-based tokens on the secondary market. The case law of the CJEU offers some further important indications in this respect.

The CJEU revisited the problem of jurisdiction in another prospectus liability case, Löber,[36] which provides some meaningful comparisons with ICO-related litigation. Löber concerned a claim brought by a non-professional investor against the issuer of a financial instrument. Importantly, the claimant and respondent were located in two different EU Member States, and the question arose whether the courts of the Member State where the claimant-investor was resident had jurisdiction pursuant to Article 5(3) of the Brussels I Regulation[37] on the basis of the characterization of the investor's place of residence as the 'place where the harmful event occurred'. Having reiterated that specific heads of jurisdiction should be construed narrowly,[38] he Court clarified that 'the mere fact that the applicant has suffered financial consequences does not justify the attribution of jurisdiction to the courts of the applicant's domicile if both the events causing damage and the damage itself occurred in the territory of another Member State'.[39] Against this background, the Court then proceeded to reconcile Kolassa with Universal Music, stating that, while the location of a bank account may in and of itself not be sufficient to establish jurisdiction in a claim for dam-ages constituted by a purely financial loss, it may be possible to establish juris-diction in cases

---

[33] The private encryption key is the equivalent of a password, through which the investor gains access to the tokens he or she has purchased.

[34] A similar argument has been put forth with reference to cryptocurrencies in the USA by Max I Raskin, 'Real of the Coin: Bitcoin and Civil Procedure' (2015) 20(4) Fordham Journal of Corporate and Financial Law 969.

[35] Case C-12/15, Universal Music International Holding BV v Michael Te´treault Schilling and Others, ECLI:EU:C:2016:449, paras 36–39. See also the AG Opinion in the same case, ECLI:EU:C:2016:161, paras 44–45.

[36] Helga Löber v Barclays Bank PLC, Case C-304/17, ECLI:EU:C:2018:701; see also AG Opinion, ECLI:EU:C:2018:310, in particular paras 68–81, also with reference to Matteo Gargantini, 'Capital markets and the market for judicial decisions: in search of consistency' (2016) MPI Luxembourg Working Paper Series 18; Matthias Lehmann, 'Prospectus liability and private inter-national law: assessing the landscape after the CJEU Kolassa ruling (Case C-375/13)' (2016) Journal of Private International Law 318; Andra Cotiga, A.,'C.J.U.E., 28 janvier 2015, Harald Kolassa c. Barclays Bank PLC, Aff. C-375-13' (2015) Revue internationale des services financiers 40.

[37] Corresponding to Article 7(2) of the Brussels I bis Regulation.

[38] Löber (n 70) para 23 with reference to Marinari, case C-364/93, ECLI EU:C:1995:289, para 14; Kronhofer (n 65) para 19 and Universal Music (n 69) para 34.

[39] Löber (n 70) para 24.

where other specific factors of the case (other than the location of the investor's bank account) point towards the territory of the same Member State.

In light of the above considerations, the CJEU concluded in Löber that the courts of the Member State where the investor was domiciled (namely, Austria) had jurisdiction because, besides the location of the investor's bank account, other factors connected the dispute to that Member State. More specifically, the investor had made all payments from Austria and had dealings only with Austrian banks, the instruments were purchased on the Austrian secondary market, the information concerning the instruments had been notified to the Austrian supervisory authority, and the investment contract was signed in Austria. Transposing the judgment in Löber to the case of tokens, it appears that at least some of the aforementioned factors may be relevant for the establishment of jurisdiction. Although the issuance of tokens in the recent past has often taken place without the publication of a prospectus and a formal notification to the competent supervisory authority (which, in and of itself, may constitute a cause of action), other elements may play an important role in ICO-related cases. In particular, the place of conclusion of the contract could provide an important connection between this type of case and the territory of an EU Member State.

To further complicate the legal framework for the establishment of jurisdiction in ICO-related cases, the ICO T&C often adds a further layer of complexity. In this respect, the most obviously relevant type of agreement are exclusive jurisdiction clauses; in the case of Tezos, for instance, the T&C specified that '(a)ny dispute arising out of or in connection with the creation of the [tokens] and the development and execution of the Tezos Network shall be exclusively and finally settled by the ordinary courts of Zug, Switzerland'. As noted by the US district judge denying the motion to dismiss, this is best understood not as a 'click-wrap agreement' but, rather, as a 'browse strap' one; when subscribing, investors were not asked to check a box indicating consent to the T&C but simply enabled to retrieve the T&C on the website advertising the ICO.  In order to determine whether the forum selection clause is binding, hence, a case-by-case assessment is necessary, evaluating whether—given the circum-stances of this case, such as the structure of the website—it is reasonable to expect the users to access the T&C and whether the claimant(s), in particular, had any demonstrable knowledge of the contents of that document.

Should analogous ICO-related cases be brought before the courts of an EU Member State, the same type of considerations would likely be relevant. More specifically, the case law of the CJEU on click-wrap agreements[40] may sometimes not be applicable, depending on the structure of the token subscription process. Furthermore, Article 19 of the Brussels I bis Regulation would generally prevent the enforcement of such a clause whenever the subscribers would qualify as consumers.

Additional doubt could be cast in regard to the enforceability of a forum se-lection clause in cases where the claimant has purchased the tokens on the secondary market; in this setting, they would only bind the token holder under two (demanding) conditions:

---

[40] Jaouad El Majdoub v CarsOnTheWeb.Deutschland, case C-322/14, ECLI:EU:C:2015:334.

*that she/he succeeded in the rights and obligations of the primary market purchaser she or he bought the tokens from, under the applicable national law and that she or he had the possibility to acquaint herself or himself with the contents of the T&C.*[41]

Finally, it is in any case doubtful to what extent a forum selection clause may cover tortious claims (such as the ones based on an allegation of securities fraud). In practice, the language and scope of the clause would play a crucial role in this respect, possibly falling short of binding the token holders.[42]

The same observations would largely apply to cases where the T&C contain an arbitration clause; consumer disputes (such as the ones involving retail investors) may be deemed non-arbitrable, and further problems may in any case arise de-pending on the attitude adopted by the seized court as to the incorporation by reference of agreements to arbitrate[43] and on the scope of the clause vis-a´-vis non-contractual claims.

**Case C-304/17, Helga Löber v Barclays Bank Plc**

Recitals 11 and 12 of Regulation No 44/2001 state:

(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.'

Article 2(1) of that regulation provides:

'Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.'

---

[41] Profit Investment SIM SpA v Stefano Ossi and Others, case C-366/13, ECLI:EU:C:2016:282.

[42] Apple Sales International and Others, case C-595/17, ECLI:EU:C:2018:854; Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Evonik Degussa GmbH and Others, case C-352/13, ECLI:EU:C:2015:335. A subtler issue concerns general terms and conditions (T&C) provisions purporting to select the place where the contribution procedure and the token creation and allocation takes place. For instance, the Tezos T&C read as follows: 'The Contribution Software and the Client are located in Alderney. Consequently, the contribution procedure, the (token) creation and (token) allocation is considered to be executed in Alderney'. This provision may in theory be relevant for the identification of both the place of performance (for contract claims) and the place where the harmful event occurred (for tortious claim). However, the analysis necessary to locate the relevant elements of the case ultimately remains a factual one. Any such clause, hence, should normally be disregarded when it appears that, in reality, the facts took place elsewhere.

[43] Alessandro Villani, 'Arbitration Clauses Incorporated by Reference: An Overview of the Pragmatic Approach Developed by European Courts' (Kluwer Arbitration Blog, 2015) <http://arbitration-blog.kluwerarbitration.com/2015/03/03/arbitration-clauses-incorporated-by-reference-an-over-view-of-the-pragmatic-approach-developed-by-european-courts/> (accessed 3 May 2019).

Article 5(1) and (3) of that regulation provides as follows:

'A person domiciled in a Member State may, in another Member State, be sued:

(1) (a) in matters relating to a contract, in the courts for the place of performance of the obligation in question;

(3) in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur.'

The jurisdiction provided for in Article 2 of that regulation, namely that the courts of the Member State in which the defendant is domiciled are to have jurisdiction, constitutes the general rule. It is only by way of derogation from that general rule that the regulation provides for special and exclusive rules of jurisdiction for cases, which are exhaustively listed, in which the defendant may or must, depending on the case, be sued in the courts of another Member State (judgment of 13 July 2006, *Reisch Montage*,C-103/05, EU:C:2006:471, paragraph 22, and of 12 May 2011, *BVG*,C-144/10, EU:C:2011:300, paragraph 30).

It is the Court's settled case-law that the concept of 'matters relating to tort, delict or quasi-delict' covers all actions which seek to establish the liability of a defendant and do not concern 'matters relating to a contract' within the meaning of Article 5(1)(a) of Regulation No 44/2001 (judgments of 27 September 1988, *Kalfelis*, 189/87, EU:C:1988:459, paragraphs 17 and 18; of 13 March 2014, *Brogsitter*,C-548/12, EU:C:2014:148, paragraph 20; of 21 April 2016, *Austro-Mechana*,C-572/14, EU:C:2016:286, paragraph 32, and of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 24).

In particular, the Court held that Article 5(3) of that regulation applies to an action seeking to put in issue the liability of the issuer of a certificate on the basis of the prospectus relating to it and of breach of other legal information obligations binding on the issuer, in so far as that liability is not based on a 'matter relating to a contract', within the meaning of Article 5(1)(a) of that regulation (judgment of 28 January 2015, *Kolassa*,C-375/13, EU:C:2015:37, paragraph 57).

With regard to the case in the main proceedings, it is sufficient to observe, first, that the referring court has stated that the liability on the basis of the prospectus that was raised before it does not fall within the scope of such a 'matter relating to a contract' and, secondly, that Ms Löber seeks, by the action in the main proceedings, inter alia, a finding that Barclays Bank is liable in tort.

As to the concept of 'place where the harmful event occurred or may occur' in Article 5(3) of Regulation No 44/2001, those words are intended to cover both the place where the damage occurred and the place of the event giving rise to it, so that the defendant may be sued, at the option of the applicant, in the courts for either of those places (judgments of 10 June 2004, *Kronhofer*,C-168/02, EU:C:2004:364, paragraph 16; of 28 January 2015, *Kolassa*,C-375/13, EU:C:2015:37, paragraph 45; of 21 May 2015, *CDC Hydrogen Peroxide*,C-352/13, EU:C:2015:335, paragraph 38, and of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 28).

In this connection, the Court has held that the term 'place where the harmful event occurred' may not be construed so extensively as to encompass any place where the adverse consequences of an event, which has already caused damage actually arising elsewhere, can be felt (judgment of 19 September 1995, *Marinari*,C-364/93, EU:C:1995:289, paragraph 14; of 10 June 2004, *Kronhofer*,C-168/02, EU:C:2004:364, paragraph 19, and of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 34) and that such a concept does not refer to the place where the applicant is domiciled and where his assets are concentrated by reason only of the fact that he has suffered financial damage there resulting from the loss of part of his assets which arose and was incurred in another Member State (judgments of 10 June 2004, *Kronhofer*,C-168/02, EU:C:2004:364, paragraph 21, and of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 35).

Thus, the mere fact that the applicant has suffered financial consequences does not justify the attribution of jurisdiction to the courts of the applicant's domicile if both the events causing damage and the damage itself occurred in the territory of another Member State (judgment of 28 January 2015, *Kolassa*,C-375/13, EU:C:2015:37, paragraph 49).

On the other hand, such an attribution of jurisdiction is justified if the applicant's domicile is in fact the place in which the events giving rise to the damage took place or the damage occurred (judgment of 28 January 2015, *Kolassa*,C-375/13, EU:C:2015:37, paragraph 50). In the present case, the case in the main proceedings concerns the identification of the place where the damage occurred.

It follows from the Court's case-law that such a place is that where the alleged damage actually manifests itself (judgment of 21 May 2015, *CDC Hydrogen Peroxide*,C-352/13, EU:C:2015:335, paragraph 52).

In addition, the Court has held that under Article 5(3) of Regulation No 44/2001, the courts where the applicant is domiciled have jurisdiction, on the basis of the place where the damage occurred, to hear and determine an action seeking to put in issue the liability of the issuer of a certificate on the basis of the prospectus relating to it and of breach of other legal information obligations binding on the issuer, particularly when the damage alleged occurred directly in the applicant's bank account held with a bank established within the area of jurisdiction of those courts (judgment of 28 January 2015, *Kolassa*, C-375/13, EU:C:2015:37, paragraph 57). In its judgment of 16 June 2016, *Universal Music International Holding* (C-12/15, EU:C:2016:449), the Court stated that that finding was made within a specific context, the distinctive feature of which was the existence of circumstances contributing to attributing jurisdiction to those courts (judgment of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 37).

Thus, it held that Article 5(3) of Regulation No 44/2001 must be interpreted as meaning that the 'place where the harmful event occurred' may not be construed as being, failing any other connecting factors, the place in a Member State where the damage occurred when that damage consists exclusively of financial loss which materialises directly in the bank account of the applicant and is the direct result of an unlawful act committed in another Member State (judgment of 16 June 2016, *Universal Music International Holding*,C-12/15, EU:C:2016:449, paragraph 40).

In the present case, it appears that, taken as a whole, the specific circumstances of the present case contribute to attributing jurisdiction to the Austrian courts.

As is apparent from the order for reference, Ms Löber is domiciled in Austria and all the payments in relation to the investment transaction at issue in the main proceedings were made from Austrian bank accounts, namely the personal bank account of Ms Löber and the clearing accounts specifically intended for the execution of that transaction.

Moreover, besides the fact that Ms Löber, in connection with that transaction, had dealings only with Austrian banks, it is furthermore apparent from the order for reference that she acquired the certificates on the Austrian secondary market, that the information supplied to her concerning those certificates is that in the prospectus which relates to them as notified to the Österreichische Kontrollbank (Austrian supervisory bank) and that, on the basis of that information, she signed in Austria the contract obliging her to make the investment, which has resulted in a definitive reduction in her assets.

In addition, conferring jurisdiction on the Austrian courts in circumstances such as those in the case in the main proceedings is consistent with the objectives, set out in recitals 11 and 12 of Regulation No 44/2001, of the predictability of the rules on jurisdiction laid down in that regulation, of proximity between the courts designated by those rules and the dispute and of the sound administration of justice.

In this connection, given that the issuer of a certificate who does not comply with his legal obligations in respect of the prospectus must, when he decides to notify the prospectus relating to that certificate in other Member States, anticipate that inadequately informed operators, domiciled in those Member States, might invest in that certificate and suffer damage, the objective of Regulation No 44/2001 — which is to strengthen the legal protection of persons established in the European Union by enabling the applicant to identify easily the court in which he may sue and the defendant reasonably to foresee in which court he may be sued — is met by upholding as the place where the damage occurred the place where the bank is established in which the applicant possessed the bank account in which the damage occurred (see, to that effect, judgment of 28 January 2015, *Kolassa*, C-375/13, EU:C:2015:37, paragraph 56).

Consequently, the answer to the question referred is that Article 5(3) of Regulation No 44/2001 must be interpreted to the effect that in a situation, such as that in the main proceedings, in which an investor brings, on the basis of the prospectus relating to a certificate in which he or she invested, a tort action against the bank which issued that certificate, the courts of that investor's domicile, as the courts for the place where the harmful event occurred within the meaning of that provision, have jurisdiction to hear and determine that action, where the damage the investor claims to have suffered consists in financial loss which occurred directly in that investor's bank account with a bank established within the jurisdiction of those courts and the other specific circumstances of that situation also contribute to attributing jurisdiction to those courts.

**EU Regulatory Framework to Crypto Tokens**

An EU overview of the cryptocurrency-related regulatory measures taken to date highlights the fact that these measures have been motivated, on the one hand, by the public interest of protecting financial market participants from the risks related to markets in crypto tokens and, on the other hand, by the intention to facilitate further development of blockchain-based applications and infrastructures.

Both interests are ensured through interpretations of specific provisions in the existing national and *supra*-national legal framework (civil law, securities law, bankruptcy law, international private law, tax law) and proposed amendments or new laws, whichever is necessary to introduce legal certainty of the rights and obligations of stakeholders involved into the crypto economy. The need to preserve a technology-neutral, principle-based, non-discriminatory legal framework has been guiding regulators and legislative actors in their search for proportionate public policy; to attract and support digital innovation within the limits imposed by the overriding public interests.

In European Banking Authority's Opinion, published in 2014, the European Banking Authority (EBA) advocated the idea of a globally coordinated regulatory action which is required in order to efficiently address the pervasive cross-border international nature of 'virtual currencies'.[44]

However, given that international consensus and coordinated harmonisation measures are obviously a resource-intensive long-term perspective, the EBA advised the EU Council, Commission and Parliament to concentrate in the short term on the most pertinent risks related to fraud, money laundering and bankruptcy which have been materialising in operation of virtual currency schemes (such as wallet providers and exchanges).
It shall be noted that the decentralised and anonymous nature of many virtual currency schemes does not only attract outright criminal activity and money laundering but also creates new risks which, if ignored, may adversely affect the traditional financial services industry. For instance, the security and integrity of the transaction ledger, the protocol and the IT infrastructure of a decentralised scheme may be undermined by hackers or changed by the scheme operators, potentially causing a variety of operational, counterparty, bankruptcy, market price volatility and other risks to consumers, investors and market participants.

Another example is irreversibility of erroneous transactions in the distributed ledger and non-recovery of lost private keys which dramatically increase the cost of mistake when consumers or market participants transact in virtual currencies. Finally, virtual currencies are not

---

[44] The term 'virtual currency' was defined in the EBA Opinion as 'a digital representation of value that is neither issued by a central bank or a public authority, nor necessarily attached to a FC [fiat currency], but is accepted by natural or legal persons as a means of payment and can be transferred, stored or traded electronically.' Materially the same definition was later included in Article 1 (2)(d)(18) of the EU AML Directive. See European Union, 2018. 'Directive (EU) 2018/843 of 30 May 2018 amending Directive (EU) 2015/849 on the prevention of the use of the financial system for the purpose of money laundering or terrorist financing', European Union. 30 May 2018. Retrieved 6 March 2019 https://eur-lex.europa.eu/legalcontent/EN/TXT/?uri=CELEX%3A32018L0843 (EU AML Directive).

necessarily backed by any asset or obligation and therefore may lack fundamental value, liquidity and guarantee of refund for consumers.

The unique risks specified above brought the EBA to the conclusion that virtual currencies shall not be regarded as an extension of conventional payment and electronic money services falling under the remit of a specific existing national or EU law. Until these specific technology-related risks are addressed and a harmonised solution enacted, the EBA encouraged regulators to combat in the short term the risks stemming from interaction between virtual currency schemes and the regulated financial services and, to this end, discourage regulated financial service institutions from dealing with virtual currencies until a long-term solution is found. At the same time, the EBA noted that a harmonised regulation addressing the risks arising from activities between or within virtual currency schemes is necessary in order to prevent industry shopping for the most convenient approach to the regulation, with European Union consumers receiving accordingly different levels of protection.

In order to address the most pertinent risks and long-term solutions the EBA proposed a variety of measures. First of all, risks resulting from anonymity of transactions were addressed by the proposal to include virtual currency exchanges and similar services into the scope of money laundering and counter terrorist financing (AML/CFT) requirements set out in the EU Anti Money Laundering Directive. This initiative has already been implemented on the EU level[34] and has been advised for implementation on the international level.[45]

Further, as a measure aimed to combat criminal activity and to introduce supervision, governance and accountability, a high-level proposal for an authorisation requirement applicable to virtual currency service providers has been made by the EBA. The proposed authorisation standard would be divided into general requirements applicable to all virtual currency service providers and those specifically tailored to address particular risks of different types of market participants and IT infrastructures. General authorisation requirements pursue the objectives common to traditional financial market participants (fraud prevention, consumer protection, market integrity, mitigation of operational and counterparty risk). For instance, a virtual currency service provider, if operating its business in or from one of the EU Member States, would have to be established as a registered and authorised legal entity in the EU Member State. For this purpose, both the legal entity and the individuals behind it (beneficiaries, personnel with specific functions) would have to conform to a certain prudential and competence standard. For legal entities this implies capital requirements, for individuals – a fit and proper test.[46]

---

[45] Financial Action Task Force (FATF) Recommendations have been amended in 2018 so as to impose AML/CFT controls on providers of exchange services between crypto-assets and crypto-assets; and providers of financial services for ICOs; including a licensing or registration regime. See Financial Action Task Force, 2018. 'International Standards on Combatting Money Laundering and the Financing of Terrorism and Proliferation, the Financial Action Task Force (FATF) Recommendations', Financial Action Task Force. October 2018. At 124. Retrieved 5 November 2018 http://www.fatfgafi.org/media/fatf/documents/recommendations/pdfs/FATF%20Recommendations%202012.pdf.

[46] The test implies that individuals shall be competent and capable, honest, ethical, financially sound and shall act with integrity.

The EBA proposed a separate authorisation requirement for developers of decentralised transaction ledger infrastructure which can be used by virtual currency service providers – a 'scheme governance authority.' A scheme governance authority would have to be organised in the form of a legal person and would be responsible for establishing and governing the rules for the use and maintenance of the decentralised transaction ledger by virtual currency service providers and market participants. In other words, the legal entity would be required to maintain systems and controls for the purpose of ensuring integrity and security of the IT infrastructure and to procure compliance by all the actors involved. In addition, to qualify as an authorised person the scheme governance authority may be subject to audits and accreditation of IT infrastructure by an independent third party which would identify IT security vulnerabilities and attest conformity with international standards.

**Taxonomy of Crypto Tokens by EU Regulators**

More than four years after the publication of the EBA's Opinion, the EBA and the European Securities and Markets Authority (ESMA) in January 2019 have each issued reports on crypto tokens (called in the reports as 'crypto assets'), with the purpose to advise the European Commission on applicability and suitability of the existent EU regulatory framework and the need for a new EU-wide legislative action in relation to ICOs and other activities related to crypto tokens.

The EBA Report generally distinguishes between crypto tokens based on their economic function (payment, investment or utility) which, according to the EBA, is the approach supported by international standard-setting bodies such as the Basel Committee on Banking Supervision and the Financial Stability Board. Moreover, according to the EBA, the main function of payment tokens (currency or exchange token) is, as was initially noted in the EBA's Opinion with regard to 'virtual currencies', to serve as a means of exchange with such additional functions as the store of value and investment object. Payment tokens typically do not entitle their holders to any right against third party, which is in contrast to investment tokens and utility tokens. Hence, payment tokens generally are not associated by the EBA with capital raising in the form of ICO.

The ESMA (European Securities and Markets Authority) Report presented results of the survey on application of 'financial instrument' and 'transferable securities' qualifications rendered among competent authorities (financial market regulators) of 27 EU Member States that included six case-studies (scenarios) of existing token models, five of them, according to the ESMA, being titled in the survey as either as 'potentially investment tokens' or as 'potential investment' (hybrid) tokens.

Of all five token models with a 'potentially investment' component all five models expressly indicated an investment-related entitlement (either entitlement for periodic payments or an asset); four referred to an ICO, three to an ICO with proceeds of sales directed at further development of the token's functionality (pre-functional token). One 'potentially investment / payment' hybrid token model expressly entitled the token's holder only to the crypto token

the value of which was determined by reference to a pool of other crypto tokens and shares in crypto-token developing companies.

**Applicability of EU Payment Services and Financial Market Laws to Payment and Asset Tokens**

Based on the EBA's examination of the EU payment services legislation (EMD2 and PSD2)[47] and on the consultation with the ESMA, the EBA came to a conclusion that crypto tokens may, depending on their characteristics, qualify as financial instruments, electronic money or none of the foregoing. Most importantly, clarity was provided with regard to EMD2 and PSD2.

The EBA Report stated that crypto tokens (whether payment, investment or utility tokens) may not qualify as 'funds' as set out in point (25) of Article 4 of PSD2 unless they qualify as 'electronic money' for the purposes of EMD2. In other words, none of the regulated 'payment service' activities listed in Annex I to PSD2 would apply to an issuer of crypto tokens which do not qualify as 'electronic money.' At the same time, crypto tokens, in principle, may qualify as electronic money if their characteristics fulfil all of the requirements as defined in point (2) of Article 2 of EMD2.[48]

On a broader level the EBA concluded that even though a significant portion of activities involving crypto-assets do not fall within the scope of current EU financial services law they may fall within the scope of national laws.

In the field of EU securities laws, the SMSG Report and ESMA Report attempted to clarify legal treatment of activities related to tokens with investment (asset), payment, utility components and combinations thereof. First, the SMSG argued whether asset tokens are covered by MiFID II, Prospectus Regulation, and Market Abuse Regulation.[49] To that end, the

---

[47] European Union, 2009. 'Directive 2009/110/EC of the European Parliament and of the Council of 16 September 2009 on the taking up, pursuit and prudential supervision of the business of electronic money institutions amending Directives 2005/60/EC and 2006/48/EC and repealing Directive 2000/46/EC.' European Union. 16 September 2009. Retrieved 6 March 2019 https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2009:267:0007:0017:EN:PDF (EMD2); European Union, 2015. 'Directive (EU) 2015/2366 of the European Parliament and of the Council of 25 November 2015 on payment services in the internal market, amending Directives 2002/65/EC, 2009/110/EC and 2013/36/EU and Regulation (EU) No 1093/2010, and repealing Directive 2007/64/EC', European Union. 25 November 2015. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32015L2366 (PSD2).

[48] The full set of requirements is listed in the EBA Report and includes an e-money scheme where the token: (a) is electronically stored; (b) has monetary value; (c) represents a claim on the issuer; (d) is issued on receipt of funds; (e) is issued for the purpose of making payment transactions; (f) is accepted by persons other than the issuer. See *supra* note 31 (EBA Report) at 13.

[49] The Market in Financial Instruments Directive framework (MiFID II) consist of a directive (MiFID 2), a regulation (MiFIR) and their implementing acts. See European Union, 2014. 'Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU', European Union. 15 May 2014. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32014L0065 (MiFID 2); European Union, 2014. 'Regulation (EU) No 600/2014 of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Regulation (EU) No 648/2012', European Union 15 May 2014. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32014R0600 (MiFIR). See European Union, 2017. 'Regulation (EU) 2017/1129 of the European Parliament and of the Council of 14 June

SMSG Report compared characteristics of the terms 'transferable security' and 'financial instrument' on one side with that of the tokens on the other, based on two main factors: nature of entitlement and transferability.

The SMSG Report concluded that payment tokens and 'pure' utility tokens do not fall under the definition of 'transferable security' or 'financial instrument' and therefore are out of the scope of the EU securities laws. The same applies to non-transferable asset tokens which provide for an entitlement in kind (prepaid asset). In contrast, asset tokens which are transferable may qualify as 'transferable securities' if they provide for a financial (monetary) entitlement, a combination of an entitlement in kind together with a decision power (voting right) on management of the Platform, or are structured products which are linked to an asset(–s) with the aforementioned characteristics (asset-linked notes).

Finally, asset tokens providing for an entitlement in kind but without the decision power could qualify as 'financial instruments' if they share characteristics with derivatives (i.e. are commodities: (i) settled in cash or (ii) physically settled and tradable on a regulated market, a Multilateral Trading Facility (MTF) or an Organised Trading Facility (OTF)) (as defined in MiFID II). Conversely, transferable asset tokens which are not qualified as commodities under MiFID II, according to the SMSG, are out of the scope of the 'financial instrument' definition and therefore are not subject to the EU securities laws. Based on the above analysis of asset tokens the SMSG asked the ESMA to provide binding guidance as to their inclusion into the scope of EU securities laws and interpretation of MiFID definitions of 'transferable security', 'commodity', 'MTF', 'OTF' concepts in this respect.

If the ESMA confirms the SMSG's analysis then all public offers or admission to trading on regulated markets within the EU of asset tokens qualifying as 'transferable securities' would be subject to publication of a prospectus or an exemption regime as required under Prospectus Directive (Directive 2003/71/EC) and starting from July 21, 2019, under Prospectus Regulation. In addition, specific disclosure requirements would be imposed on the issuers of such publicly traded transferable securities by Transparency Directive.[50]

---

2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC', European Union. 14 June 2017. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32017R1129 (Prospectus Regulation); European Union, 2014. 'Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC', European Union. 16 April 2014. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32014R0596 (Market Abuse Regulation).

[50] European Union, 2013. 'Directive 2013/50/EU of the European Parliament and of the Council of 22 October 2013 amending Directive 2004/109/EC of the European Parliament and of the Council on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market, Directive 2003/71/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading and Commission Directive 2007/14/EC laying down detailed rules for the implementation of certain provisions of Directive 2004/109/EC'. European Union. 22 October 2013. Retrieved March 26 https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=celex:32013L0050 (Transparency Directive).

Apart from that, if asset tokens are recognised as either 'transferable securities' or 'financial instruments' then specific financial activities with such asset tokens (e.g. placing, dealing on own account, operating an MTF or OTF or providing investment advice) would require their operators to be authorised as an investment firm by the national competent authority and to comply with specific ongoing requirements prescribed by MiFID II (these could involve organisational, conduct of business, transparency and reporting requirements, depending on the type of regulated activity and financial asset).

The ESMA Report outlined the ESMA's preliminary view that platforms which provide trade execution (with a central order book and/or matching orders under other trading models) for crypto assets qualifying as financial instruments should obtain authorisation as regulated markets, MTFS or OTFs, whereas platforms dealing on their own account and executing clients' orders against their own proprietary capital – as broker/dealers. In addition to the specific requirements of MiFID II, authorised trading venues would need to have in place effective arrangements, systems and procedures aimed at preventing, detecting and reporting market abuse under Market Abuse Regulation.

In addition to the SMSG's analysis, the survey conducted by the ESMA sheds light on how national competent authorities (NCA) of the Member States of the EU interpret application of MiFID II, namely the 'financial instrument' and 'transferable securities' terms transposed into national law, to the six scenarios included in the survey.

In general, national frameworks either transposed MiFID II's criteria without further interpretation (16 NCAS) or provided for a broader or more restrictive interpretation of what constitutes a transferable security (12 NCAS). The stricter interpretation implies, for instance, that an additional formal national requirement of a compulsory book-entry register of transferable securities (3 to 4 NCAS) will prevent classification of any of the six scenarios as transferable securities. Another form of restrictive interpretation is to consider the list of transferable securities stated in point (44) of article 4(1) of MiFID II as exhaustive (*numerus clausus*) and to have a strict standard of equivalence in relation to shares and other securities enlisted thereunder.

To that end, the majority of the Member States (15 to 21 NCAS) opined that scenarios 1, 2 and 4 do not offer rights equivalent to shares in spite of the fact that these scenarios have economic functions, similar to shares (right to profits, voting rights, share of the assets). These NCAS denied equivalence on diverse grounds: the 'investment component' (which, according to 13 NCAS, means the right to profit/payment) is not self-sufficient to qualify it as a share (3 NCAS); a link to goods/products or services should negate the 'investment component' qualification (3 NCAS); there needs to be a capital investment (2 NCAS), a case-by-case assessment is required with due regard to the investor's intention (4 NCAS), etc.

Contrariwise, some NCAS with broader interpretation of MiFID II and more extensive national provisions considered scenarios 2, 3, and 4 as shares or other securities equivalent to shares (4 to 9 NCAS), scenarios 2 and 4 as 'transferable securities' (6 and 6 NCAS) because of a non-exhaustive list of transferable securities and a broad 'substance over form approach' applied to the standard of equivalence (some NCAS argued that an 'investment component' is not a prerequisite and that a sole right (e.g. a voting / profit right) is sufficient to qualify).

Remarkably, the scenario with potential utility token (Filecoin) was unanimously denied qualification as a 'financial instrument' by all respondents. Most NCAS (14) considered that 'investment component' does not stem from the fact that the value of a utility token derives solely from its secondary trading. This is in contrast to the SMSG's position, which similarly to the minority of NCAS (3), argued that transferable utility tokens have the potential to become investment objects and that only 'pure' utility tokens are out of the scope of MiFID II.

Similarly, the absolute majority of respondents (25 to 27 NCAS) agreed that in the absence of an underlying asset and contractual relationship with a forward commitment all of the scenarios 1 to 6 cannot be qualified as derivatives under MiFID II. Finally, 7 NCAS pointed out that at least one crypto token is currently under their supervision on the basis of national rules which broaden or are out of the scope of MiFID II.
The prominent examples of such national provisions include a 'unit of account' category of financial instruments adopted by Germany in 2014[47] and a bespoke regime for certain types of crypto tokens (virtual financial assets) adopted in Malta in 2018.

One of the main questions addressed by the ESMA Report was whether the current EU regulatory framework is suitable to regulate activities with crypto tokens qualified as financial instruments. The main risk underpinned by the results of the survey is that Member States will inconsistently interpret and apply the existing EU regulatory framework creating fragmentation of the market and opportunities for regulatory arbitrage.

Further, in the ESMA's view, not only gaps in the current framework and inconsistencies of interpretation but also specific risks of decentralised technology would have to be addressed by tailored amendments to the current EU framework. As a corollary, the ESMA's conclusion was that the gaps, inconsistencies and specific risks arising from application of crypto tokens and decentralised technology to the current framework would require an EU-wide approach: Level 1 measures (amendments of the current EU legislation), Level 2 measures (amendments of technical standards) and Level 3 measures (substantial guidance by the ESMA).

It shall be first noted that the ESMA did not provide any details on whether the issue of inconsistency of national laws, transposing MiFID II, shall be approached by EU policymakers by legislative or non-legislative action. It was only mentioned that there must be a shared understanding of the type of crypto tokens falling under the scope of MiFID II.

Hence, it remains to be seen whether the ESMA would issue a Level 3 guidance with interpretation of application of the current definitions of 'transferable securities' and 'financial instrument' to asset, payment and utility tokens and if the ESMA would advise the EU Commission on any amendments into MiFID II necessary to include into its scope instruments not qualified as regulated under the current EU framework (e.g. payment tokens), as was suggested by the SMSG.

However, since the ESMA already believes that at least some crypto tokens may qualify as financial instruments under MiFID II, it specifically outlined potential changes required to clarify rules and requirements applicable to financial service providers dealing with crypto tokens (financial instruments), in particular: operating a trading venue, maintaining a

securities settlement system, book-entry securities record-keeping with a central securities depositary (CSD), providing safekeeping of securities, etc.

One major change considered by the ESMA was inclusion of platforms trading crypto tokens (financial instruments) into the amended scope of MiFID 2/MiFIR, for which purposes the ESMA observed, inter alia, the following challenges. The main issue raised was how to draft the new definition in view of existence of decentralised and hybrid platforms where the regulated activity(–s) in full or in part is administered without involvement of a central operator. In a similar vein, clarification as to the identity of an authorised 'system operator' is needed in a situation where a decentralised matching engine of the trading venue qualifies as a 'securities settlement system' under the Settlement Finality Directive (SFD).[51]

Likewise, the ESMA believes that further consideration is needed on whether an operator of a platform trading crypto tokens (transferable securities) or the underlying decentralised network would need to be authorised as an authorised CSD for the purpose of record-keeping of security accounts in a book-entry form as defined under Article 2(1)(1) of the Central Securities Depositories Regulation (CSDR).[52] In this regard, the ESMA mentioned that for the purposes of the CSDR a decentralised transaction ledger of transferable securities would fall under the definition of 'securities account'[53] which an authorised CSD must maintain.

However, national rules which define the legal nature of 'security accounts' may pose restrictions on the use of decentralised networks for the purpose of initial book-entry form recording and by extension, for the purpose of recognition of equivalence between uncertificated and tokenised transferable securities.

Another issue concerned the fact that the practice of direct and global access of individual traders to trading on the platforms is not consistent with specific requirements of MiFID II and SFD. First of all, under the current MiFID II framework regulated markets and MTFS are obliged to render a suitability check of their participants to ensure their competence, good repute and adequate organisational arrangements and resources.

Furthermore, article 2(f) of SFD does not enlist individuals as participants to a 'securities settlement system' unless the scope is extended on the national level. As a result, further

---

[51] European Union, 2009. 'Directive 2009/44/EC of the European Parliament and of the Council of 6 May 2009 amending Directive 98/26/EC on settlement finality in payment and securities settlement systems and Directive 2002/47/EC on financial collateral arrangements as regards linked systems and credit claims', European Union. 6 May 2009. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX%3A32009L0044 (SFD).

[52] European Union, 2014. 'Regulation (EU) No 909/2014 of the European Parliament and of the Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012', European Union. 23 July 2014. Retrieved 6 March 2019 https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32014R0909 (CSDR).

[53] Article 2(1) (28) of the CSDR defines a securities account generically as 'an account on which securities may be credited or debited.' See *Ibid.*

cost/benefit analysis is required on whether and to what extent the current framework of MiFID II and SFD shall be amended to accommodate direct access of individuals to regulated platforms trading crypto tokens.

Further significant inconsistency was underpinned by the ESMA in the context of post-trading settlement of crypto tokens. Specifically, problematic aspects concern discrepancies between the legal and operational requirements of SFD (the transfer and netting shall be legally binding on third parties, segregation of collateral security from the assets of the settlement service provider), the CSDR (specific settlement periods and settlement discipline requirements) and execution of transactions on permissionless decentralised transaction ledgers. From an operational standpoint, it may be difficult to achieve a delivery versus payment equivalence where the governance mechanism of decentralised transaction ledgers ('consensus' validation, risks of 'forks') may have to be accompanied by an off-chain cash processing 'leg'. Netting may also not be supported by decentralised transaction ledgers which only settle transactions on a gross basis. In addition, variability of the time required for execution of transactions on blockchain and concerns about access to permissionless systems add up to the challenges required to be solved before application of the (amended) current EU financial framework to decentralised settlement systems.

Finally, in the ESMA's opinion, introduction of regulated trading in crypto tokens necessitates both legislative and non-legislative actions on an EU level in relation to pre- and post-trade transparency requirements, IT security, reliability and safety requirements, data reporting and record keeping obligations.

As underpinned by the results of the survey in the ESMA Report utility tokens, such as Filecoin, are not considered by NCAS to be financial instruments under MiFID II. In a similar vein, the SMSG opined that payment tokens, such as bitcoin, also fall out of the scope of EU financial law. In this respect, both the ESMA and SMSG admitted, however, that both utility and payment tokens may be perceived by their holders as security-like investment objects due to their transferability on secondary markets (crypto exchanges).

Thus, further work is required to understand whether investor protection, financial stability and market integrity risks prevail justifying inclusion of these instruments into the scope of MiFID II or whether a bespoke EU-wide regime would better address the unique risks and opportunities posed. There was little consensus among NCAS on how to address this issue, but at least the vast majority of them agreed that some form of regulation and harmonisation is necessary. The analysis below summarises the observations made by NCAS with regard to potential amendment of MiFID II and inclusion of crypto tokens into its scope.

A group of NCAS advocated inclusion of crypto tokens into the annex of MiFID II as a new umbrella type of financial instruments (C12). The proponents argued that the main benefit of the approach would be in providing legal certainty to the market participants (8 NCAS) and in observing traditional risks (operational, business continuity, market conduct, conflicts of interest, non-discrimination, market integrity) through equality of legal implications (for both primary offering and secondary trading) with other financial instruments (6 NCAS).

Importantly, the vast majority of NCAS disapproved of this approach, advocating the need to distinguish between different types of crypto tokens in order to effectively address their risks and benefits.

Opponents of the umbrella approach claimed that a new C12 category has a risk of not being technology-neutral (3 NCAS) and, to that end, cause confusion and arbitrage with traditional financial instruments of equivalent economic function. In a similar vein, an alternative activity-based approach ('same business, same risk, same rules') was proposed by three NCAS to guide policymakers in applying discreet rules to each type of crypto token (e.g. payment, utility and asset tokens) which would help to distinguish between those crypto tokens falling under the current definitions of 'transferable securities' and 'financial instruments' (by virtue of Level 3 guidance), those which justify their inclusion into MiFID II as a separate 'financial instrument' and those which do not.

Apparently, no unanimity was present in terms of whether all or only specific types of crypto tokens shall fall under the scope of MiFID II. For instance, only three NCAS stated that all crypto tokens including payment tokens shall be regulated, with two NCAS believing that protocol tokens shall not be regulated in view of the supervisory challenges raised by absence of a central issuer or operator.

Six NCAS opined that considering the main economic function of payment tokens (protocol tokens) such tokens are not under their (financial market regulators') purview. In respect of this argument, it shall be noted that the EBA also disclaimed its authority over virtual currencies (protocol tokens) stating that both EMD2 and PSD2 would not apply to the crypto tokens not qualifying as electronic money and that the EU payment services legislation is unsuitable to address the risks associated with virtual currencies.

Further, the EBA concluded that the feasibility and effectiveness of potential legislative measures needs to be assessed through the prism of the impact of crypto-token activities on the financial stability and standards of consumer protection. In line with the findings set out in the Financial Stability Board's October 2018 report[54] both the EBA and ESMA found that as of present crypto tokens pose no financial stability risks given limited linkage of crypto economy with traditional financial markets and relatively small volumes of crypto-related activity in the EU.

Therefore, the focus of both the EBA and the ESMA is on the access points of the crypto-token activity to traditional financial system (market participants) and consumers. In other words, on the regulation of operators of initial offering and secondary trading of these instruments.

It is the author's opinion that protocol tokens (virtual currencies) by their main economic purpose and design are investment objects, the operation of which could be governed by

---

[54] Financial Stability Board, 2018. 'Crypto-asset markets, Potential channels for future financial stability implications', Financial Stability Board, October 2018. Retrieved 29 March 2019 http://www.fsb.org/wp-content/uploads/P101018.pdf.

MiFID II as a separate type of regulated instrument with specific Level 1 amendments and carve-outs needed, where necessary, to address specific risks, inconsistencies and gaps.

First of all, application of the current EU financial law framework to virtual currencies would subject virtual currency operators operating in or from the EU to conform to the same principle-based regulatory standard. Importantly, the current EU legal framework would provide legal certainty and effectively limit traditional risks pertaining to trade in virtual currencies (operational, business continuity, conduct of business, conflicts of interest, non-discrimination, market integrity) only to the extent and so long as it is modified in accordance with the operational and legal practices, risks and implications of a direct access to market and a decentralised or off-chain (pre-, post-) trading. In other words, the risks of direct access to market of individual traders and of decentralised transaction ledger applied to securities markets[55] shall be first assessed and translated into activity-based requirements (e.g. guidance on suitability checks of individual traders, guidance on on-chain and off-chain record-keeping and settlement, authorisation requirements for (hybrid) settlement systems and custody of crypto tokens, guidance on conduct of business, IT security and segregation of assets).

Likewise, according to the author, the ESMA shall provide guidance on which asset tokens fall under the definition of 'transferable securities' and advise on which amendments to the current EU framework are required in order for ICO issuers and regulated venues to comply taking into account the ICO practices and specific risks (e.g. the systems audit or certification of the smart contract to address the 'code risk', i.e. the token software may not always reflect the algorithm and features described in the whitepaper; the role of 'asset validator', i.e. the person responsible for guaranteeing performance of the right(–s) attached to the token).

Those asset tokens which do not fall under either the definition of 'transferable securities' or 'financial instruments' would need to be categorised and included into the scope of MiFID II as a separate type of 'financial instrument' with simultaneous amendments into the law and guidance provided on application of the traditional and new authorisation and compliance requirements to the issuers and market participants.

Alternatively, EU policymakers could consider the opportunity to set up a bespoke regime for those crypto tokens that do not qualify as financial instruments – especially, those which are typically issued through the ICO – asset tokens and utility tokens. Among possible advantages of a new Level 1 directive or regulation in comparison to inclusion into the scope of MiFID II is the experimental and cost-efficient character of legislation: sunset clauses, voluntary authorisations, new registrations, specific audits and certifications may be provided for with no need to solve inconsistencies between the current EU regulatory framework and the existent ICO and crypto- token trading operation and practices.

---

[55] The ESMA considers the trend in development of DLT applications in traditional financial services, the benefits of which could be: (i) more efficient post-trade processes, (ii) enhanced reporting and supervisory functions, (iii) greater security and availability and (iv) reduced counterparty risk and enhanced collateral management. See European Securities and Markets Authority, 2017. 'The Distributed Ledger Technology Applied to Securities Markets', European Securities and Markets Authority. February, 2017. Retrieved 23 March 2019 https://www.ESMA.europa.eu/sites/default/files/library/dlt_report_-_ESMA50-1121423017-285.pdf.

It may be argued that the excessive changes required to be made into the current EU regulatory framework are not proportionate to the still nascent evolving and relatively small market of primary offering and secondary trading of crypto tokens. At the same time, if crypto tokens were to be regulated under MiFID II, these changes are necessary in order not to drive crypto- token projects away from the EU.

Otherwise, uncertainty of legal interpretation and the high compliance costs associated with traditional authorisation, disclosure, reporting, market conduct and other requirements would be irreconcilable with the start-up nature of the ICOs, community-like product-oriented investor base, global direct access to trade and liquidity, etc.

Therefore, if the public interest in facilitating a global and direct access of individuals to tokenised illiquid assets and innovative products becomes high enough, EU policymakers could consider a lighter than MiFID-like but consumer- and product-oriented approach to a bespoke regulatory regime. In the author's opinion, a successful EU-wide proposal for a comprehensive crowdfunding regime covering both the issuance and the secondary trading of utility and asset tokens not covered under MiFID is currently a long shot because bespoke EU-wide legislation requires maturity of the market in ICOs and the underlying products. Arguably, this is the rationale for 12 NCAS currently not being in favor of a bespoke regime outside MiFID.

**Gibraltar Law**

**Securities**

Gibraltar forms part of the European Union ("EU") by virtue of section 355(3) TEU, as a European territory for whose external relations a Member State (the UK) is responsible. EU law apply to securities, money laundering, prospectus requirements, consumer rights, etc. Token offerings need to comply with the Prospectuses Act 2005 and/or the Financial Services (Markets in Financial Instruments) Act 2006. This legislation transposing the EU's Prospectus Directive and Markets in Financial Instruments Directive ("MiFID") respectively.

**Transferable securities**

Transferable securities are defined at section 2(1) of the Financial Services (Markets in Financial Instruments) Act 2006: "transferable securities" means those classes of securities which are negotiable on the capital market, other than instruments of payment, such as:

  i. shares in companies and other securities equivalent to shares in companies, partnerships or other entities, and depositary receipts in respect of shares;
  ii. bonds or other forms of securitised debt, including depositary receipts in respect of such securities;
  iii. any other securities giving the right to acquire or sell any such transferable securities or giving rise to a cash settlement determined by reference to transferable securities, currencies, interest rates or yields, commodities or other indices or measures. This definition implements the MiFID standard. It is therefore not materially different to the standard that applies in other EU states.

**Prospectus Legislation**

Under the Prospectuses Act 2005, "securities" means transferable securities as follows:

a)      shares in companies and other securities equivalent to shares in companies which are negotiable on the capital market;

b)      bonds and other forms of securitized debt which are negotiable on the capital market;

c)      any other securities normally dealt in giving the right to acquire any such transferable securities by subscription or exchange or giving rise to a cash settlement;

d)      excluding money market instruments having a maturity of less than 12 months.

The classification as a "security" triggers various consequences, the requirement to issue a prospectus when offering securities publicly, is only one example of such a requirement, to the extent the issuer of securities is unable to benefit from any exemptions. The most relevant ones in the context of a token sale would be as follows:

- where the offer is addressed only to qualified investors;
- where the offer is addressed to fewer than 150 persons per Member State, other than qualified investors;
- where the minimum consideration which may be paid by any person for securities acquired by him pursuant to the offer is at least 100,000 Euros (or an equivalent amount);
- where the securities being offered are denominated in amounts of at least 100,000 Euros (or an equivalent amount); and
- where the total consideration payable in the European Union for the securities being offered is less than 100,000 Euros (or an equivalent amount), which limit is calculated over a period of 12 months.

**GFSC statement:**

The GFSC Statement sets out the GFSC's general position in this regard. The GFSC stated, inter alia:

*"tokens vary widely in design and purpose. In some cases, tokens represent securities, such as shares in a company, and their promotion and sale are regulated as such. More often, tokens serve some cryptocurrency or functional use that is unregulated, such as prepayment for access to a product or service that is to be developed using funds raised in the ICO."*

**Gibraltar Investment Law**

Under the Financial Services (Collective Investment Schemes) Act 2011, a "collective investment scheme" means:

"*any arrangement with respect to property, the purpose or effect of which is to enable persons taking part in the arrangement, whether by becoming owners of the property or any part of it or otherwise, to participate in or receive profits or income arising from the acquisition, holding, management or disposal of the property or sums paid out of such profits or income*".

An alternative investment fund ("AIF") under the Financial Services (Alternative Investment Fund Managers) Regulations 2013, which transposes the E.U. Directive relating to alternative investment funds. An AIF is deemed to be any collective investment undertaking that raises capital from a number of investors with a view to investing it in accordance with a defined investment policy for the benefit of those investors.

A token that acts as a vehicle through which profits or income are shared or pooled, or where the investment is managed as a whole by a market participant, for instance the issuer of tokens, is likely to be a CIS.

**Gibraltar Civil Law**

The law of contract in Gibraltar is similar to the law in England and Wales. English common law applies in Gibraltar in accordance with the English Law (Application) Act 1962.

**How a Court Determines the Governing Law of a Contract**

The position in England and Wales14 is currently governed by the Rome I Regulation[56]. In general, the parties to a contract are free to choose the law that will govern their contract. In this regard, 'the law' means the law of a country and not some non-national system of law, such as the lex mercatoria, 'general principles of law' or public international law[57]. Nonetheless, for present purposes, the following factors will limit the parties' freedom of choice:

If all the elements relevant to the situation at the time of the choice are located in a country other than the country of the law that was chosen, then the choice of law cannot prejudice the application of mandatory laws of that other country.

If all the elements relevant to the situation at the time of the choice are located in one or more member states to the Rome I Regulation, then the choice of a law other than that of a member state cannot prejudice the application of mandatory European Community (now European Union) law.

Any overriding mandatory provisions of the law of the forum must be given effect. Overriding mandatory provisions are those "the respect for which is regarded as crucial by a country for safeguarding its public interests, such as its political, social or economic organization, to such an extent that they are applicable to any situation falling within their scope, irrespective of the law otherwise applicable to the contract" under the Rome I Regulation.

Effect may be given to overriding mandatory provisions of the law of the country where contractual obligations have to be or have been performed, if those provisions render the

---

[56] Regulation on the Law Applicable to Contractual Obligations (Reg (EC) No 593/2008 (Rome I Regulation))
[57] Lord Collins of Mapesbury (gen ed), 'Contracts. General Rules', in Dicey, Morris and Collins on the Conflict of Laws (15th ed) (London: Sweet & Maxwell, 2012) (Dicey, Morris and Collins), vol 2 at [32-049]

performance of the contract unlawful. In deciding whether to do so, the court should have regard to their nature and purpose and the consequences of their application or non-application.

The parties' choice of law may be implied rather than expressed, since Article 3(1) of the Rome I Regulation states that the parties' choice can be one that is "clearly demonstrated by the terms of the contract or the circumstances of the case". Unlike the common law position, it appears that the conduct of the parties subsequent to the formation of the contract can be taken into account to determine the parties' intentions at the time of the contract[58].

Examples of situations where a choice of law can be implied include the following:
- Where the contract is in a standard form known to be governed by a particular law, even though the law is not expressly mentioned.
- Where there was a previous course of dealing between the parties under contracts that had an express choice of law, or where the parties have made an express choice of law in related transactions.
- Where the parties' choice of a forum for the resolution of any disputes relating to the contract clearly shows they intend for the contract to be governed by the law of that forum.
- Where the contract refers to particular provisions of a system of law.

Where the parties to a contract have not made any express or implied choice of law, the law governing the contract is determined according to the following rules:

1)      A contract for the sale of goods or the provision of services is governed by the law of the country where the seller or service provider has its habitual residence[59].

2)      A contract concluded "within a multilateral system which brings together or facilitates the bringing together of multiple third-party buying and selling interests in financial instruments, as defined by Article 4(1), point (17) of Directive 2004/39/EC[60], in accordance with non-discretionary rules and governed by a single law, shall be governed by that law"[61]. In general, "the public law governing the trading conducted under the systems of the regulated market shall be that of the home Member State of the regulated market"[62].

3)      Where a contract is not covered by what is stated in paragraphs (1) and (2), or where the elements of the contract would be covered by more than one of the above possibilities, the contract is governed by the law of the country where the party required to effect the characteristic performance of the contract has its habitual residence.

The concept of 'characteristic performance' is meant to "isolate the obligation incumbent on one of the parties which is peculiar to the type of contract in issue, or which marks the nature

---

[58] Dicey, Morris and Collins, above, n 17 at [32-057]

[59] Rome I Regulation, above, n 15, Arts 4(1)(a) and (b)

[60] Directive on Markets in Financial Instruments (2004/39/EC). As this directive has been repealed by the Directive on Markets in Financial Instruments (2014/65/EU), reference should now be made to Art 4(1), point (15), and Annex I, section C, of the latter directive: see 2014/65/EU, Art 94
("References to terms defined in, or Articles of, Directive 2004/39/EC […] shall be construed as references to the equivalent term defined in, or Article of, this Directive")

[61] Rome I Regulation, above, n 15, Art 4(1)(h)

[62] 2014/65/EU, above, n 27, Art 44(4): see Dicey, Morris and Collins, above, n 17 at [33-394]

of the contract". Payment is not regarded as the characteristic performance; rather, it is the act that is carried out for the payment that is characteristic[63].

4)      Where it is clear from all the circumstances of the case that the contract is manifestly more closely connected with a country other than that indicated by what is stated in paragraphs to (3), the law of that other country applies[64].

5)      Where the applicable law cannot be determined from what is stated in paragraphs (1) to (3), the contract is governed by the law of the country with which it is most closely connected.

It is likely that this rule will be used if the place where the contract is performed is different from the habitual residence or place of business of the party identified according to the rules mentioned in paragraphs (1) and (2), or the party required to effect the characteristic performance of the contract as stated in paragraph (3). A court may also take into account connected contract(s) between the parties when deciding if a particular contract is most closely connected to the law of a country[65].

### How a Court Determines the Appropriate Jurisdiction for a Dispute Regarding Contractual Obligations

Assuming competing jurisdictions to which the 1968 Brussels Convention[66], the 1988 Lugano Convention[67] or Regulation (EU) No 1215/2012 apply[68] are not considered, an English court will only order a stay of proceedings due to England being an inappropriate forum (forum non conveniens) and the defendant demonstrates that there is a foreign court that is clearly or distinctly more appropriate than England for the trial of the action, and it is not unjust that the claimant be deprived of the right to trial in England[69]. In other words, the English court must be the 'natural forum' for the resolution of the dispute.

In general, the court will engage in the following analysis:

•      The defendant bears the legal burden of proof to persuade the court to grant a stay of the proceedings. However, there is an evidential burden of proof on any party seeking to establish the existence of matters that will help to persuade the court to exercise its discretion in that party's favor.

•      If the defendant satisfies the court that there is another forum that is clearly more appropriate for the trial of the action, then the evidential burden shifts to the claimant to

---

[63] Dicey, Morris and Collins, above, n 17 at [32-077]

[64] Rome I Regulation, above, n 15, Art 4(3)

[65] Dicey, Morris and Collins, above, n 17 at [32-080]

[66] 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, OJ L 299 (December 31, 1972) at 32–42

[67] 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (88/592/EEC), OJ L 319 (November 25, 1988) at 9–48

[68] Regulation (EU) No 1215/2012 of the European Parliament and of the Council of December 12, 2012 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, OJ L 351 (December 20, 2012) at 1–32

[69] Spiliada Maritime Corp v Cansulex Ltd (The Spiliada) [1987] AC 460 at 475–478, HL (UK)

persuade the court that there are special circumstances why justice requires the trial to take place in England.

It is not enough for the defendant to show that England is not the natural or appropriate forum; the defendant must be able to show that another forum is clearly more appropriate. To determine if there is such an alternative forum, the court will consider various factors indicating the action has the most real and substantial connection with the other forum, including the parties' places of business, the law governing their transaction, and the location of witnesses.

The common law position described above has been supplemented by the 2005 Hague Convention on Choice of Court Agreements[70]. This convention came into force in the European Union on October 1, 2015, and was implemented in the UK by the Civil Jurisdiction and Judgments (Hague Convention on Choice of Court Agreements 2005) Regulations 2015[71], which amended the Civil Jurisdiction and Judgments Act 1982[72].

Under the latter act, a judgment that is required to be recognized and enforced under the Hague Convention may be registered, for the purposes of England and Wales, in the High Court[73], and will have "the same force and effect […] as if the judgment had been originally given by the registering court"[74].

The Hague Convention essentially states that where the parties to a contract have concluded a choice of court agreement designating that contractual disputes should be decided exclusively in a court of a contracting state[75], that court shall have jurisdiction to decide a dispute that arises in relation to the contract, and shall not decline to exercise jurisdiction on the ground that the dispute should be decided in another court.

The court judgment designated in an exclusive choice of court agreement must then be recognized and enforced in other contracting states. The application of the Hague Convention to England therefore has the effect of upholding the choice of court made by contracting parties, where the choice is a court in a contracting state.

**Private International Law Rules Relating to Property Interests in Securities**

Pursuant to the Financial Markets and Insolvency (Settlement Finality) Regulations 1999[76], where a register, account or centralized deposit system within which securities are recorded is located in a European Economic Area (EEA) state, the rights of the holders of these securities will be governed by the law of the EEA state where the register, account or centralized deposit system is located.

---

[70] Hague Convention of June 30, 2005 on Choice of Court Agreements (Hague Convention), in force
[71] SI 2015 No 1644 (UK)
[72] 1982 c 27 (UK)
[73] Id, ss 4B(1) and (2)(a)
[74] Id, s 4B(6)
[75] Hague Convention, above, n 50, Art 3
[76] SI 1999/2979, implementing Directive 98/26/EC

Similarly, under the Financial Collateral Arrangements (No 2) Regulations 2003[77], various aspects of book entry securities collateral, such as their legal nature and proprietary effects, are governed by the law of the country in which the relevant account is maintained[78]. Essentially, these are implementations of the so-called PRIMA principle: the court will regard the 'place of the relevant intermediary account' as the lex situs of the securities – that is, the place where the property or a claim to the property is situated[79].

There may be situations where the above laws and regulations do not apply. Under common law, the courts will look to the lex incorporationis (the law of the place where the company was incorporated)[80], as the usual reason for identifying the situs of company shares is to identify the law that determines how they may be dealt with or confiscated.

If the lex incorporation is allows the shares to be dealt with at a place other than the place of incorporation (for example, because the register is in that place, or the shares are bearer shares, meaning they can be dealt wherever the certificate happens to be), then that place will be treated as the situs of the shares[81].

Adrian Briggs notes: "*Where shares are held in international deposit and clearing systems, and are therefore to be regarded as 'immobilized' (if there is a certificate but which is locked in a vault operated by or on behalf of the entity which operates the system) or as 'dematerialized' (where there is no share certificate at all), it would be possible, but it probably makes little sense, to say that the shares are situated in any particular place, for the investor does not have a contractual relationship with the company (in the case of shares) or other issuer (in the case of other securities).*"

In such cases, the investor's contract will probably state that it has a direct right against the entity (or intermediary) with which it has an account. Any credit or value in the account will therefore be regarded as situated where the intermediary is situated, once again applying the PRIMA principle.

**Application of Private International Law Rules to the Collateralized DLT Transaction**

Where Tokens Merely Record Real-world Assets, under the most straightforward implementation of the collateralized DLT transaction, the real-world collateral assets (such as cash or securities) are not replaced with on-ledger tokens or digital assets that possess intrinsic value. Rather, the tokens merely record the various forms of collateral provided and exchanged.

---

[77] SI 2003/3226, implementing Directive 2002/47/EC
[78] Id, reg 19. See Dicey, Morris and Collins, above, n 17 at [24-072]
[79] See the FLMC paper, above, n 2 at [4.1] and [4.4]–[4.5]
[80] Compare Macmillan Inc v Bishopsgate Investments plc (No 3) [1987] 1 WLR 387, CA (England & Wales); Akers v Samba Financial Group [2014] EWHC 540 (Ch)
[81] Macmillan, ibid; Dicey, Morris and Collins, "Law of Property", above, n 17 at [24-066]; and Briggs, "Property" in Private International Law in English Courts (Oxford: Oxford University Press, 2014) at [9.23]

If a dispute arose over the entitlement of a party to securities used as collateral, this would therefore be decided by the situs of the securities. Depending on the particular situation, this could be the lex incorporation is (including the law of some place other than the lex incorporation is if the latter allows the securities to be dealt with there) or, where the securities are held in a centralized deposit system, the law of the country where the register, account or centralized deposit system is situated.

**Where Tokens Possess Intrinsic Value**

A more complex implementation of the collateralized DLT transaction could involve the replacement of the real-world collateral assets with a form of token or digital asset that possesses intrinsic value (such as a cryptocurrency).

In this scenario, determining the situs of the token is more difficult as, depending on the nature of the token, there may be no lex incorporation is. The token is also not held in a centralized deposit system, nor in an account with an intermediary.

One solution would be for the situs of the token to be the 'law of the platform' or 'law of the system' that the parties have agreed will govern all on-ledger transactions on the relevant DLT system[82].

Alternatively, if national authorities and regulators are concerned that allowing parties an unfettered choice of a governing law of the platform is undesirable[83], then they might consider whether they should apply pressure for the choice of law to be restricted to the laws of countries where the parties (such as the issuer of assets, the system administrator and market participants) are subject to sufficient legal and regulatory oversight[84]. However, this may also reduce flexibility and could prove challenging to implement.

If this approach was adopted, then, conceptually, a situation where the value of the collateral is represented by tokens on the distributed ledger would not be very different to that based on real-world assets such as cash and securities. Despite the novelty of such tokens, the principal issue would be whether a court order requiring one party to compensate another could be obtained and whether it would be enforced. So long as the judgment debtor compensates the judgment creditor in accordance with the court order, the judgment creditor is unlikely to be concerned about whether the compensation takes the form of tokens on a distributed ledger, or cash or other traditional asset.

---

[82] Philipp Paech, The International Law of Digital Asset Settlement – Functional Analysis and Draft Legal Principles (May 2019 working paper) at 10

[83] For example, as the FMLC has suggested, where the parties may choose "a system of law which is subject to significant undue external or private influence". FMLC paper, above, n 2 at [7.4]

[84] Id at [7.5]; Paech, above, n 118 at 10 ("It is paramount that one single law applies throughout each network. […] The only legally safe method isto rely on a chosen law. Those that set up the DLT network make the initial choice, which is subsequently adhered to by any participant joining. However, supervisors should have an interest in, and regulation should set requirements for, that choice. Given the importance in terms of enforceability of acquisition and disposition, especially in insolvency, there should be restrictions as to which law can be chosen.")

If an order is obtained, then a question could arise over the enforceability of a foreign judgment by the court having jurisdiction over the judgment debtor if it is located in another jurisdiction. In determining the answer to this question, there seems to be little conceptual difference between a scenario where the parties have used tokens, cash or securities when exchanging collateral assets.

There may also be means of addressing this issue on the platform itself. For example, each transaction on Corda is validated by a notary to ensure uniqueness in order to address the 'double-spend' concern. Given the flexibility that R3 provides on contractual arrangements on Corda business networks, it could be possible to create an agreement between the participants that empowers the notary to implement a court order obtained from a court of the contractually agreed jurisdiction on Corda, potentially avoiding the need for the relevant judgment to be enforced against the judgment debtor in its home courts.

Accordingly, in the event a court order (of a court with jurisdiction) states that a participant is not the proper party to hold tokens, the notary (as a result of the platform agreement) could be empowered to deny the transferability of such tokens. This, in turn, ensures that such tokens are no longer fungible. Further, the issuer of the tokens, through a contractual arrangement, could then issue replacement tokens to the proper party that should be the owner of these tokens.

Assuming the agreement the parties have entered into contains express choices regarding the law of the platform and the court before which disputes are to be litigated, a judgment creditor faced with an uncooperative judgment debtor would simply serve the court order on the notary to invalidate the tokens of the debtor and require the issuer to issue new tokens to satisfy the order. A distributed ledger structured in this way would reduce the difficulties that may arise when a judgment creditor tries to enforce a foreign judgment before a court.

It could also provide an alternative to issues posed by permissionless platforms where the identities of the parties and their physical locations are not easily ascertainable, which clearly creates difficulties for traditional court-based enforcement of judgments.

**Gibraltar E-Commerce and Consumer Protection Regulations**

All the relevant EU legislation on e-commerce and consumer protection has been transposed into Gibraltar law via various Acts of Parliament or Regulations. The EU e-commerce and consumer protection rules (E-Commerce Directive, Consumer Rights Directive, Directive on Distance Marketing of Consumer Financial Services) all specify the information that should be disclosed.

Token offerings fall within the scope of the EU's e-commerce Directive which has been transposed into Gibraltar law through the Electronic Commerce Act 2001. The contract on which a token sale is based constitutes a consumer contract and consumer protection rules will apply, as set out in the Consumer Rights on Contracts Regulations 2013 (which transposes, inter alia, the Consumer Rights Directive).

**Gibraltar Money Laundering Regulations**

The EU Anti Money Laundering Directive has been transposed into Gibraltar law by the Proceeds of Crime Act 2015 ("POCA"). It should be noted that Section 9(1)(p) of the POCA now includes within the definition of "relevant financial business" any "undertakings that receive, whether on their own account or on behalf of another person, proceeds in any form from the sale of tokenized digital assets involving the use of distributed ledger technology or a similar means of recording a digital representation of an asset." POCA also requires reporting (by businesses and by the GFSC) when there is a suspicion (rather than actual knowledge) of money laundering. Essentially, the addition of the new definition of "relevant financial business" specifically brings the sale of a token within existing AML laws, which in turn have been very well received by other service providers in the industry. Amongst other things, customer due diligence is required before a business may receive proceeds from the sale of tokens.

These businesses would also be required to appoint a money-laundering reporting officer (''MLRO''), as well as apply certain record keeping requirements. The business must also maintain an AML compliance program and report suspicious activity.

In essence, any entity issuing tokens, whether security, utility, cryptocurrency, hybrid or otherwise, would be subject to POCA requirements in full, from the moment it invites expressions of interest.

The Regulatory Principles set out at Schedule 2 to the Financial Services (Distributed Ledger Technology Provider) Regulations 2017 also state that a "A DLT Provider must have systems in place to prevent, detect and disclose financial crime risks such as money laundering and terrorist financing."

**Gibraltar DLT regulation**

The DLT Regulations state that the provision of DLT services is a 'controlled activity' for which a license is required from the GFSC. The activity is defined in section 3 of the underlying Financial Services (Investment and Fiduciary Services) Act as "carrying on by way of business, in or from Gibraltar, the use of distributed ledger technology for storing or transmitting value belonging to others."

Entities that qualify as DLT Providers under the DLT Regulations are required to abide by the regulatory principles that are set out in Schedule 2 of the Regulations, namely a DLT Provider must:

1. conduct its business with honesty and integrity.
2. pay due regard to the interests and needs of each and all its customers and must communicate with them in a way that is fair, clear and not misleading.
3. maintain adequate financial and non-financial resources.
4. manage and control its business effectively, and conduct its business with due skill, care and diligence; including having proper regard to risks to its business and customers.

5. have effective arrangements in place for the protection of customer assets and money when it is responsible for them.
6. have effective corporate governance arrangements.
7. ensure that all of its systems and security access protocols are maintained to appropriate high standards.
8. have systems in place to prevent, detect and disclose financial crime risks such as money laundering and terrorist financing.
9. be resilient and have contingency arrangements for the orderly and solvent wind down of its business.

## Gibraltar Administrative Law

The GFSC has the power to:
- Power to impose penalties or issue censure
- Power to prohibit individuals from managing or dealing
- Suspending permission to carry on regulated activities etc
- Power of court to impose administrative sanctions in cases of market abuse

## Gibraltar Criminal Law:

- Reporting of infringements
- Misconduct in, or misuse of information relating to, a financial market
- Misleading statements
- Money Laundering Regulations
- Proceeds of Crime Act
- Fraud or dishonesty or breach of trust

## Criminal Justice Act 1993

For paragraph 5 of Schedule 1(a) to the Criminal Justice Act 1993 (special defences) and the italic heading before paragraph 5 substitute:

"*Buy-back programmes and stabilization*"

An individual is not guilty of insider dealing by virtue of dealing in securities or encouraging another person to deal if he shows that he acted in conformity with:

(a) Article 5 of Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse regulation) and each directly applicable EU regulation made under that Article; (b) rules made under section 137Q(1)
(b) of the Financial Services and Markets Act 2000.".

Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse regulation); (b) disclosure requirements consistent with Articles 3, 5, 7, 8, 10, 14 and 16 of Directive 2003/71/EC of the European Parliament and of the Council of 4th November 2003 on the prospectuses to be published when securities are

offered to the public or admitted to trading; (c) disclosure requirements consistent with Articles 4 to 6, 14, 16 to 19 and 30 of Directive 2004/109/EC of the European Parliament and of the Council of 15th December 2004 relating to the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market; or (d) disclosure requirements consistent with EU legislation made under the provisions mentioned in paragraphs (a) to (c)" Financial Services Act 2012 15.

**Facts and Circumstances RSK Labs/RIF Labs scheme**

In November 2015, RSK Labs published its white paper in relation to a smart-contracting platform to be built on the Bitcoin network via merge-mining.

Diego got stage and promoted his vision and business plan around RSK during the North American Bitcoin Conference held in Miami, the United States, in 2016, 2017 and 2018.

Why was this relevant at the time? Bitcoin is the most secure decentralized network in the world and creation of smart-contracts on the Bitcoin blockchain would mean a huge level of security and, as they proposed it, faster transition speed of bitcoin transactions (which would be an improvement from 7 transactions per second up to 22,000 transactions per second). The project was embraced by the community and investments in the company equity (shares were sold with an agreement under New York State law), including investments by US investors, in May 2017 (a full list is available to us). The investor in RSK Labs included industry leading companies, e.g. bitcoin mining giant Bitmain.

At that time RSK Labs informed investors that NO ICO would be conducted by RSK Labs in the future and this was also included in the information package shared with investors, i.e. RSK Labs was planning to conduct a Series A. However, in May 2018, RSK Labs announced performing on ICO under its new entity RIF Labs.

The investors of RSK Labs got a document that instead of their shares they will receive RIF tokens, to be issued by RIF Labs.

RIF Labs then conducted an ICO. RIF Labs raised around 22,000 bitcoin.

During an interview, there was a question raised on how RSK is funded and who is supporting RSK, Diego answered that: ''*In 2018, the **RSK team raised USD150 million <u>by selling RIF tokens</u>** to a collective of respected blockchain investors, including **Silver 8 Capital** and Coinsilium. Furthermore, RSK has formed a Federation of 30-plus service providers to support the network's transactional activity. Among the Federation's ranks are prominent entities such as Digital Currency Group, Bitmain and Coinfirm. Finally, RSK has gathered the support of over 80 per cent of the Bitcoin network's miners, who will also use their computing power to safeguard the RSK network.*''

What Diego ''forgot'' to mention is that RSK Labs received a seed investment in two rounds, i.e. in 2016 and in 2017.

Similar to fundraising for the investment in RSK Labs, a lot of promises were made by the RIF team in relation to the RIF ICO. Almost 3 years after date, not much has

happened and CEO (Diego) is admitting mistakes on the RIF Group Channel to try to calm duped investors. In brief:

1. RSK Labs has sold securities to US Investors (see overview and agreements). For which no Reg D filing has been completed with the SEC, making it a sale of unregistered securities (not in line with the US Securities Act and other relevant Securities legislation). Furthermore, since all investors received RIF from RIF Labs for their investment in RSK Labs, it is an indirect investment in the ICO (as the ICO entity is paying the previous shareholders in RIF acknowledging their legal and economic relationship). Moreover, the RIF ICO includes US investors (via RSK Labs and directly), for which no Reg D filing or other approval was provided by the SEC or notification was sent to the SEC, and thus, the ICO is an unregistered sales of securities in the US (and same counts for other jurisdictions).
2. RSK Labs and RIF Labs have been unclear about their legal structure and have made false statements in relation to their legal structure to investors and the public.
3. Instead of spending the funds raised to development of the RIFOS (RIF Labs) network, the company e.g. acquired a social media platform. Which acquisition was not announced anywhere in the documentation shared for soliciting funds from investors and was also not mentioned during the various presentations given by the RSK/RIF/IOV Labs team.
4. When the company is asked what happened with the funds raised no clear answers are provided, while a substantial amount of bitcoin has been withdrawn from the bitcoin contribution wallet. No financial statements have been deposited by RSK/RIF/IOV Labs.
5. RIF Labs does not provide any updates to investors.
6. We are in the possession of materials in which Diego and Alex, and other RSK Labs, RIF Labs, IOV Labs team members, have been actively involved in the slander and defamation of Megalodon, through encrypted chats, emails, and telephone conversations (which recordings we possess).

Below you will find detailed information including these items.

**The Entities**

Below is the entity structure as projected by the RSK team and their lawyers. This entity structure deviates from the actual legal structure (as certain entities do not exist or transactions like acquisitions did not take place).

a. RSK Labs BVI Limited

RSK Labs Limited
(BVI)

Cactus Technologies
(CA)

Smart Labs S.A
(ARG)

Entity details:

Cactus Technologies LLP: company number LL0108804 – we got informed by the British Colombia (Canada) company register that this company did not exist (also not in their historic database). They further informed us that the company number LL0108804 is related to Asturias Investments LLP, an entity incorporated on July 6, 2020.

RSK Labs Limited: company number 1895440 – shareholders never received any share certificates.

Smart Labs S.A.: company number 15462 – which has the same founders as RSK Labs and RIF Labs.

Shareholders (investors) overview of RSK Labs (BVI) Limited:

| Name | Company | Country | Responsible Reg |
|---|---|---|---|
| Sergio Lerner | RSK | Argentina | CNV |
| Gabriel Kurman | RSK | Argentina | CNV |
| Ruben Altman | RSK | Argentina | CNV |
| Adrian Eidelman | RSK | Argentina | CNV |
| Adrian Garelik | RSK | Argentina | CNV |
| Diego Gutierrez Zaldivar | RSK | Argentina | CNV |
| Topspring Technology Limited | Bitmain | People's Republic of China | CSRC |
| Ms. Hongmin Sun | Huiyin | People's Republic of China | CSRC |
| Minka INC | Minka Inc | The United States of America | SEC |
| Digifinex Inc | Bitfinex | BVI | BVIFSC |
| Anthony Di Iorio | - | Canada | CSA |
| Certo S.A. | Certo S.A. | Uruguay | BCA |
| Maciej Ziolkowski | Maciej Ziolkowski | Poland | KNF |
| Tomasz Rulka | Tomasz Rulka | Poland | KNF |
| Mark Levin | Mark Levin | Canada | CSA / AFM |
| BAHA Ventures LLC | BAHA Ventures LLC | The United States of America | SEC |
| Bitfury Finance Limited | Bitfury Finance Limited | Cayman / The United States of America (HQ) | SEC |
| Paola Rebuffo | Paola Rebuffo | Switzerland | BaFin |
| Andrea Rossi | Andrea Rossi | Switzerland | BaFin |
| Yuan Dawei | Yuan Dewei | People's Republic of China | CSRC |
| Han Weiping | Han Weiping | People's Republic of China | CSRC |
| Bruce Fenton | Artrantic Financial | The United States of America | SEC |

| Seedcoin Limited (later Coinsilium) | Seedcoin Limited (later Coinsilium) | BVI / UK | BVIFSC/FCA |
|---|---|---|---|
| Laurent Christian Joseph Kssis | Laurent Christian Joseph Kssis | UK | FCA |
| Pier Andreina Thomas | Pier Andreina Thomas | UK | FCA |
| Cameron John Parry | Cameron John Parry | UK | FCA |

b. RSK Labs BVI Limited – after ''acquisition'' by RIF



Entity details:

Ginger Developments Limited: Investors were promised to receive a shareholding in this company, and were promised to receive proceeds of transaction fees generated by RSK Labs.

RSK Labs Limited: company number 1895440 – shareholders never received any share certificates.

RIF Labs Limited: RIF Labs Limited was incorporated as IOV Labs Limited, which name was changed prior to the unregistered securities offering conducted by RIF Labs Limited and later changed back to IOV Labs Limited prior to acquiring Taringa!.

c. RSK Labs BVI Limited – Final



Entity details:

Ginger Developments Limited: Investors were promised to receive a shareholding in this company, and were promised to receive proceeds of transaction fees.

RSK Labs Limited: company number 1895440 – Shareholders never received any share certificates.

RIF Labs Limited: RIF Labs Limited was incorporated as IOV Labs Limited, which name was changed prior to the unregistered securities offering conducted by RIF Labs Limited and later changed back to IOV Labs Limited prior to acquiring Taringa!.

**Communication by RSK In Relation to Their Legal Structure**

In relation to the legal structure related to (b) and (c) we would like to comment the following:

- In relation to (b):
  - this is the structure after the acquisition by RIF Labs Limited, which entity raised 22,000 bitcoin.
  - RIF Labs Limited was incorporated as IOV Labs on December 21, 2017, but the name was changed to RIF Labs Limited in 2018, to be later changed back to IOV Labs in 2019.
  - A shareholding and distribution of profits generated by Ginger Developments Limited was promised to the early investors of RSK Labs Limited. However, no shareholding was ever provided, and furthermore, no profits were paid.
  - RSK promised to pay excessive capital to investors, which has not been done or status of such payment has not been communicated by the RSK team to investors.
  - RSK pushed investors out and forced investors to sign documents.
  - RSK and its lawyers requested investors to sign lost share certificate forms, however, investors did not receive share certificates initially (so these could not be lost). Furthermore, a copy passport was requested. Which basically means they were in the possession of personal information and financial documents. These documents where then used by RSK and their lawyers to complete the transfer of shares (without open communication about this with investors).

- In relation to (c):
  - The RSK / RIF team communicated through open channels that IOV Labs was purchasing RIF. This is also stated as such on the website of IOV Labs. Where the following is mentioned:
    - November 2018: RIF Labs **incorporation** in Gibraltar and acquisition of RSK Labs. Which is false, RIF Labs, was incorporated as IOV Labs on December 21, 2017, where its name was changed to RIF Labs on March 29, 2018, and which name was changed back to IOV Labs on May 14, 2019. This information is misleading (which we assume to mask the acquisition of Taringa).

- May 2019: RIF Labs renames to IOV Labs in order to differentiate the organization from the platforms (where in other channels this was communicated as an acquisition – see below).
- September 2019: IOV Labs acquires Taringa. Which was an acquisition conducted by the former RIF Labs entity; which entity raised funds during an ICO in 2018 (and which was not communicated in the white paper).

## Offering and Selling Unregistered Securities

### Seed and Series Round of Equity

An overview of the early investors has been included above. This overview includes an overview of the founders as well as shares (securities) sold during the various rounds held by RSK Labs (BVI) Limited.

Attached we included the business plan of RSK Labs shared with potential investors (which is close to similar to the RIF labs white paper and business plan). In brief RSK Labs claims to have created a smart-contracting protocol on the bitcoin blockchain and were promoting the RSK eco-system, including partnerships and a RSK university. The potential use-cases of RSK are similar to those from RIF. In the business plan **also a 5 year market potential of RSK Labs** was included. Which stated that RSK Labs fees would be total 6,512 (times 1 million, i.e. 6,5 billion).

It was further communicated and publicly stated that RSK blockchain, handles 100 transactions per second, with a US$ 0,03 fee per transaction, which amounts in a US$ 3,00 generated transaction fee revenue per second.

For this round the following wallet was used: 3MsDxYKpwEkfYmroTGsiuUfpup7vQBDLbi The wallet currently holds 0.003 btc from the 665 btc raised. Basically the wallet is empty - all funds are taken out, without an explanation by RSK Labs to investors on how funds were spend or providing investors with audited financial statements.

Investors in this round include various investors from the United States of America, for which **NO regulation D form was filed with the U.S. Securities and Exchange Commission (SEC). Consequently, this sale of securities qualifies as an unregistered sale of securities in violation with the (US) Securities Act. Moreover, as described in our previous chapter, none of the EU regulatory requirements for selling securities to EU consumers and retailers, have been met by RSK Labs Limited.**

### Preparation of the RIF Token Sale

Preparation of the RIF token sale, is conducted by the same managing team as RSK Labs Limited. IOV Labs (later RIF Labs) was incorporated under the laws of Gibraltar, with incorporation number 116697.

On March 29, 2018, the name of IOV Labs Limited was changed to RIF Labs Limited.

Consequently, we are of the view that, even though the RSK offering and RIF offering were separately conducted, they should be seen as ''one offering'', as they were part of a single plan of financing and made for the same general purposes. Furthermore, this argument is strengthened by the facts that (1) RIF Labs acquired RSK Labs after completion of its sale, (2) that RIF Labs and RSK Labs have the same founders and technology wise, they cannot be seen separate from each other as RIF is build on RSK and (3) in the RIF white paper (page 5), the white paper is signed off by the RSK Labs & RIF Labs team, which founding team is:

a. Sergio Demain Lerner (also founding team of RSK Labs Limited);
b. Diego Gutierrez Zaldivar (also founding team of RSK Labs Limited);
c. Ruben Altman (also founding team of RSK Labs Limited);
d. Adrian Eidelman (also founding team of RSK Labs Limited);
e. Gabriel Kurman (also founding team of RSK Labs Limited);
f. Ariel Muslera (also founding team of RSK Labs Limited) – acting as strategic advisor;
g. Malcom Palle – acting as strategic advisor - currently a board member and director to IOV Labs;
h. Eddy Travia – acting as strategic advisor (also an advisor to RSK Labs Limited and investor plus shareholder in RSK Labs Limited - currently a board member and director to IOV Labs;
i. Joey Garcia – as a lawyer, advisor to RIF Labs Limited – currently a board member and director to IOV Labs;
j. Valeria Bystrowicz – acting as advisor;
k. Miguel Santos – acting as advisor;
l. Alex Aberg Cobo – advisor and director (later CFO);
m. Cesar Levene – as a lawyer acting as an advisor.

Also, at the moment the RIF sale was conducted NO tokens existed or were generated by RIF Labs. Moreover, RIF Labs did not hold a one year lock-up period for the securities/tokens (also referred to as legend), which should have been done before listing and public selling of RIF tokens.

By selling unregistered securities, RSK Labs Limited and RIF Labs Limited violated the Securities Act of various jurisdictions, including EU jurisdictions and the United States of America.

*Token Sale and Conversion of Equity into RIF*

After the closing of their rounds in 2017 for RSK Labs Limited, RSK announced in January 2018 (also during the Miami North American BTC conference) that they would hold a token sale, i.e. Diego was mentioning this on stage.

Moreover, in November 2017, an employee of Coinsillium / Startup Token was already stating that RSK Labs would conduct on ICO in the range of US$ 125mm, where they would not need a white paper as people would invest anyway.

RSK Labs kept secret who of the team was involved in RIF, however, later on we found it is the same team in RIF Labs as RSK Labs – which is also stated in public (e.g. Gabriel Kurman is also mentioned as founder of RIF Labs in the white paper while during the raise he was NOT using his RIF email address, and was claiming he was acting separate from RIF.

Gabriel acted as a RIF / RSK Labs representative soliciting funds for the sale of securities to investors and has held all communication in this regard via his RSK Labs email (which is another example showing the coherence between both parties)).

The white paper of RIF refers to RSK Labs and shows the overall idea of the project, i.e. creating a smart-contract system build on the bitcoin blockchain, on which decentralized apps can be built on the Bitcoin blockchain.

The business plan of RIF Labs is similar to that of RSK Labs (where according to the RSK Labs team, RSK Labs transferred all its IP and knowledge to RIF - see below), and the funds received should have been used for the development of the blockchain protocol and stimulation of developers (also see white paper).

In the white paper the role of RIF Labs is described as the entity managing the RIF token and RIFOS development and promotion. The white paper further refers to a newly established entity in Gibraltar, where it did not state that RIF Labs was established and incorporated as IOV Labs Limited, were solely the name was changed to RIF Labs, for only a few months later to be changed back.

It is further stated that:

- '*'RIF Lab's goal will be to build already done by RSK Labs*"
- '*'RSK has agreed to assign all its RSK-related IP, brands and knowledge to RIF Labs*''

NO minutes or communication with RSK Labs Limited shareholders and investors has been sent in relation to the agreement of assigning all IP and other relevant items held by RSK Labs to RIF Labs. The only communication investors of RSK Labs received was that their shares would be sold to RIF Labs (and if they did not agree, they sale would be concluded anyway – see attached emails).

The white paper is misleading, as it appears as if the transfer of knowledge was done for no remuneration, while RIF Labs fully acquired RSK Labs after the token sale has been completed. Moreover, in communication sent by Gabriel, it seems that RSK Labs was in discussion with RIF Labs about an acquisition; while it is the same team for both entities.

RIF Labs was looking to raise a minimum of 15,000 bitcoin. They eventually raised more than 22,000 bitcoin (both in bitcoin and Ethereum). Where the amount of bitcoin received in this wallet is 21,113 bitcoin received (see https://www.blockchain.com/btc/address/3FiMKffg2kY2Pi2Kebn2HZqN7m6kEcNUMk ). And where currently the wallet only holds around 5,500 bitcoin (meaning that more than 17,000 bitcoin has been withdrawn by RIF Labs (without actual proof of the usage of the Funds - as investors do not receive any update from RIF Labs (now IOV Labs)).

*Post-Token Sale*

After the RIF Labs tokensale, which closed in June 2018, the only moment investors of RIF Labs heard something about RIF Labs was in relation to redemption of tokens.

Note that RIF labs has setup a channel to communicate with its community @rif_os_community (channel name on Telegram) to keep people up-to-date. After the tokensale was completed the following occurred:

1. a project called Temco https://temco.io/ - was supposed to be the first project to build on the RIF Labs smart-contract. For unknown reasons the project withdrew from working with RIF Labs and started working with another blockchain protocol.
2. No updates have been sent to investors. No communication on what timelines to be expected from RIF Labs. Only one deliverable was announced (which was also part of the RSK Labs business plan and NOT RIF Labs) https://www.iovlabs.org/press/rif-labs-announces-rif-name-service-for-public-use.html
3. Promises were made about listing of the RIF token on certain exchanges, which did not occur.
4. Promises were made about the ambassador program and collaboration with blockchain related companies for the RSK Federation, which has not occurred.
5. No technical updates have been provided and what we have seen as a deliverable now, is very basic not difficult to create (and definitely not in the range of funds raised).
6. RIF tokens are ERC-677 token, meaning that it is BUILD on ETHEREUM not Bitcoin, furthermore, while a claim was made that an own blockchain would have been build.
7. NO clarity has been provided on usages of the FUNDS raised. In the Telegram Chat people did ask and RIF Labs only response was that not all 10,000 bitcoin (at that time USD 80,000,000 - 100,000,000 was spent but also diversified). No further clarification has been provided.
8. RIF Tokens trading volume is nothing and the token dropped more than 90% in price. Basically, investors will need to see a 10,000% rise in price in order to break-even.
9. RIF Labs changed its name to IOV Labs (not much information is available about this. But basically you went from RSK Labs, to RIF Labs and now IOV Labs in a short time).
10. IOV Labs acquired the SOCIAL MEDIA PLATFORM Taringa https://www.iovlabs.org/press/iovlabs-brings-rsk-technology-to-30-million-users-social-network-by-acquiring-taringa.html
11. Taringa is an **Argentinian** based SOCIAL MEDIA PLATFORM which has nothing to do with smart-contracting and creating technology on a blockchain. Furthermore, the founders of Taringa are also part of IOV Labs. The RSK/RIF team mentioned that the acquisition price should remain confidential and they did not share anything in this regard.
12. The RSK Explorer showed around a 2,000% merge-mining hash rate (which is odd, as this should be maximum 100%). We found that RSK is paying miners for merge-mining.
13. RIF token got listed on Binance and many people were complaining about not being able to deposit tokens, where RSK team was blaming Binance, while Binance (the biggest cryptocurrency exchange in the world) was telling people to contact the RSK/RIF team.

*Legal Position related to the Offerings*

*RSK Labs Offering*

In relation to the offering of shares by RSK Labs Limited, under New York, United States of America, jurisdiction, we do not find it necessary to further elaborate, that this is a sale of equity securities. This offering was completed by RSK Labs Limited and included US investors, non-accredited investors and accredited investors.

RSK Labs Limited failed to register these securities with the SEC, this is a main rule when offering securities to US investors. Moreover, RSK Labs Limited also failed to apply for a so called regulation D offering, for which it would need to verify investors, and file a notice with the SEC within 15 days after the first sale of securities.

Considering that RSK Labs Limited failed to meet any of the Securities Act requirements. It conducted an unregistered Securities sale in the United States of America; which is as such in violation with the Securities Act and punishable by law.

*RIF Labs Offering*

Following the RSK Labs Limited securities offering, RIF Labs Limited, conducted a securities offering. Based on the SEC vs Kik case, we are of the view that, even though the RSK Labs Limited offering and RIF Labs Limited offering were separately conducted, they were part of a single plan of financing and made for the same general purpose. Thus, both sales should be seen together.

In relation to the RIF Labs offering, it should also be taken into account, that RIF Labs, was selling an investment contract, which qualifies as a security under the Howey test and the ICO conducted by RIF Labs included US investors.

In the SEC vs Howey case, the Court held that a promoter that sold interests in a citrus grove, coupled with an agreement for the promoter to manage those citrus groves, had created an "investment contract" that was a security under the federal securities laws. The *Howey* Court set up a test to determine whether a financial product, business arrangement or the like is an investment contract and therefore a security. Important elements in this regard are (1) it is an investment of money (bitcoin), (2) in a common enterprise (RIF Labs Limited in coherence with RSK Labs Limited and (3) with an expectation of profits predominantly from the efforts of others (the RIF and RSK team).

**Entities Facts**

*RSK Labs Limited*

RSK Labs Limited is incorporated on November 6, 2015 (attached Memorandum and Articles of Association), with registered office MMG trust (BVI) Corporation. On the website of IOV Labs, open for the public, it is stated that RSK Labs was founded in January 2016 (which is untrue).

At the moment of incorporation, the amount of shares was capped at 50,000 shares. Where, RSK Labs Limited had a seed round for offering securities, for which no changes were made in the legal documentation of the entity.

On the 24th of February 2017, RSK Labs increased the authorized maximum number of shares to 8,521,286 shares, which were divided in classes (see attachment).

Seed investors did not receive a share certificate from RSK Labs Limited.

As stated in the RIF white paper, all intellectual property and functions of RSK Labs Limited has been transferred to RIF Labs Limited.

Furthermore, the entity being actually established in BVI, is questionable, as the management of the company is established in Argentina (which would make the entity a tax resident there).

Moreover, RSK Labs founders were publicly stating that all shareholders voluntarily collaborated with a swap of shares to RIF tokens. While, in communication received from RSK, it is clear that no shareholder in RSK Labs had a saying and NO voting took place on the share transfer by the shareholders (investors).

*Cactus Technologies LLP*

In the documentation shared with investors by RSK Labs, it is stated that the operational holding within the legal structure is Cactus Technologies LLP with registration number LL01804. The RSK team communicated that that entity was established in British Columbia (Canada).

However, the British Columbia registry informed us that NO entity called Cactus Technologies LLP ever existed, not now and also not in history. Moreover, they informed us that the registration number LL01804 is on the name of Asturias Investments LLP, which registered on July 6, 2020.

*Smart Labs S.A.*

In the documentation shared with investors by RSK Labs, Smart Labs S.A. is mentioned as the development company. This company is registered in Argentina with registration number 15462.

*IOV Labs Limited / RIF Labs Limited*

IOV Labs Limited was incorporated in Gibraltar, GX111AA, on December 21, 2017. On March 29, 2018, the name of IOV Labs was changed to RIF Labs Limited. Where on May 14, 2019, the name RIF Labs Limited, was changed back to IOV Labs Limited.

The company is setup as a private company limited by guarantee, not having share capital. On the website of IOV Labs Limited it is stated that RIF Labs Limited is incorporated in Gibraltar on November 2018. It further states that RIF Labs renamed to IOV Labs in order to differentiate the organization from the platforms. The latter is not true, as the entity was incorporated in December 21, 2017 as IOV Labs.

Furthermore, only after renaming of RIF Labs into IOV Labs, IOV Labs acquires Taringa. Which on the website till date is showing the acquisition of Taringa as the final accomplishment. RIF Labs (IOV Labs) Limited never communicated to investors that it would acquire Taringa. Moreover, the RSK Labs/RIF Labs team kept secret the acquisition price of Taringa.

RSK/RIF Labs, never shared usage of funds with investors.

*Ginger Developments Limited*

On the 15th of August 2018, Ginger Developments Limited was established in the British Virgin Islands. This entity was meant for initial investors and shareholders of RSK Labs Limited. Moreover, as communicated by Gabriel Alejandro Kurman, this entity was meant to share transaction fees generated by RSK Labs Limited.

In this regard, no share certificates – similar to RSK Labs Limited shareholding – were received by Mark Levin. Moreover, for more than 2.5 years, there has not been any communication by the RSK team in relation to financials and payment of profits made by Ginger Developments Limited to its investors.

Moreover, Mark Levin was not free in his choice of keeping a shareholding in Ginger Development Limited. But was extorted into providing his personal data (including financial data) in order to avoid losing his full investment.

Furthermore, sharing of RSK Labs Limited transaction fees was NOT only falsely promised to the initial shareholders of RSK Labs Limited, but also promised to (1) miners, (2) the public and (3) RIF investors. No proof of any sharing of transaction fees have been shared with the public.

*Koinbanx*

The RSK Labs and RIF team never communicated any affiliation with Koinbanx in documentation shared with investors, while two of the RSK founders were also founders of Koinbanx, which entity was founded in 2014. However, Koinbanx is marketed by RSK Labs / RIF Labs / IOV Labs as a strategic partnerships, while in fact, the founders are the same.





**The Offerings in Detail**

*RSK Labs Limited*

In 2016 and 2017, RSK Labs Limited, conducted an offering of securities to several ''seed'' investors (listed above). It undertook this offering without registering with the SEC and any other regulator RSK Labs had investors in. Furthermore, RSK Labs Limited also did not meet the requirements for an exemption on selling of securities in each jurisdiction (including the United States of America – as no Reg D 506(b) or 506(c) has been filed with the SEC by RSK Labs Limited).

RSK Labs Limited also did not provide investors with the material information which is common practise to be shared by issuers conducting similar sales of securities.

In the marketing material for its May 2017 offering of securities, RSK Labs Limited included the following numbers to investors, in order to justify it valuation and making it attractive for investors to invest. Note that **no** disclaimers were used; which implies that investors could trust these numbers are based on true numbers and true events.



In the limited marketing material RSK Labs shared with potential investors, it stated the following in relation to the legal structure (also see above in relation to the entities – where Cactus Technologies LLP never existed, and thus, this information is false and aimed to mislead investors).



Furthermore, RSK Labs Limited indicated in its materials that it would be aiming at a Series A within 8 months from closing its raise of May 2017.



While in public, the CEO of RSK Labs stated that they may sell RSK Labs to the public in the form of an ICO. No Series A has been conducted, instead, the RSK Labs team setup a new entity structure in order to conduct an ICO (private sale).

In relation to expected future valuation of RSK Labs Limited, the following was communicated:



In relation to the valuation expectation, no disclaimer is used for Blockstream. Furthermore, a valuation of Ethereum did not make sense, as it is based on an initial coin offering sold to the public and NOT shares sold to a private circle of investors (private placement).

In relation to transaction speed and transactions per second it states:

**Exhibit 1: RSK Main Technical Features 3/3**

| Item | RSK | Bitcoin | Ethereum | Factom | Counterparty |
|---|---|---|---|---|---|
| Security guarantee | SHA256D merge-miners + Federation checkpoints | SHA256D miners | Ethash miners | SHA256D miners + fed. servers | SHA256D miners |
| Confidential Transactions | Native support Planned | No | Via contract | Via external program | No |
| Unique transaction ID | Yes | No (malleab.) | Yes | No | No |
| Scalability [tps] | 100 target | 3 to 24 | unbounded | unbounded | 3 to 24 |
| Native token | BTC via two-way peg | BTC | ETH | FACTOID | XCP |

In multiple interviews and public communication provided by RSK Labs, it is clear that miners can merge-mine RSK (at no extra costs) and that the transaction fee for RSK Labs is US$ 0.03 per transaction (meaning US$ 3 dollar per second at 100 transactions per second). However, based on public available information we understand that RSK Labs is PAYING miners in bitcoin to merge-mine; we assume with the funds raised by the RIF Labs ICO.

After the investment, investors in the offering of RSK Labs Limited, did not receive any information on how the funds where used or what the status was of the RSK Labs technology (and expected profit as included in its presentation for investors). Also no audited financial statements were shared.

The only moments investors heard back about their investment from the RSK Labs Limited team, after investing, was in July 2018, after the RIF token sale was conducted and closed. In which case the RSK Labs team (which is similar to the RIF Labs team) decided the sell RSK Labs to RIF Labs.

*RIF Labs Limited*

As mentioned, the company incorporated as IOV Labs limited in December 2017, changed its name to RIF Labs limited in March 2018.

In April/May/June 2018, RIF Labs conducted its digital token offering. The documentation shared by RIF Labs Limited was limited. Moreover, RIF Labs sold unregistered securities to US investors, including Silver 8 Capital; without registration with the SEC or filing for an exemption. Making it an offering violating the US Securities Act.

In the white paper RIF Labs Limited states the following:
1. *''As of the date of publication of this whitepaper, Tokens <u>have no known or intended future</u> use other than on the platform **<u>which is under development</u>**.''*
   **Comment**: Which basically means that at the time of the sale no RIF platform was, or RIF token were, available.
2. *'' Tokens are not being structured or sold as securities. Tokens hold no rights and confer no interests in the equity of the Company. Tokens are sold with an*

*intended future use on the platform and all proceeds received during the token sale may be spent freely by the Company on the development of its business and the underlying technological infrastructure.''* **Comment**: RIF Labs Limited takes the position that its token is not a security, ignoring the fact the (1) no platform or token is available at the time of sale, (2) Coinsillium announced and published with the SEC a token for equity swap between RSK and RIF in the form of RIF tokens and basically reporting this transaction with the SEC (<u>**Securities**</u> Exchange Commission) in the US (3) the sale meet all the criteria of the Howey test under US Securities Law and a description of securities within local legislation of any jurisdiction. Below we will further elaborate on this.

3. *''This whitepaper does not constitute a prospectus or disclosure document and is not an offer to sell, nor the solicitation of any offer to buy any investment or financial instrument in any jurisdiction.''* **Comment**: however, the white paper refers to disclaimers and forward looking statements and includes potential restrictions and risks. Latter language you would typically find in a private placement document. Furthermore, the RIF Labs sale was marketed as a private placement; but besides the white paper no further information was shared with investors of the private placement.

4. *''No regulatory authority has examined or approved any of the information set out in this whitepaper. No such action has or will be taken under the laws, regulatory requirements or rules of any jurisdiction. The publication, distribution or dissemination of this whitepaper does not imply that applicable laws or regulatory requirements have been complied with.''* **Comment:** In this statement RIF basically states that it did not seek any regulatory approval for its digital token offering and that its documents do not imply that it is meeting applicable regulation. The latter is contrary to the next statement made.

5. *'' The token sale and/or Tokens could be impacted by regulatory action, including potential restrictions on the ownership, use, transferability or possession of such Tokens. Regulators or other competent authorities may demand that we revise the mechanics of the token sale and/or the functionality of Tokens in order to comply with regulatory requirements or other governmental or business obligations. Nevertheless, we believe we are taking commercially reasonable steps to ensure that the token sale mechanics and issue of Tokens do not violate applicable laws and regulations.''* **Comment**: RIF states that it took reasonable steps to ensure the token sale mechanics and issue of tokens do not violate applicable laws and regulations. Which is the complete contrary to the statement under 4 above, as NO actions were taken with any regulator. RIF just took the position it was conduction a token sale, where the token should not be seen as a security (without further elaborating on that or providing investors with a memorandum of a law-firm confirming this).

6. *''The RIF Token is intended to be a utility token allowing any token holder to consume all of the services that are compatible with the architecture of and integrated to the RIFOS. Such services may include third party-developed infrastructure services, and any other apps that might be deployed on our protocol that agrees to accept RIF Tokens as a means of accessing/consuming the service or app.''*

7. *''Initial allocation ● A total of 1 billion RIF Tokens will be created by RIF Labs at the Token Generation Event. ● Approximately 35%-40% will be*

*allocated to the private sale contributors. The initial price of RIF Tokens will be set in BTC. Further details relating to the private sale will be disclosed in the relevant contribution agreements and associated documentation. ● Approximately 40% will be kept by RIF Labs, unlocked at a rate 1/60th every month for 5 years after the Token Sale and used primarily as a way to promote and increase the adoption of the RIFOS as indicated in this document. ● 20% will be distributed to RSK Labs' shareholders, founders and management team as consideration for the acquisition of all RSK Labs' assets and IP, and as a way to align the team long term with the RIF project. These tokens will be unlocked at a rate of 1/48th every month for 4 years after the Token Sale ends, with an initial cliff of 6 months. ● We plan to raise the equivalent of 20,000 BTC +/- 10%, but we reserve the right to conclude the Token Sale at any time after we reach 15,000 BTC or its equivalent in such other cryptocurrencies that we may decide to accept. ● While we don't plan to do a public sale of tokens, RIF Labs will initially earmark 21 million RIF Tokens for early adopters of the RIFOS through a set of bounty and early adoption incentive programmes.''* **Comment**: in its Token overview, it is stated that RIF Labs and the team (which is the same team of RSK labs) will keep around 60% of the total token supply and will keep the 22,000 bitcoin raised via their token offering. The valuation of RIF is not based on anything and furthermore, the RIF Labs team and its founders are selling RIF and bitcoin without a restriction to third parties in order to monetize the value for their own benefit; while the RIF token value has dropped significantly and would need around a 15,000% price increase in order to break even.

8. *''As a purpose-based company, RIF Labs' future earnings should be re-invested to benefit the growth of the RIFOS and its long term objectives. It is therefore important to assess potential sources of revenue for RIF Labs in the coming years, as the RIFOS is built up.''* **Comment**: based on this statement it seems that RIF Labs is expecting profit, while it is incorporated as a non-profit organization.

9. *''We believe that as the adoption of the RIFOS increases, RIF Labs could potentially generate revenue from at least the following two sources: a. Revenue from the Smart Contract processing fees: The RSK Smart Protocol charges a small fee in RBTC as gas for processing and executing each Smart Contract deployed on the protocol. As part of the acquisition of RSK Labs' assets and IP, RIF Labs will be entitled to a percentage of this revenue stream. While initially this number will be insignificant, as the volume of smart contract processing grows, this might become a steady source of income for RIF Labs. b. Ecosystem Partnerships: In connection with the promotional activities for the RIFOS ecosystem, RIF Labs plans to establish strategic partnerships in different parts of the world with start-up accelerators, incubators, education programme providers, event organisers, etc. These partnerships might provide additional revenue streams for RIF Labs. We believe that Blockchain-based applications can transform the way we exchange value in the coming decade. RIF Labs is therefore proposing to create the necessary infrastructure and partner up with businesses and other institutions who will contribute to help our vision materialize. We hope you share this vision and join us! The RSK Labs & RIF Labs Team''* **Comment**: In this statement it is mentioned that RIF Labs Limited would be entitled to a part of the RSK Labs revenue stream generated by transactions. This was also

promised to the initial investors/shareholders and later on also promised under Ginger Developments Limited. The initial investors/shareholders received nothing in this regard. It is stated that this is a steady source of income for RIF Labs; which would imply that the only financial benefit for operating the protocol would come back to the RIF team (same founders of RSK Labs) and NOT to any of the investors.

During its sales of securities RSK Labs team (Gabriel Kurman), various presentations were given in the United States. During one of these presentations on May 18, 2018, in Denver United States, Gabriel Kurman explains the usage of RSK Labs and states:

10. '*'everybody in the eco-system can profit and trive through the use of RSK we and hopefully we all together can get to those billions of users that need blockchain technology quicker*''. **Comment**: engagement by users would mean an increase in value.

11. Adrian Eidelman shows a stats website during this presentation, which is similar to the RSK Explorer state website which was announced after the completion of the token raise. **Comment**: by showing already available website which did not change after raising 22,000 bitcoin (see screenshots), it shows the intention of the RIF/RSK team for the usage of funds.

12. *They get 80% of the total fees, for execution on RSK.* **Comment**: with this Gabriel means that the miners get 80% of the total transaction fees of RSK; which means that RSK is giving away 80% of the transaction fees to the miners. And 40% to the RSK shareholders in Ginger? This means, RSK Labs is paying out a total of 120% of their mining fees. Moreover, RSK Labs stated that in relation to RIF Labs, RIF investors would also have access to transaction fees generated by RSK Labs.

During its sales of securities RSK Labs founder and RIF founder Gabriel Kurman, gave another presentation during the Atlanta Blockchain conference held in the United States. On the slide where he explains why they are doing what they (i.e. why is RSK Labs doing what they do), he states the following:

1. '*'We have this vision, you know, we started, we came to Sillicon Valley for the first time, we wanted to become entrepreneurs, everybody told us to pursue a unicorn. We should pursue try to build something a billion dollar worth of value or become billionaires ourselves. We think it is about the time to change that* ''.

2. *Maybe if you are trying to think, what to build and how to get involved in the space, keep this in mind, because probably the **only positive margins will be in the billions** new commerce to the internet. But **as off today there is no bank or fintech** that has the technology and process in order to be able to handle millions of transactions and making money in the process. **Only with the security of bitcoin technology, blockchain technology and the programmability of smart contracts, we are going to be able to create these use cases**, like that going to have the automation of WhatsApp or Spotify, that apply to the internet of value.* **Comment**: the statement here is that only with RSK Labs / RIF Labs, new commerce would benefit from a financial system being able to perform millions of transactions and making money in the

process. Gabriel is in its statement describing RSK to be the party driving this in creation of the internet of value.

3. *''We are very excited about solutions where we incentive tellers, personal tellers, to become centralized banking branches. Where a person can become a cash-in and cash-out part of system, are going to be key, especially in the developing markets. We developed a few partnerships, especially in the non-banking network, those that allow you to recharge you, you pre-paid phone.* ***We expect them to become key players in the financial services of the future.*** *So, you receive a micro-loan from anywhere in the world and you can just go to the kiosk where you recharge your phone every week and you can then just take the cash you requested, to a Chinese development bank, or Indian or anywhere. […] the good thing is we hate going to the bank anyway […]* **Comment**: this statement is in line with statement made by RSK that it is another bank settlement layer / an inclusive payment system. However, RSK is not in the possession of a money transmitter license, nor a e-money institution license or banking license.

During the North American Bitcoin conference held in Miami in 2017 and 2018 Diego stated the following in relation to RSK and also RIF (without mentioning RIF but rather referring to an ICO):

1. *One year go, I shared in the same conference (2016), a vision on how bitcoin was going to be the corner stone of the new internet. An internet which would enable the transfer of value, whether we would be talking about stocks, property titles, money, or even vote in a democracy. That mission was comprised of multiple layers, where each layer had different purposes in the transfer of value.*

2. *The upper layers, may achieve transaction costs. So when we talk about bitcoin we have 15 cents per transaction. But when we go to RSK, we go down to 0.01 (1) cent, but with one technology we are developing we can achieve 5000 transactions per second, at 0.001 cent.* **Comment**: in different interviews given by RSK team members, it is stated that RSK handles 100 transactions at US$ 0.03 per transaction. The statement made by Diego about 5,000 transactions per second is misleading, as RSK did not reach that level of transaction and how we see it now, never will.

3. *This was the vision I shared last year. And one year later, I am here sharing what happened last year. We were merely a white paper back then, with RSK. The main decision back then, we were not going to issue a new currency, we would use bitcoin as our currency to run smart contracts.* **Comment**: Diego is contradicting himself as at a later stage he would be talking about creation of a currency (see TEDxTalk SF under 3 above). Moreover, (1) bitcoin is not a currency and (2) you cannot run a smart contract on a currency. The latter shows, the incompetence of RSK/RIF/IOV Labs founders.

4. *We took two further decisions, one is that we were going to build a federation comp rived of the 25 most important bitcoin companies in the world.* **Comment**: this statement was made, but no clear overview of the federation and whereabouts of the federation have been shared by RSK/RIF/IOV with its investors, or the public.

5. *On the mining side we already have agreements with 70% of the mining corporations in the world for merge-mining RSK.* **Comment**: this statement was made in January 2017. However, in May 2018, Gabriel Kurman and Ruben Altman stated that the merge-mining corporation was 10% (making RSK blockchain extremely vulnerable to hacks). Moreover, in the RIF_OS Community chat in 2019, screenshots where shared

by the RSK/RIF team that merge-mining was between 30% and 40%. The latter is significantly lower that the 70% statement made by Diego in 2017. The latter is relevant as RSK/RIF makes itself dependable on merge-mining. RSK claims further that merge-mining does not costs the miners anything, hence, for miners no issue to merge-mine RSK. However, the reality is that RSK is paying miners (providing them incentives) to merge-mine RSK (this is stated by RSK on its website).

On the RSK website, RSK refers to the most profitable Bitcoin merged mined platform





RSK states on its website that the reward of miners is paid in bitcoin. And that these are paid by the transactions fees of the (RSK) network. It is further stated that miners earn around 80% of the fees generated by RSK. And that even ''uncles are rewarded''. The latter is strange to us, as RSK promised fee sharing of transactions with (1) the miners, (2) the initial investors via Ginger Developments Limited (40% of the fees) and (3) RIF investors (as stated in the white paper) and (4) Diego further stated that they are looking for a way to share the RSK

fees with the general public. The latter in relation to the fees is misleading and false information, shared with investors and the general public.

On the RSK website, miners could even calculate their profits generated. The latter is not something stated by any of the RSK/RIF/IOV team members during their talks about why miners would merge-mine. Moreover, RSK/RIF/IOV is acting as if they are the only protocol offering merge-mining during their talks and it is part of their overall sales pitch to investors. However, RSK/RIF/IOV is not the only platform offering merge-mining on the bitcoin blockchain.

6. *We are also working with all of the main pools, Antpool, Bitclub… to implement our plug-in to merge mining and I think in the next one or two months we will have everyone of them merge-mining (RSK)*. **Comment**: Diego proudly stated that Bitclub is one of the partner mining pools merge-mining RSK. While Bitclub in 2018, was already a very controversial mining pool, as it was considered to be a ponzi-scheme; where people typically did not want to be associated with.

The United States Department of Justice published the following in relation to Bitclub (more below):



7. *On the industry side on the stakeholder of RSK, we have some of the biggest miners and VCs in the industry participating in RSK already and in the second round we are finishing in the next two months, we will add many new important components in the Middle East and Latin America, that will complete the picture of partners that will help us develop the network of business and solution providers that we want to have on a global scale, and once we launch we might do an ICO to also let participate individuals into the company. But we did not want to do that until we were fully functional.* **Comment**: Diego makes various statements about global expansion during his talk about RSK Labs, including expansion in the Middle East. However, when looking for RSK in the Middle East, we could only find and Gas & Oil Company.



Moreover, RSK states on its website that it has offices in San Francisco (United States) and Buenos Aires (Argentina).



Diego further stated that they '*might do an ICO*''. However, in January 2018, Gabriel Alejandro Kurman already started mentioning and soliciting funds for an ICO. Which was during THE SAME conference in Miami where Diego was speaking and mentioning that they '*might*'' do an ICO. Moreover, IOV Labs Limited, later RIF Labs Limited, is the ICO company which was already established in December 21, 2017.

8. *As we see RSK, first we have the securest network, securing your smart contract, it is maybe 6 times cheaper than Ethereum. RSK will always have the cheapest costs.* **Comment**: This statement is false, RSK is not the most secure network, as it is completely dependable on the Bitcoin blockchain, i.e. Bitcoin is currently the most secure network (not RSK).

9. *Well we did not want to do an ICO? Oh sorry, what are the probabilities of an ICO of RSK and what would be the valuation and what would be the value proposition for investors. That is the thing, we did not want to open for a public offering, before we understand the full eco-system. That is why we delayed the decision. It will happen if we find a way on how to share the profits of RSK with the general public in a responsible way.* **Comment**: Diego states that RSK is not doing an ICO until it fully

understands how the profits of RSK can be shared with the public in a responsible way. The latter, is misleading and false. RSK never had the intention or the possibility to share profits with the public, as RSK had obligations to its investors. Fee sharing of RSK's transaction has been promised to various parties (which is oversold).

10. *I also made a promise last year (2017), a promise that I would show you a version of a smart contract by the bitcoin network. Two weeks ago, that became a reality, that technology is only as valuable as the community is that support it. So we need your help and build this network together.* **Comment**: Diego said he would show a version of a smart contract by the bitcoin network. This was only a statement, during the conference and his talk, nothing was SHOWED.

11. *This is the revolution, this is the future of our society.* **Comment**: these are statements similar to EOS (which made the statement that EOS could fundamentally change the way society operates). However, despite this grandiose statement made by Diego (RSK/RIF/IOV) we fail to see how this technology can be the future of our society. Now, almost 3 years after this statement, RSK/RIF/IOV, has NO impact on society and is undefined amount of time away from even having the most minor impact on any society.

12. *I renew my vows today, in front of you, and next year I will come back and will show the progress for this creation, so next year (2019), I would love to meet here and I want to know that you are part and an agent of change, helping us with this revolution.* **Comment**: Despite calling his followers to be part of the RSK revolution, the ''big leader'' Diego cancelled participation of the same conference in the year 2019, i.e. the year after the ICO. Breaking his promise to his followers (one of many).

Furthermore, during the digital token offering, family members of the RIF/RSK team, i.e. Valeria – advisor to IOV Labs and sister of Ariel Muslera (CEO of RSK Innovation Studios in San Francisco), residing in the United States of America, was soliciting for reselling of their allocation while in the United States of America. In messages it was claimed that they could mark the price up to 50% of the token offering price (as advised by the team (including Ariel)).



Throughout the offering the RIF team was the source of information, which promoted the RSK (which is coherent to RIF) on a variety of available media, including but not limited to YouTube, financial news, online discussions, chats, etc..

After completion of the RIF ICO, a description and example on how the internet of value works, has been has been provided by Diego during has talk in San Francisco (i.e. TEDxSanFrancisco), in which a few interesting statements were made:

1. *''We could not remove the middle-man in the transfer of value and I did not see a good solution in that. Until in 2012 a good friend of mine called me outside out, he lives in sillicon valley and he told me Diegito, you have to see this, it is awesome. I said okay, what can be so awesome. He said, open an account; and to give you some context, in Argentina back then it was almost impossible to move money in and out from the country, as we have strict capital controls, so no money was getting in and out. He said open an account on this website; it would be a bitcoin account. 10 minutes later the amount equivalent to a small apartment in Buenos Aires appeared into that account. It looked like a game you know. So I send it back, hahaha, okay, I know, we all made mistakes. The thing is I send it back. He said no keep one, so you can play around with it. And I did and I aid okay, this is how an open financial system, inclusive financial system would look, because I did not have to ask permission to open account and could interact with others without asking permission. That was the same essence of the internet of information back then, openness, neutrality, access for everybody. So then, I decided I was going to devote my life into it.* **Comment**: RSK/RIF/IOV Labs founders are all based in Argentina, and that is the place of effective management of the entities. In this statement it is clearly described how an open financial system would work, which is the core vision of the RSK/RIF/IOV Labs team; aiming to cut out the middleman (regulated entities), no KYC/AML, and circumventing capital controls.

2. *So, as part of doing everything, I started meeting in cafes in Buenos Aires, to buy and sell bitcoin. Very scary thing. Not for me, as I am accustomed to it.* **Comment**: being a facilitator of buying and selling bitcoin for cash via e.g. localbitcoins.com, would be subject to money transmitter regulation, making Diego subject to registration as a money service business, following KYC/AML requirements when those trade were made.

3. *This internet of value, will transform our lives in many ways. One of them, it will give the power of money back to the people. Now we will be able to create our own money. To represent our economy. It will give us a financial system that will be inclusive. It will lower the transaction costs.''* **Comment**: making a statement in the United States of America, about creation of own money, as one of the pros of the internet of value (IOV), seems misleading, as RSK /RIF/IOV Labs is not the Federal Reserve.

### 7. Announced Partnerships

During conference and in news articles RSK Labs made questionable announcements in relation to partnerships, for example:

- Etherparty: *a partnership between RSK Labs and Etherparty was announced. The articles states: RSK is the first open-source smart contract platform that allows Bitcoin users and miners to be players in the smart contract movement. The South American company is well positioned in the global ecosystem, **and is strongly aligned with Etherparty's values**.*

Not long after this announcement the following news article was made public about Etherparty (then called Vanbex): *Vanbex, a blockchain based firm based in Vancouver, has posted a statement defending itself regarding allegations made by the British Columbia Director of Civil Forfeiture and covered in the media. The original report, covered by the Vancouver Sun, revealed strong statements alleging a "$30-million cryptocurrency scam." Vanbex, formerly doing business as Etherparty, was co-founded by Kevin Hobbs and Lisa Cheng – two prominent members of the Canadian cryptocurrency industry.  Vanbex is a firm that has evolved from a "strategic communications firm into a consultancy laboratory—leading ideas to launch and helping established companies and start-ups alike harness emerging technology for a changing world."*

- Bitclub: Diego stated that RSK is working with all of the main pools and specifically mentioned Bitclub. In relation to Bitclub the following was stated by the United States Department of Justice: *From April 2014 through December 2019, BitClub Network was a fraudulent scheme that solicited money from investors in exchange for shares of purported cryptocurrency mining pools and rewarded investors for recruiting new investors into the scheme.  Goettsche, Balaci, Weeks, and others conspired together to solicit investment in BitClub Network through fraudulent means, including by providing false and misleading figures that BitClub investors were told were "bitcoin mining earnings" purportedly generated by BitClub Network's bitcoin mining pool.  Goettsche, Balaci, Weeks, and others obtained the equivalent of at least $722 million from BitClub Network investors.*

RSK (Diego) is proudly announcing such partnerships in public, i.e. al parties being part of the RSK eco-system.

### Actions against Megalodon by Diego, Alex and RIF Labs

*Overall Overview of RSK / RIF / IOV involvement*

In relation to Megalodon, Diego, Alex and other team members as legal representatives of RIF Labs have communicated with various persons about Megalodon, not limited to: (1) Maarten Christiaan Verweij, (2) Mattan Lurie, (3) Arnie Hill, and (4) Joshua Newton.

RIF Labs has never mentioned this to Megalodon or has asked any approval from Megalodon and affiliated parties for approval on such communication. Moreover, the RIF/RSK/IOV Labs team orchestrated a smear campaign with these people via various Telegram channels, including the RIF_OS Community channel.

In these communications:

- RIF is denying to have done business with Megalodon and are claiming that Megalodon defrauded people / misrepresented. These claims are made in chats, but also on https://blog.rsk.co/noticia/diego-zaldivars-ama-session/ (which website is referring to a Megalodon scam (fraud)).

1. Diego stated to Mattan Lurie in a chat that 30% to 40% of the investors did not redeem. Which means 72 out of 172 initial addresses did not redeem tokens at that time. Yet, communication from Diego's side is as if Megalodon was the only one who did not redeem (which is false).
2. Diego is further stating on February 24, 2019 to Josh Newton that:
   1. ''*Great work I am happy that you are bringing the truth to the light*''. Diego is referring to ICO Reverso Channel, where Maarten, Mattan, Josh and Alejandro Bantas (RSK Labs) had conducted a smear campaign against Megalodon.
3. Alex Kobo is in contact with Maarten Verweij about topics related to Megalodon. But which not have been revealed to Megalodon or affiliated parties.
4. Alex Kobo stated in an email to Maarten Verweij that ''*most of them have redeemed their tokens without problems*''. Where the emphasize is put on '*'most*''. Alex Kobo further states that based on privacy legislation ''*we cannot confirm or deny the entity that Megalodon used to sign the contribution agreement with RIF Labs*'' . While Diego stated to Josh Newton that Alex is in contact with Maarten Verweij ''*to help in anything we can*''. Diego further stated to Mattan Lurie (**no client of Megalodon**) that ''*we will definitely collaborate in a legal process*'' and ''*we have been deeply damaged by Mega's actions*''. While before he was stating to have no business dealing with Megalodon. And at that moment in time bringing claims about Megalodon, while he know and should have known, that Megalodon has contributed bitcoin to RIF Labs raise and that Megalodon would redeem in November 2019 (1 year after TGE).
5. Maarten Verweij had calls with RSK Legal, including Diego, of which Megalodon was not informed and no consent for this was provided by Megalodon.
6. Diego was communicating with Mattan Lurie, who is not a client of Megalodon. In the chats with Mattan Lurie, Diego provided information about Megalodon. He further, together with Alex Kobo, exchanged emails with Mattan Lurie. The latter is strange to us, as Mattan is no client of Megalodon, while Diego is providing wrongful information to him about Megalodon. We are in the possession of emails sent by Alex Aberg Cobo and Diego Gutierrez Zaldivar, which include a Zoom link for a call on February 1, 2019. Without Megalodon's consent, and also, making legal claims in their emails about misrepresentation (which under Dutch law is not the case). Alex stated that Megalodon *has been misrepresenting* in his email to Mattan Lurie on January 31, 2019. The latter is surprising to us, as (1) Mattan Lurie is no client of Megalodon and (2) a statement about misrepresenting without knowing local law and without Megalodon's consent is purely focussed on damaging Megalodon's reputation and putting people against Megalodon for the better of RIF Labs and is misleading the public (the public as Mattan Lurie is no client of Megalodon or has business dealing with Megalodon).
7. Diego further stated in a Telegram chat he had with Maarten Verweij, that he is not going to the Miami conference, which reference is to the North American Bitcoin conference. He states in his chat: '*I'm not going, I felt sick*'', ''*But also they told me it's associated with them*'', '*I don't want to be associated with anything related to them*''. He is talking about reputation, while Diego / RIF happily took an investment

and thereafter, willingly tried to put a blame on Megalodon (with the knowledge that tokens would need to be delivered in November 2019 to Megalodon). Furthermore, in May 2017, RSK Labs also happily took an investment from Moe Levin; which Diego denied to Maarten Verweij that Moe Levin is not a shareholder in RSK (which is a false statement looking to harm Megalodon's reputation).

8.  Diego further states to Maarten that: '*I was more than willing to help Josh because I was empathetic with the situation although we have __no contractual relationship__ with this*''. Diego here confirmed the communication with Josh Newton, which should not have taken place and is a breach of confidentiality. He further is referring to lawyers helping, while we are talking about a __delayed supply__.

9.  Diego further had a telephone conversation with Josh Newton in which he stated the following:

    1.  *''They fucked up on multiple ways''* and is referring to a Ledger (Megalodon did not use Ledger). Furthermore, Diego knowingly emphasizes on Megalodon not redeeming, while he knew delivery will be made in November 2019;

    2.  *''They should be more humble and accept their errors'' (*while 75 out of 145 contributors did not redeem at that time and Megalodon already indicated multiple times to redeem in November 2019 – communication about that was between RIF and Megalodon).

    3.  *''I know you are chasing them from the Netherlands, I imagine they cannot escape no…[Josh responded with: yes they do not know who they are fucking with]... [Diego responded with]... very good''.* Diego mentioned this laughing, were we cannot understand why Megalodon needs to be chased and not be able to escape, where we are talking about a delay in supply not a scam, which was known to Diego and RIF Labs.

    4.  *2019 will be an amazing year.* Diego is talking about capturing value and explains how to do it (basically referring to the fact that <u>RIF is a security and NOT a utility token</u>).

10. As mentioned above, on February 24, 2019, a smear campaign was conducted against Megalodon, its founders and affiliated persons. On that day Diego messaged Josh stating: *''<u>Great work</u> I am <u>happy that you are bringing the truth to the light</u>''*. In this message information was shared about Megalodon, and its founders, plus false claims like misrepresentation were included. This shows Diego's (and RIF Labs) active involvement in slandering Megalodon's name, while being aware of the facts. On March 8, 2019, Megalodon founders Esteban and Peter met with Alex Kobo in London, by Alex no reference was made to any communication he and Diego had with third parties.

*Involvement of Diego CEO and Co-Founders of RIF (RSK and IOV)*

We have included in the attachments communication between Diego, Alex, and third parties who are not a contracting party of RSK / RIF Labs. It also shows the collaboration between Diego and third parties in relation to an ongoing smear campaign against Megalodon, its founders and affiliated partners and entities.

**Summarizing**

In summary (and in legal terms and non-exhaustive) **our position** is that:

1. RIF Labs conducted an unregistered sale of securities in various countries, including the United States (reference is made to the SEC case Telegram), where first RSK Labs sold securities to US investors, followed by converting those securities into RIF and separately a sale of RIF took place to a limited amount of investors (including US investors), who would have the function of underwriters, in order to sell RIF (an unregistered security) to the public (of which RIF Labs was aware).

2. RSK Labs/RIF Labs/IOV Labs, have mislead investors in investing in their financial products (unregistered securities), with misleading statements, false information, without full disclosure of affiliated parties (such as Koinbanx), etc.. Furthermore, in our view during both private placements, no plain English description of the offering, key risk factors and description of important information and management incentives was shared with investors.

3. RSK Labs/RIF Labs/IOV Labs, have been unclear on the use of proceeds during all raised and have not informed investors about this. However, from public information available to us, it is clear that the funds were used for other purposes than described in the white paper and the limited information shared (e.g. acquiring a social media platform and payment to miners in order to create an incentive for merge-mining). Moreover, during the private placements, no description was provided on how the ICO proceeds with accomplish any company goals.

4. RIF Labs/IOV Labs, offered ERC-20 tokens after completion of its offering not a token build on the bitcoin blockchain. Moreover, Diego stated in various interviews that merge-mining would not costs miners extra, while he forgets to mention that RSK Labs pays miners to merge-mine (most likely with proceeds raised from the ICO).

5. RSK Labs/RIF Labs/IOV Labs, made themselves guilty from identity theft, forging financial documents after signing and usage of personal information for financial gains.

6. RSK Labs/RIF Labs/IOV Labs, made themselves, in our view, guilty to securities fraud and money laundering.

7. RSK Labs/RIF Labs/IOV Labs, made themselves, guilty to slander and defamation of their investors.

8. RSK Labs/RIF Labs/IOV Labs, made themselves, guilty in collaboration of an attempt of murder, extortion and abduction. Diego and Alex, have been actively pushing people to madness and encouraged them to ' *not let Megalodon escape'',* while feeding them information, in which they collaborated with these persons to: (1) extort Megalodon, (2) attempt of murder to E.A. van Goor, (3) attempt of abduction of E.A. van Goor.

9. RSK Labs/RIF Labs/IOV Labs, in specific Diego, encouraged slander and defamation against Megalodon and Esteban.

10. RIF Labs, Diego and Alex have violated our confidentiality agreement. They have held private chats on an encrypted chat app (Telegram), email correspondence and several telephone conversations with clients of Megalodon (without Megalodon's consent or awareness). They furthermore, shared the majority of information and concerns about misrepresenting and in their view fraud, to the public via the RSK website, via Telegram group channels, emails, chats, and telephone conversations with people who were NOT clients of Megalodon.

We are in the possession of all documentation and files (including recording) were these claims are based on.

## 12. Demand

Based on our position we demand the following:

- In relation to the investment made by Mark (Moe) Levin into RSK Labs (BVI) Limited:
  - ○ Refund of the invested **22.0761 bitcoin/BTC,** by means of transfer to a wallet designated by Claimant;
  - ○ Payment of damages, i.e., payments due by Ginger Developments Limited, as promised by RSK Labs Limited. Which we currently estimate at 3 US$ per second (US$ 0.03 x 100 transactions per second), for 2 years is US$ 189,216,000, of which Ginger was eligible 40%, US$ 75,686,400 and for which the stake (preferred would amount in): **US$ 983,923** (equivalent in bitcoin).
- In relation to the investment in RIF Labs, which was coherent to the RSK Labs Limited unregistered securities sale:
  - ○ A refund of the invested **750 bitcoin/BTC**, by means of transfer to a wallet designated by Claimant;
  - ○ Compensation of damages related to slander and defamation caused by wrongdoings of Diego, Alex, and Alejandro Bantas, **150 bitcoin/BTC**, by means of transfer to a wallet designated by Claimant.

Designated bitcoin wallet by claimant: **3CDQqApQE7Xz3hZGPaMjuUniPtg3BB8gvX**

## Litigation

Claimant can confirm that Claimant would be agreeable to mediation and would consider any other system of Alternative Dispute Resolution (ADR) in order to avoid the need for this matter to be resolved by the Courts.

Claimant would invite you to put forward any proposals in this regard.

Claimant look forward to hearing from you within the next **14 days**. In case Claimant does not receive a reaction from you to its satisfaction before the **4th of March 2021** Claimant reserves the right to proceed with the aforementioned actions (including serving you a summons) without any notification in advance.

## Document Retention Notice

In the meantime, please be advised to maintain, and not to destroy, any documents or other records, electronic or otherwise, that are pertinent to the issues raised in this letter, including any so-called "ephemeral media" such as texts, messaging application messages, etc.

**Final remarks**

Claimant aims to recoup its losses which are caused by the wrongdoings of RSK/RIF/IOV Labs. Claimant expects to be compensated appropriately. Claimant is willing to take all necessary steps required to hold you accountable for your actions in case you do not provide a solution that Claimant seems fit.

You may contact us by e-mail (rsk@megalodon.ae).

We will await your written response.

E.A. van Goor LL.M.
Mark Levin
Kerem Turetgen
Megalodon Capital Managment B.V.
Megalodon DMCC

# EXHIBIT 2

<table>
<tr><td>

**LETTER OF CLAIM**/

**LETTER BEFORE ACTION**

</td><td align="right">

**Megalodon DMCC**
**Megalodon Capital Management B.V.**
**c/o Esteban Arturo Van Goor**
**Mark Levin**
**Kerem Turetgen**
**rsk@megalodon.ae**

</td></tr>
</table>

**March 16th , 2021**

**Your ref: JIM/AP**

**BY EMAIL: james.montado@isolas.gi**

**Re: Letter of Claim/Letter Before Action dated 18th February 2021**

   **Letter to Megalodon dated 4th March 2021, James Montado, Partner, ISOLAS LLP**

**Dear Mr. Montado,**

With reference to your letter of 4th March 2021, we provide you with the requested supplementary information in addition to our Letter of Claim, by letter of 18th February 2021.

**Question 1 Isolas:**

*Specify the address of each of the proposed Claimants: it is insufficient and unacceptable to give only a United Arab Emirates email address;*

**Answer 1:**

Claimants:

-   Mark Levin, residing at Magalhaensplein 27-2, 1057 VE, Amsterdam, The Netherlands;
-   Kerem Türetgen, residing at Beylerbeyi Mah, Asaf Halet Celebi, SK, Building No12, flat 2, Uskudar, Istanbul, Turkey;
-   Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers, Dubai, United Arab Emirates, represented by Esteban van Goor, Managing Partner and Owner;
-   Megalodon Capital Management B.V., whose registered office is located at Paasheuvelweg 39, unit 12, 1105 BG, Amsterdam, The Netherlands, represented by Esteban van Goor, Managing Partner and Owner.

REPRESENTATIVENESS

- Steven Christiaan Witte, residing at Zenderstraat 87, 1223 DS HILVERSUM, The Netherlands, *[and/or]*;

- Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers, Dubai, United Arab Emirates, represented by Esteban van Goor, Managing Partner and Owner,("the agent" on behalf of Kerem Türetgen and Mark Levin (PoA));
- A Dutch 'RSK Claim' Foundation, yet to be formed, if we need to proceed to Court, as 'ultimum remedium', as a last resort.

**Question 2 Isolas:**

***Identify the jurisdiction in which it is intended to initiate legal proceedings, and specify the basis upon which each of the proposed Defendants is alleged to be liable to be sued in that jurisdiction: your Letter merely discusses at some length a number of supposed possibilities;***

**Answer 2:**

**First option:**

- **The Netherlands, as jurisdiction and enforcement of judgments in civil and commercial matters for:**

- Mark Levin, residing at Magalhaensplein 27-2, 1057 VE, Amsterdam, The Netherlands;
- Megalodon Capital Management B.V., whose registered office is located at Paasheuvelweg 39, unit 12, 1105 BG, Amsterdam, The Netherlands, represented by Esteban van Goor, Managing Partner and Owner.

Competent Authorities that could be of assistance:

- European Securities and Markets Authority (ESMA)
- Netherlands Financial Services Complaints Tribunal (Kifid)
- Autoriteit Consument & Markt (ACM), The Netherlands
- Autoriteit Financiële Markten, The Netherlands

**Gibraltar and Turkey, as jurisdiction and enforcement of judgments in civil and commercial matters for:**

- Kerem Türetgen, residing at Beylerbeyi Mah, Asaf Halet Celebi, SK, Building No12, flat 2, Uskudar, Istanbul, Turkey;
- Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers, Dubai, United Arab Emirates, represented by Esteban van Goor, Managing Partner and Owner;

Competent Authorities that could be of assistance:

- • **Gibraltar Public Service Ombudsman**
- • **Gibraltar Financial Services Commission**
- • **Office of Fair Trading Gibraltar**
- • **Capital Markets Board of Turkey (CMB)**
- • **The Turkish Capital Markets Association (TCMA)**

- **The Netherlands, Gibraltar, The United States of America, United Kingdom, Argentina, Turkey, British Virgin Islands, filing of a criminal complaint, competent jurisdictions to report violations of:**

1. **Securities Law**
2. **Money Laundering Law**
3. **Wire Fraud Law**
4. **Insider Trading**
5. **Identity Theft**
6. **Violation of Money Transmitter Regulation**
7. **Unjust Enrichment**
8. **Slander and Defamation**
9. **Unfair Business Practices**
10. **International Fraud Scheme**
11. **Investor Protection Directive 2014/65/EU**
12. **Regulation (EU) No 1215/2012**
13. **European Securities and Markets Authority (ESMA)**
14. **The Prospectus Directive**
15. **The Transparency Directive**
16. **The Markets in Financial Instruments Directive Framework**
17. **The Market Abuse Regulation**
18. **The Settlement Finality Directive and the Central Securities DepositoriesRegulation**
19. **The fifth AMLD on money laundering and terrorist financing**
20. **Financial Services (Markets in Financial Instruments) Act 2006**
21. **Prospectuses Act 2005**
22. **Financial Services (Collective Investment Schemes) Act 2011**
23. **English Law Act 1962**
24. **Gibraltar E-Commerce and Consumer Protection Regulations**
25. **Gibraltar Money Laundering Regulations**
26. **Misconduct in, or misuse of information relating to, a financial market**
27. **Misleading, false and fraudulent statements**
28. **Proceeds of Crime Act**
29. **Fraud or dishonesty or breach of trust**
30. **Criminal Justice Act 1993**
31. **Regulation (EU) No 596/2014**
32. **Communiqué on Prospectus and Issuance Document No II-5.1, Turkey.**
33. **Communiqué on Sale of Capital Market Instruments No II-5.2, Turkey.**
34. **Capital Market Law, NO 6362, Turkey.**

35. **Sourcing information about investors with third parties, collaboration with thirdparties leading to an assassination attempt and extortion.**
36. **Conducting an unregistered securities sale in the United States of America, without an approval of the SEC or applying an Exemption (also referred to as aReg D).**
37. **Actively participated in the commission of a crime, i.e. slander and defamation, an assassination attempt, and extortion.**
38. **Bank Act and Exchange Act**

Competent Authorities that could be of assistance:

- **European Securities and Markets Authority (ESMA)**
- **Netherlands Financial Services Complaints Tribunal (Kifid)**
- **Autoriteit Consument & Markt (ACM), The Netherlands**
- **Gibraltar Public Service Ombudsman**
- **Gibraltar Financial Services Commission**
- **Office of Fair Trading Gibraltar**
- **Royal Gibraltar Police**
- **Autoriteit Financiële Markten, The Netherlands**
- **U.S. Securities and Exchange Commission**
- **U.S. Commodity Futures Trading Commission**
- **U.S. Consumer Financial Protection Bureau**
- **U.S. Federal Trade Commission**
- **U.S. Federal Bureau of Investigation**
- **North American Securities Administrators Association**
- **Financial Industry Regulatory Authority, Inc.**
- **Capital Markets Board of Turkey (CMB)**
- **The Turkish Capital Markets Association (TCMA)**
- **INTERPOL General Secretariat**
- **Banco Central De La Republica Argentina**
- **Comisión Nacional de Valores, Argentina**
- **Gendarmeria Nacional, Argentina**

**Second option:**

Claimant can bring a bundle of claims in the name of several individual claimants through a power of attorney obtained from them. Claimant can also bring a bundle of claims in their own name as the owner of claims obtained by assignment.

The representative collective action is a mechanism allowing a representative entity, which is either a Dutch foundation (*stichting*) or an association (*vereniging*) with full legal capacity, to initiate proceedings to protect the similar interests of an unnamed group (class).

A representative entity can submit a claim for a declaratory judgment, injunctive relief or specific performance and claim monetary damages. A declaratory judgment establishing, for example, the unlawfulness of the defendant's conduct, can be a stepping-stone to claim

damages in separate proceedings, either on an individual basis or bundled, or to seek a class settlement agreement.

**A Dutch 'RSK and RIF Claim' Foundation, will be formed, if we need to proceed to Court as 'ultimum remedium'.**

The Court of Appeal ruled in Dexia[1]:

"It is not necessary that each of the four applicants should appear individually to be representative of the entire group of injured parties. It flows from the statutory rules that it is enough that the joint applicants are sufficiently representative with regard to the interests of the persons for whose benefit the Collective Settlement Procedure (WCAM) agreement has been concluded, provided that each of them are sufficiently representative with regard to a sufficiently sizeable group of these persons."

In the 'Converium' case, the Court of Appeal added that the law does not require that each applicant is sufficiently representative for a group of sufficient size.[2]

*Converium* is significant for several reasons, as the Dutch court:

Assumed jurisdiction even though:

- the claims were not brought under Dutch law and the securities where not traded on a Dutch stock exchange;
- the alleged wrongdoing took place outside the Netherlands; and
- none of the potentially liable parties and only a limited number of the potential claimants were domiciled in the Netherlands. Considered that a 20% fee for the principal counsel was not unreasonable.

In the context of determining the fairness of a class settlement, the Court took into account customary US fee practices, when US law firms are involved and the legal services they provided took place predominantly in the US. Consequently, the Amsterdam Court of Appeal held that a fee amounting to 20% of the settlement amount was not unreasonable.

There has also been an increase in the use of third-party funding in Dutch collective actions and the number of third party funders active on the Dutch market is growing. Other funding options, for example crowdfunding, are possible.

The principal sources of law for representative collective actions and class settlement proceedings are the Civil Code and Code of Civil Procedure. Representative collective actions are governed by Articles 3:305a to 3:305d of the Civil Code.

---

[1] Dexia, par. 5.26.
[2] Converium, par. 10.2.

The first phase of class settlement proceedings is the private, non-court supervised and undisclosed negotiation process between the parties aiming to reach a settlement. The settlement agreement is ultimately concluded between:

- the parties that will pay the compensation for the event that has caused damage; and
- one or more Agents that represent the interests of the class of persons intended to be covered by the settlement agreement.

**Potential claimant**

A Dutch foundation or association with full legal capacity can represent the interests of the parties concerned in a representative collective action (*Article 3:305a, Civil Code*). Certain public legal bodies can also initiate collective proceedings, provided that they represent the similar interests of other persons (*Article 3:305b, Civil Code*).

In class settlement proceedings, the parties that request the Amsterdam Court of Appeal to declare the collective settlement binding on all class members are the parties to the collective settlement. These may be foundations or associations with full legal capacity that represent the interests of the class members and the party or parties that will pay the damages.

All types of claimants can bring a bundle of individual claims on the basis of a power of attorney given by the individual claimants, or on the basis of assignment of the claims to a claiming entity.

**Claimants outside the jurisdiction**

Foreign claimants can be represented by a Dutch foundation or association with full legal capacity in a representative collective action. Under the WAMCA foreign class members are not bound if they do not opt-in, unless the court orders that an opt-out system applies.

Certain organisations with their registered office abroad but that are placed on the list referred to in Article 4(3) of the Directive 98/27/EC on injunctions for the protection of consumers' interests also have standing to represent interested persons for that purpose in the Netherlands (*Article 3:305c, Civil Code*).

**Question 3 Isolas:**

*Identify specific causes of action against each of the proposed Defendants: your Letter does not clearly do so, either by specifying the parties to and material provisions of an agreement or agreements and the breaches alleged, or by specifying breach or breaches of some other specified obligation or obligations. t is insufficient merely to allege fraud (amongst a plethora of other claims) in general terms and without informing the proposed Defendants of the nature of the case to be advanced against them;*

**Answer 3:**

A defendant in a collective action that is held jointly and severally liable can apply for an order to commence third-party proceedings (*vrijwaring*) against their joint and several liable co-debtors for recourse for an awarded claim.

If the court allows third-party proceedings, the defendant in the main proceedings must commence the new proceedings against their joint debtors, which then become the defendants in the third-party proceedings. They do not become a party in the main action unless those defendants join the defendant in the main action.

In addition, any sufficiently interested party can apply to join the defendant or to intervene and issue an independent claim in the main action.

Multiple defendants can co-operate in their defence. Multiple defendants can enter into "joint defence agreements" (or other arrangements) to share confidential information (without waiving privilege, including other protections such as a process to be followed if conflicts arise). Multiple defendants can also instruct the same lawyers or experts.

In this regard, as stated in your letter of 4th March 2021:

*We write further to your Letter of Claim/Letter Before Action dated 18 February 2021. We are instructed on behalf of the proposed Defendants and would be grateful if all further correspondence in respect of this matter were sent directly to us.*

**Considered to be defendants in absence of proof to the contrary:**

- IOV Labs Limited, RIF Labs Limited, Suite 23 Portland House Glacis Road, GibraltarGX11 1AA Gibraltar, Company Number: 116697.
- Fiduciary Trust Limited, 3, Bell Lane, Gibraltar.
- RSK Labs limited, BVI, 1895440, Morgan & Morgan Building, Pasea Estate, RoadTown, Tortola, British Virgin Islands.
- Ginger Developments Limited, 1989326, Pasea Estate p.o. box 958 Road TownTortola VG1110 Virgin Islands, British.
- Isolas LLP, Portland House, Glacis Rd, GX11 1AA, Gibraltar.
- Malcolm Stephen David, Palle 26 Arlington Midtown, Gibraltar GX11 1AA, Gibraltar, British, flat 65 Aegean apartments, 19 Western Gat Victoria Docks, London,England, United Kingdom E16 1AR.*
- Alejandro Maria Aberg Cobo, Camino De Los Horneros 220, Lomas de la Tahoma Lote 346 Colonia Nicolich Canelones 14000, Uruguay, Argentinian.*
- Wayne Leslie Almeida, 4 Richmond Close Montagu Crescent GX11 1AA Gibraltar,British.*
- Joseph Peter Garcia, 3 Garden Apartment King's Wharf, Gibraltar, British.*
- Diego Gutierrez Zaldivar, 2028 4 R Vidt, Buenos Aires C1425, Buenos Aires,Argentina, Argentinian.*
- Fiduciary Management Limited, 3 Bell Lane GX11 1AA, Gibraltar.
- Sergio Lerner, Jauretche 162 7B (1405), Buenos Aires, Argentina.*
- Gabriel Alejandro Kurman, Roseti 138 PBC (1427), Buenos Aires, Argentina.*
- Ruben Ariel Altman, Salguero 2136 9a (1425), Buenos Aires, Argentina.*

- Adrian Eidelman, Acuña de Figueroa 1470 (1180), Buenos Aires, Argentina.*
- Adrian Garelik, Blanco Encalada 1910 (1430), Buenos Aires, Argentina.*

*Please submit latest whereabouts, correct address to Claimant, as the addressesprovided by you in official communications and documentations are incorrect!

### Question 4 Isolas;

*Explain the alleged common interest of the various proposed Claimants which you allege entitles the Claimants to join together in the proposed legal proceedings: your Letter does not attempt to do so;*

### Answer 4:

Championing the interests of these current and former holders of RSK/RIF/IOV Labs shares/tokens/securities who have sustained damage. Entering into a collective settlement agreement in order to end the disputes in connection with these events. Overseeing compliance with the Settlement Agreement; and everything that is connected with the foregoing or that may be conducive to it.

### Jurisdiction and Competence

The Amsterdam Court of Appeal has sole competence to take cognizance of this petition pursuant to article 1013(3) DCCP.

### International jurisdiction

In the *Shell* and *Converium* cases, the Court of Appeal found that it can derive international jurisdiction from the predecessor of the Brussels I Regulation (recast),[3] the EVEX Convention[4] and article 3 of the Dutch Code of Civil Procedure ["DCCP"] for declaring a Settlement Agreement binding formed in the context of the WCAM. The Claimants concur with these findings. This has the following meaning for these proceedings.

With regard to the eligible RSK/RIF/IOV Labs shares/tokens/securities holders (current and previous) who are domiciled or have their place of establishment in the Netherlands, the Court of Appeal can derive jurisdiction from article 4 (1) of the Brussels I Regulation (recast).[5]

With regard to the eligible RSK/RIF/IOV Labs shares/tokens/securities holders (current and previous) who at the time this petition was submitted had their domicile or place of establishment outside the Netherlands, in a state that is party to the Brussels I Regulation (recast) or the EVEX Convention, the Court of Appeal can derive international jurisdiction from article 8 preamble and (1) of the Brussels I Regulation (recast), or article 6 preamble and (1) of the EVEX Convention, respectively.[6] These articles stipulate that a person who is

---

[3] Regulation (EU) no 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast).

[4] Convention of 21 December 2007 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters.

[5] Cf. Shell, par. 5.18 and Court of Appeal Amsterdam 12 November 2010, NJ 2010, 683 (Converium interim decision) (hereinafter "Converium Interim Decision"), par. 2.10.

[6] Cf. Shell, par. 5.19 and Converium Interim Decision, par. 2.11

domiciled in the territory of a Member State of the European Union or an EVEX Member State can also be sued:

*"where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings."*

Furthermore, the Court of Appeal can also derive international jurisdiction with regard to the eligible RSK/RIF/IOV Labs shares/tokens/securities holders (current and previous) residing or established in a European or EVEX Member State from article 7, preamble, and (1)(a) of the Brussels I Regulation (recast) and article 5, preamble, and (1)(a) of the EVEX Convention.[7] These articles stipulate that a person or legal entity domiciled in the European Union or an EVEX Member State, respectively, can also be sued:

*"in matters relating to a contract, in the courts for the place of performance of the obligation in question."*

The contractual obligation in the current case pertains to the obligation to provide to the Eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders the compensations to which they are entitled under the Settlement Agreement. If the Settlement Agreement is declared binding, this obligation will be implemented in the Netherlands: the Foundation, a legal entity established in the Netherlands, will assess claim forms, determine the compensation and arrange for its distribution (by engaging the Claims Administrator appointed by it and acting on its behalf).

With regard to Eligible RSK/RIF/IOV Labs shares/tokens/securities holders who, at the time this petition was submitted, were not domiciled or established in a country party to the Brussels I Regulation (recast) or the EVEX Convention, the Dutch courts have jurisdiction on the grounds of article 3, preamble, and (a) DCCP.[8]

### Content and amount of the settlement agreement

The compensation offered offers a reasonable balance between the risks of litigation and the advantages of a settlement. This settlement offers eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders the possibility to claim a reasonable compensation of the loss perceived by them, rightly or wrongly, without them having to pursue legal actions.

In the context of the comprehensive arrangement as set down in the Settlement Agreement, Claimants have taken account of the likelihood that the communication by RSK/RIF/IOV Labs in a particular Relevant Period might be qualified as misleading in court.

If the Settlement Agreement is declared binding, eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders will be able to receive a compensation within a relatively short period (within 14 days).

The Claimants will request that the Court of Appeal treat the list with names and addresses of the eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders known

---

[7] Cf. Converium Interim Decision, par. 2.8 – 2.9.
[8] Cf. Shell, par. 5.16 and Converium Interim Decision, par. 2.12.

to them as a 'file' in accordance with Article 2.2.2.1 of the Rules of Procedure within the meaning of article 1(c) of the Dutch Personal Data Protection Act so that the file is not included as part of the public case file.

The eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders known to the Claimants will be summoned to appear at the hearing by means of a letter or e-mail.

In addition, for the benefit of the unknown eligible RSK/RIF/IOV Labs shares/tokens/securities (current and previous) holders and the legal entities meant in article 1014 DCCP, the Claimants will make an announcement of the hearing in various newspapers and press agencies.

In determining the newspapers in which the Claimants intend to publish the announcement, Claimants will take account of the geographical spread of the eligible Shareholders known to the Claimants.

The Claimants propose that the Petition and other documents pertaining to the case, including in any event the Settlement Agreement and the Settlement Distribution Plan, be published on the websites of the Foundation (www.rskclaim.com and www.rifclaim.com) and to make it possible to consult them through the websites of the various Petitioners (including by means of a link to the website of the Foundation).

The Claimants assume, in addition to this, that it will be possible to submit written requests for the petition and other documents pertaining to the case from the registry of the commercial section of the Court of Appeal, in accordance with article 290(3) DCCP, and that they will be published on www.rechtspraak.nl.

**Period for submitting a statement of defense**

Pursuant to article 282(1) DCCP in conjunction with article 2.2.2.8 of the Rules of Procedure, defenses can be submitted up to no later than six weeks before the date of the hearing, unless otherwise determined by the Court of Appeal.

The Claimants do not know whether statements of defense will be submitted. If that is the case, the Claimants will of course gladly respond to these. So as on the one side to safeguard that this can adequately be done and on the other side to avoid delaying the proceedings as much as possible, Claimants request the Court of Appeal not to deviate from article 2.2.2.8 of the Rules of Procedure and thus direct that any statements of defense may be submitted up to no later than six weeks before the date of the hearing.

The Claimants also will request that the Court of Appeal direct that interested parties who wish to speak during the hearing, in person or represented by counsel, notify the Court of Appeal and the Claimants to this effect no later than four weeks prior to the date of the hearing.

Additionally, the Claimants wish to see the proceedings completed as soon as reasonably possible. This is deemed to be in the interest of all parties involved in the Settlement Agreement – in particular the Eligible RSK/RIF/IOV Labs shares/tokens/securities holders entitled to compensation – so that they can obtain certainty in the short term and the implementation of the agreements set out in the Settlement Agreement can be started as soon

as possible as well as the distribution of the amounts provided for in the Settlement Agreement.

Shareholders (investors) overview of RSK Labs (BVI) Limited:

| | | | |
|---|---|---|---|
| Topspring Technology Limited | Bitmain | People's Republic of China | CSRC |
| Digital Currency Group, Inc | DCG | The United States of America | SEC |
| Ms. Hongmin Sun | Huiyin | People's Republic of China | CSRC |
| Minka INC | Minka Inc | The United States of America | SEC |
| Digifinex Inc | Bitfinex | BVI | BVIFSC |
| Anthony Di Lorio | - | Canada | CSA |
| Certo S.A. | Certo S.A. | Uruguay | BCA |
| Maciej Ziolkowski | Maciej Ziolkowski | Poland | KNF |
| Tomasz Rulka | Tomasz Rulka | Poland | KNF |
| Mark Levin | Mark Levin | Canada | CSA / AFM |
| BAHA Ventures LLC | BAHA Ventures LLC | The United States of America | SEC |
| Bitfury Finance Limited | Bitfury Finance Limited | Cayman / The United States of America (HQ) | SEC |
| Paola Rebuffo | Paola Rebuffo | Switzerland | BaFin |
| Andrea Rossi | Andrea Rossi | Switzerland | BaFin |
| Yuan Dawei | Yuan Dewei | People's Republic of China | CSRC |
| Han Weiping | Han Weiping | People's Republic of China | CSRC |
| Bruce Fenton | Artrantic Financial | The United States of America | SEC |
| Seedcoin Limited (later Coinsilium) | Seedcoin Limited (later Coinsilium) | BVI / UK | BVIFSC/FCA |
| Laurent Christian Joseph Kssis | Laurent Christian Joseph Kssis | UK | FCA |
| Pier Andreina Thomas | Pier Andreina Thomas | UK | FCA |
| Cameron John Parry | Cameron John Parry | UK | FCA |

**Question 5 Isolas:**

*Indicate at least in general terms the nature of the relief sought against each of the proposed Defendants: your Letter does not clearly do so.*

*Answer 5:*

Quantum Meruit:

- In relation to the investment made by Mark (Moe) Levin into RSK Labs (BVI) Limited:

  - Refund of the invested **22.0761 bitcoin/BTC,** by means of transfer to a wallet designated by Claimant;
  - Payment of damages, i.e., payments due by Ginger Developments Limited, as promised by RSK Labs Limited. Which we currently estimate at 3 US$ per second (US$ 0.03 x 100 transactions per second), for 2 years is US$ 189,216,000, of which Ginger was eligible 40%, US$ 75,686,400 and for which the stake (preferred would amount in): **US$ 983,923** (equivalent in bitcoin).

- In relation to the investment made by Mark (Moe) Levin into RIF Labs, which was coherent to the RSK Labs Limited unregistered securities sale:

  - A refund of the invested **400 bitcoin/BTC**, by means of transfer to a wallet designated by Claimant;

- In relation to the investment made by Kerem Türetgen into RIF Labs, which was coherent to the RSK Labs Limited unregistered securities sale:

  - A refund of the invested **50 bitcoin/BTC**, by means of transfer to a wallet designated by Claimant;

- In relation to the investment made by Megalodon Capital Management B.V. into RIF Labs, which was coherent to the RSK Labs Limited unregistered securities sale:

  - A refund of the invested **300 bitcoin/BTC**, by means of transfer to a wallet designated by Claimant;
  - Compensation of damages related to slander and defamation caused by wrongdoings of Diego, Alex, and Alejandro Bantas, **100 bitcoin/BTC**, bymeans of transfer to a wallet designated by Claimant.

- In relation to Megalodon DMCC Compensation of damages related to slander and defamation caused by wrongdoings of Diego, Alex, and Alejandro Bantas, **50 bitcoin/BTC**, bymeans of transfer to a wallet designated by Claimant.

| | | Name Claimant | Defendants | Amount of Claim |
|---|---|---|---|---|
| 1 | Mark Levin | | RSK Labs Limited and all its directors | 22.0761 bitcoin |
| | | | RSK Labs Limited (Ginger Developments Limited) and all its directors | US$ 983,923 (equivalent in bitcoin) |
| | | | RIF/IOV Labs Limited and all its directors | 400 bitcoin |
| 2 | Kerem Türetgen | | RIF/IOV Labs Limited and all its directors | 50 bitcoin |
| 3 | Megalodon DMCC | | RSK/RIF/IOV Labs Limited and all its directors | 50 bitcoin (smear campaign) |
| 4 | Megalodon Capital Management B.V. | | RIF/IOV Labs Limited and all its directors | 300 bitcoin |
| | | | RIF/IOV Labs Limited and all its directors | 100 bitcoin (smear campaign) |

Designated bitcoin wallet by claimant: **3CDQqApQE7Xz3hZGPaMjuUniPtg3BB8gvX**

Claimant would invite you to put forward any proposals in this regard.

Claimant look forward to hearing from you within the next **14 days** with a detailed Letter of Response. In case Claimant does not receive a reaction from you to its satisfaction before the **31th of March 2021,** Claimant reserves the right to proceed with the aforementioned actions (including serving you a summons) without any notification in advance.

We consider that this correspondence provides sufficient information to enable you and your clients to commence investigations and to put a valuation upon the claim.

This correspondence is not intended to have the formal status of a pleading and, therefore, we reserve the right to provide further information under each of the headings above in due course.

**Document Retention Notice**

In the meantime, please be advised to maintain, and not to destroy, any documents or other records, electronic or otherwise, that are pertinent to the issues raised in this letter, including any so-called "ephemeral media" such as texts, messaging application messages, etc.

**Final remarks**

Claimant aims to recoup its losses which are caused by the wrongdoings of RSK/RIF/IOV Labs. Claimant expects to be compensated appropriately. Claimant is willing to take all necessary steps required to hold you accountable for your actions in case you do not provide a solution that Claimant seems fit.

You may contact us by e-mail (rsk@megalodon.ae).

We will await your written response.

Yours faithfully,

E.A. van Goor LL.M.
Mark Levin
Kerem Turetgen
Megalodon Capital Management B.V.
Megalodon DMCC

# Power of attorney

**The undersigned**

Mark Levin, residing at Magalhaensplein 27-2, 1057 VE, Amsterdam, The

Netherlands,

(hereinafter "the principal")

**hereby gives power of attorney to**

Steven Christiaan Witte, residing at Zenderstraat 87, 1223 DS HILVERSUM, The

Netherlands,

*[and/or]*

Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers,

Dubai, United Arab Emirates, represented by Esteban van Goor, Managing

Partner and Owner,

(hereinafter "the agent")

to represent him in the collective negotiations, actions and proceedings to obtain a compensation out of the Settlement Amount (hereinafter "the RSK/RIF/IOV Labs Settlement") as determined in the Settlement Agreement (as may be amended) entered into between parties (hereinafter "the Settlement Agreement").

Under this power of attorney, the agent has irrevocable authority to act in the name and on behalf of the principal to:

— Take all necessary or useful measures, collect all information and documents, sign all documents and complete all formalities, including contacting third parties who possess such information and documents such as, but not limited to, financial institutions, asset managers or other intermediaries involved in the principal's RSK/RIF/IOV Labs;

— Take any legal action to submit a Claim Form and approve the claim for compensation, including collecting the funds / money / Bitcoin (BTC) recieved from RSK/RIF/IOV Labs; on the designated bitcoin wallet: 3CDQqApQE7Xz3hZGPaMjuUniPtg3BB8gvX ; collecting any additional information or documents requested by the Claims Administrator or any other institution authorised to request such information or document under the Settlement Agreement;

— Fully, finally and irrevocably release and discharge all Releasees and waive any and all rights

1

against all Releasees, as described in the Claim Form and as provided for in the Settlement Agreement;

— Submit the claim for compensation to the exclusive jurisdiction of (i) the Claims Administrator, (ii) the Dispute Committee and (iii) the Amsterdam Court of Appeal and its appellate bodies;

— Cooperate with and have contact with (i) the Claims Administrator, (ii) the Dispute Committee ;

— Take any other useful or necessary measure, take any other useful or necessary action, and prepare and sign any other useful or necessary document relating to the RSK/RIF/IOV Labs Settlement.

This power of attorney remains fully force and is therefore irrevocable until the full and final amount of the compensation due to the principal under the RSK/RIF/IOV Labs Settlement has been received.

This power of attorney is subject to and is exclusively governed by Dutch law. All disputes between the parties concerning this power of attorney are the exclusive competence of the courts of [Amsterdam].

Capitalised terms not otherwise defined in this power of attorney have the meaning ascribed to them in the Settlement Agreement.

The principal: Mark Levin

Date:     February- 2- 2021

# Power of attorney

**The undersigned**

> Kerem Türetgen, residing at Beylerbeyi Mah, Asaf Halet Celebi, SK, Building No
>
> 12, flat 2, Uskudar, Istanbul, Turkey,
>
> (hereinafter "the principal")

**hereby gives power of attorney to**

> Steven Christiaan Witte, residing at Zenderstraat 87, 1223 DS HILVERSUM, The
>
> Netherlands,
>
> *[and/or]*
>
> Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers,
>
> Dubai, United Arab Emirates, represented by Esteban van Goor, Managing
>
> Partner and Owner,
>
> (hereinafter "the agent")

to represent him in the collective negotiations, actions and proceedings to obtain a compensation out of the Settlement Amount (hereinafter "the RSK/RIF/IOV Labs Settlement") as determined in the Settlement Agreement (as may be amended) entered into between parties (hereinafter "the Settlement Agreement").

Under this power of attorney, the agent has irrevocable authority to act in the name and on behalf of the principal to:

— Take all necessary or useful measures, collect all information and documents, sign all documents and complete all formalities, including contacting third parties who possess such information and documents such as, but not limited to, financial institutions, asset managers or other intermediaries involved in the principal's RSK/RIF/IOV Labs;

— Take any legal action to submit a Claim Form and approve the claim for compensation, including collecting the funds / money / Bitcoin (BTC) recieved from RSK/RIF/IOV Labs; on the designated bitcoin wallet: 3CDQqApQE7Xz3hZGPaMjuUniPtg3BB8gvX ; collecting any additional information or documents requested by the Claims Administrator or any other institution authorised to request such information or document under the Settlement Agreement;

— Fully, finally and irrevocably release and discharge all Releasees and waive any and all rights

1

against all Releasees, as described in the Claim Form and as provided for in the Settlement Agreement;

— Submit the claim for compensation to the exclusive jurisdiction of (i) the Claims Administrator, (ii) the Dispute Committee and (iii) the Amsterdam Court of Appeal and its appellate bodies;

— Cooperate with and have contact with (i) the Claims Administrator, (ii) the Dispute Committee ;

— Take any other useful or necessary measure, take any other useful or necessary action, and prepare and sign any other useful or necessary document relating to the RSK/RIF/IOV Labs Settlement.

This power of attorney remains fully force and is therefore irrevocable until the full and final amount of the compensation due to the principal under the RSK/RIF/IOV Labs Settlement has been received.

This power of attorney is subject to and is exclusively governed by Dutch law. All disputes between the parties concerning this power of attorney are the exclusive competence of the courts of [Amsterdam].

Capitalised terms not otherwise defined in this power of attorney have the meaning ascribed to them in the Settlement Agreement.

The principal: Kerem Türetgen

Date: February- 2- 2021

DocuSigned by:

*Kerem Turetgen*

82956AB297E0485...

# EXHIBIT 3

<table>
<tr><td>

**LETTER OF CLAIM**/

**LETTER BEFORE ACTION**

</td></tr>
</table>

**Megalodon DMCC**
**Megalodon Capital Management B.V.**
**c/o Esteban Arturo Van Goor**
**Mark Levin**
**Kerem Turetgen**
**rsk@megalodon.ae**

**April 22th , 2021**

**Your ref: JIM/AP**

**BY EMAIL: james.montado@isolas.gi**

**Re: Letter of Reply to Megalodon dated March 31, 2021, James Montado, Partner, ISOLAS LLP**

**Dear Mr. Montado,**

Thank you for your letter of March 31, 2021. This letter constitutes our letter of response to your Letter of Reply of March 31, 2021, where we have included our input to the statements made by Isolas LLP.

*Statement 2.1 Isolas*

2.1     '*In your second letter you have not clearly specified the jurisdiction in which you propose to sue.*'

**Answer:**

In relation to this statement, we would like to emphasize that based on our previous letter of March 16, 2021, it is already described that there are two options for us, i.e., separate jurisdiction per claim, *i.e.:*

- **The Netherlands, as jurisdiction and enforcement of judgments in civil and commercial matters for:**

   -   Mark Levin, residing at Magalhaensplein 27-2, 1057 VE, Amsterdam, The Netherlands;
   -   Megalodon Capital Management B.V., whose registered office is located at Paasheuvelweg 39, unit 12, 1105 BG, Amsterdam, The Netherlands, represented by Esteban van Goor, Managing Partner and Owner.

Competent Authorities that could be of assistance:

   •   European Securities and Markets Authority (ESMA)
   •   Netherlands Financial Services Complaints Tribunal (Kifid)

- Autoriteit Consument & Markt (ACM), The Netherlands
- Autoriteit Financiële Markten, The Netherlands

**Gibraltar and Turkey, as jurisdiction and enforcement of judgments in civil and commercial matters for:**

- Kerem Türetgen, residing at Beylerbeyi Mah, Asaf Halet Celebi, SK, Building No12, flat 2, Uskudar, Istanbul, Turkey;
- Megalodon DMCC, whose registered office is located at Jumeirah Lakes Towers, Dubai, United Arab Emirates, represented by Esteban van Goor, Managing Partner and Owner;

Competent Authorities that could be of assistance:

- **Gibraltar Public Service Ombudsman**
- **Gibraltar Financial Services Commission**
- **Office of Fair Trading Gibraltar**

However, as described in our letter of March 16, 2021 a second option for us would be to file a claim through a Dutch Foundation. Which Foundation would be acting on behalf of Claimants. Moreover, as stated in our letter of March 16, 2021, the foundation would be able to act on behalf of all current and previous holders of RSK/RIF.

*Statement 2.1 Isolas*

2.1     *You have proceeded on the misconceived notion, not only that the relevant exclusive jurisdiction clauses in the relevant Early Contribution Agreements are of no effect, but that in default thereof the courts of The Netherlands would accept jurisdiction because of the residence of the proposed Claimants or of other prospective Claimants whom you believe that you are entitled to represent.*

**Answer:**

The choice of law can only be effective if it is based on parties' common consciousness and will.[1] Expression of this consensus ad idem is subject to some requirements under the Regulation system. According to the second sentence of Art 3(1) of the Rome 1 Regulation, 'the choice shall be made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case'. Moreover, in relation to the question which jurisdiction is governing the early-contribution agreement, we refer to article 6 of Regulation EC no 593/2008, which states that in relation to consumer contracts the agreement is governed by the law of the country where the consumer has his habitual residence.

In relation to dispute on the choice of law, the CJEU has ruled in  C-135/15 Hellenic Republic v Grigorios Nikiforidis that the "overriding mandatory provisions" of the law of a particular

---

[1] M. Mandery, Party Autonomy in Contractual and Non-Contractual Obligations: A European and Anglo-Common Law Perspective on the Freedom of Choice of Law in the Rome I Regulation on the Law Applicable to Contractual Obligations and the Rome II Regulation on the Law Applicable to Non-Contractual Obligations, at 25 (2014). Supra note 11, at 43.

state can be taken into account by a Member State court when determining a contractual dispute even where a different law has been chosen to govern the contract. Applying the Rome I Regulation on the law applicable to contractual obligations, the CJEU found that a national court (e.g. The Netherlands) can give effect to overriding mandatory provisions of the law of a third state (e.g. Gibraltar).

Furthermore, in relation to Kerem Turetgen, we would like to note that the subjective and objective choice of law rules under the Turkish Private International Law Act no.5718 both draw a framework that is consistent with the relevant European Union instruments. The Turkish legislature adopted its new Private International Law Act (PILA) no.5718 in 2007 which was inspired by the Rome Convention and brought about to accommodate the Turkish choice of law rules to European law.

An agreement between the parties to confer on one or more courts or tribunals of a Member State exclusive jurisdiction to determine disputes under the contract should be one of the factors to be taken into account in determining whether a choice of law has been clearly demonstrated[2].

Terms which restrict how and where Claimants can take legal action and obliging them to provide proof which is the responsibility of the other party to the contract, are unfair contract terms. Under the Directive on Unfair Terms in Consumer Contracts, a contractual term which causes a significant imbalance in the parties' rights and obligations arising under the contract, to the detriment of the consumer, is regarded as unfair.[3] It is settled in the jurisprudence of the CJEU that a pre-dispute arbitration clause that deprives the consumer of the choice to litigate is unfair within the meaning of the Directive[4].

Ensuring access to justice for the consumer through a fair and efficient dispute resolution mechanism is one of the central aspects of EU consumer law[5]. The consumer can bring the Defendant before the court of his jurisdiction (e.g. The Netherlands).[6] In case of conflict of applicable substantive laws, the law which is the most favorable to the consumer is applied[7].

The consumer cannot be subjected to pre-dispute arbitration agreement that excludes an option to litigate[8].The Dutch court will assess whether an arbitration agreement is unfair

---

[2] REGULATION (EC) No 593/2008 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL, Recital 12
[3] Council Directive 93/13/EEC, of 5 April 1993 on Unfair Terms in Consumer Contracts, OJEC, L 95/29. Article 3(1). (Directive on Unfair Terms in Consumer Contracts).
[4] Case 27.6.2000, joined cases C-240/98–C-244/98, Océano Grupo Editorial, and Salvat Editores. – ECR 2000, p. I–4941 & Case
26.10.2006, C-168/05, Mostaza Claro v. Centro Móvil Milenium SL. – ECR 2006, p. I–10421.
[5] Besides dispute settlement provisions in many of the EU regulations and directives governing cross-border commerce, the EU has implemented specific dispute settlement rules that are favorable to the consumers including the alternative dispute resolution directive (Directive 2013/11/EU of the European Parliament and of the Council of 21 May 2013 on Alternative Dispute Resolution for Consumer Disputes and Amending Regulation (EC) No 2006/2004 and Directive 2009/22/EC, OJEU, L 165/63. (Directive on consumer ADR).
[6] Regulation (EU) No. 1215/2012 of The European Parliament and the of the Council of 12 December 2012 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, OJEU, L 351/1, Article 18(1). (Brussels I).
[7] Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the Law Applicable to Contractual Obligations (Rome I), OJEU, L 177/6, Art. 6. (Rome I).
[8] Andreas von Goldbeck, 'Consumer Arbitrations in the European Union' (2018) 18 Pepperdine Dispute Resolution Law Journal 263,

under the Unfair Terms in Consumer Contracts Directive, ex officio during a proceeding for the annulment[9] or enforcement of an arbitral award.[10]

Based on the above we feel comfortable that a Dutch court would rule in favor of the jurisdiction being the Netherlands in the case at hand; also considering the fact the Netherlands allows (mass) claims through Dutch foundations. In our letter of March 16, 2021, on page 5 and 6, we describe the basis of the position and a Dutch foundations involvement in this claim (based on case law).

To summarize the above:

1. Mark Levin:
   a. In relation to his agreement with RSK Labs Limited and Ginger Development Limited. All agreements are governed by the Netherlands, as for these agreements he is considered to be a consumer (also see article 6 of Regulation EC no 593/2008).
   b. In relation to his agreement with RIF Labs Limited. For this agreement the governing law is the Netherlands, as for these agreement he is considered to be a consumer (article 6 of Regulation EC no 593/2008).

2. Megalodon Capital Management B.V.
   a. In relation to his agreement with RIF Labs Limited. For this agreement the governing law is the Netherlands, based on Rome I Regulation and relevant case law C-135/5.

3. Kerem Turetgen:
   a. In relation to his agreement with RIF Labs Limited. For this agreement the governing law is Turkey, we refer to the Turkish regulation under PILA no. 5718.

In case of a class action lawsuit via a Dutch foundation the jurisdiction would be the Netherlands (we refer to our letter of March 16, 2021, where this position and relevant case law is described).

*Statement 2.1 Isolas:*

2.1    *'We are surprised that you have adopted such a position given that you appear to have previously accepted (in your letter of 18th February 2021) the primary rule that jurisdiction is determined by the residence of Defendants, not of Claimants.'*

**Answer:**

This is an incorrect interpretation of our letter of February 18, 2021. We do not agree with your conclusion on the jurisdiction, we i.a. refer to the above regarding our position on how to interpret the governing jurisdiction for agreements based on EU law.

---

265.
[9] Mostaza Claro v. Centro Móvil Milenium SL (n 105).
[10] Asturcom Telecomunicaciones SL v Cristina Rodrı́guez Nogueira (n 106).

Furthermore, there are procedural prerequisites (Pre-trial Correspondence requirements) to filing a lawsuit in The Netherlands in cases of mismanagement brought before the Enterprise Court (Section 2:349 DCC) and collective actions (Section 3:305a DCC). When failing to comply with these prerequisites, you may not have cause of action. Reasonable attempt to settle: under 3:305a DCC, a collective action cannot proceed unless the representative entity has made a reasonable attempt to settle the case. In this context, the Dutch law also provides that a letter that gives the defendant two weeks to respond will suffice.

*Statement 2.2 Isolas:*

*2.2 In any event, the terms of the applicable Early Contribution Agreements with Megalodon Capital Management BV, Mark Levin and Kerem Turetgen provide for:*

> *2.2.1.  arbitration of any disputes in Gibraltar under London Court of International Arbitration Rules, the exclusion of class or representative actions, and the exclusivesupervisory jurisdiction of the courts of Gibraltar applying Gibraltar law: clause 18.1, and Note to Contributors on page 6; and*

**Answer:**

We refer to our input on statement 2.1 of this letter (above). Furthermore, 18.7 of the Early Contribution Agreement, which strengthens our interpretation of Rome I.

*Regarding Clause 18.1, and Note to Contributors on page 6:*

Consumer (Mark Levin and Kerem Turetgen):

An arbitration agreement that require parties to waive their right to proceed on a class action basis can be annulled by the national courts on the grounds that the arbitration proceedings were based on arbitration clause **as an unfair contract term** under the Council Directive 93/13/EEC of 05/03/1993 on unfair terms in consumer contracts (see for example the European Court of Justice decision in the case Claro v. Móvil or Sebestyen, C-342/13)[11]

Under the Unfair Terms in Consumer Contracts Regulations 1999, the inclusion of an arbitration clause is considered unfair[12]

The Netherlands has implemented an "opt-out" system in consumer class-actions. The "opt-out" system, which is used in the US, by considering the significant size of the US market, grants a right for litigants to initiate lawsuits with extremely large claims. Such claims force enterprises to seek settlement, as the risk of loss provides a great danger for the company at stake.

Company (Megalodon Capital Management B.V.):

In practice, international tribunals when determining the law applicable to the merits of a dispute are influenced by the widely-accepted rules contained in those instruments. They normally also take into account any overriding mandatory rules and public policy concerns, in

---

[11] see Directive 93/13/EEC of 05/03/1993
[12] *Mylcrist Builders Limited v Mrs G Buck [2008] EWHC 2172 TCC*

light of their duty to render an enforceable award, as well as the supervisory role of EU courts in annulment and enforcement proceedings of an arbitral award.

Article 28(2) of the UNCITRAL Model Law on International Commercial Arbitration[13], stipulates that " *the arbitral tribunal shall apply the law determined by the conflict of laws rules which it considers applicable.*" National arbitration laws empower arbitrators to apply directly the law (or rules of law) they deem appropriate.

*Statement 2.2.2 Isolas:*

> 2.2.2. *subject to that arbitration clause, that the courts of Gibraltar should have exclusive jurisdiction to determine any dispute (even if non-contractual) under Gibraltar law: clause 22.9.*

**Answer:**

We refer to our input on statement 2.1 and 2.2. of this letter (above). Furthermore, 18.7 of the Early Contribution Agreement, which strengthens our interpretation of Rome I.

Moreover, besides the above we fail to see the mentioning of Gibraltar as jurisdiction in relation to the agreement between Mark Levin and RSK Labs Limited. The jurisdiction mentioned in this agreement is New York (the United States of America) law and not Gibraltar.

*Statement 2.3 Isolas:*

*2.3 For any one of the above reasons it is therefore inconceivable that any court would accept jurisdiction except as specified in paragraph 2.2.2 above.*

**Answer:**

We fail to see a legal basis for this position based on EU law and CJEU case law. As described in this letter under statement 2.1 and 2.2 (above) we feel comfortable that a Dutch court would accept our position that the governing jurisdiction is The Netherlands based on the EU law described there (2.1 and 2.2).

*Statement 3.1 Isolas*

*3.1 You have wholly failed to specify the parties to and material provisions of any agreement or agreements with our Clients and the breaches alleged, or to specify breach or breaches of some other specified obligation or obligations of our Clients.*

**Answer:**

We invite you the read:

1. our letter of February 18, 2021, including attachments:

---

[13] 1985-UNCITRAL-Model-Law-on-International-Commercial-Arbitration.pdf (iaa-network.com) 2006-UNCITRAL-Model-Law-on-International-Commercial-Arbitration.pdf (iaa-network.com)

- o   Attachment I – relevant information for the year 2017, which includes the agreement between Mark Levin and RSK Labs Limited (based on New York law), promotional material shared by RSK Labs Limited and other legal documents stating investors of the unregistered securities sold to them by RSK Labs.
- o   Attachment II – relevant information for the year 2018, which includes several agreements in relation to the RSK Labs Limited, Ginger Technologies, and email correspondence.
- o   Attachment III – relevant emails 2018, which includes email correspondence between Mark Levin, RSK Labs Limited, and lawyers including Isolas.
- o   Attachment IV – overview of communication by the RSK Labs Limited and RIF Labs Limited executives in a smear campaign against 'Megalodon'.
- o   Attachment V – Letter Alex to the public, which includes an email sent by Alejandro Aberg Kobo to the public.

Based on our letter and information provided, we are of the opinion that we clearly identified and substantiated on our position and evidence in our letters of February 18, 2021 and March 16, 2021, including our evidence provided attachments.

*Second half Statement 3.1 Isolas*

3.1   *'In truth our Clients have not committed any such breaches, tacit admission of which we take from your failure to identify any such breaches.'*

**Answer:**

We do not agree with the position taken and consider this an Argumentum ad Ignorantiam.

We feel comfortable with the position described by us in this letter and in our letters of February 18, 2021 and March 16, 2021, including our evidence provided attachments.


*Statement 3.2 Isolas:*

3.2   *Whilst you state your cause of action to be 'quantum meruit' you do so without alleging any facts upon which such a cause of action against our Clients might be based, let alone how you allege that our Client have been unjustly enriched at anyone else's expense.*

**Answer:**

**Further substantiation of Claimants legal claims and committed breaches and violations by RSK/RIF/IOV Labs and its Directors and Officers in addition to our letters of February 18, 2021 and March 16, 2021:**

**RSK/RIF/IOV Labs and its Directors and Officers are liable for disgorgement.**

RSK/RIF/IOV Labs conducted a fraudulent unregistered securities offering. RSK/RIF/IOV Labs repeatedly lied to investors in connection with its offering, including misrepresentations about purported partnerships, like EtherParty[14].

In 2017, Vanbex reportedly launched its cryptocurrency Etherparty (FUEL), a token that was purportedly designed to provide an ecosystem for the company's smart contracts system, promising investors massive returns. In a FUEL pre-sale, Hobbs and Cheng reportedly raised more than 30 million Canadian dollars ($22 million), which was allegedly accompanied by a sudden acquisition of substantial wealth by both founders, the document notes.[15]

The firm, which was interchangeably called Vanbex and Etherparty, was actually a shell company that developed no useable products, the court document argues.

The Director of Engineering of EtherParty  had no engineers to direct, despite their having existed for several years prior. He also found it a tad odd that he didn't had a computer. There were no engineering notes, no product, nothing. Just the CEO's power point slides and his MBA buzz words.

RSK press-release quote[16]:

RSK is the first open-source smart contract platform that allows Bitcoin users and miners to be players in the smart contract movement. The South American company is well positioned in the global ecosystem, and is strongly aligned with Etherparty's values. "We are putting blockchain technology at the service of social transformation to build a more flexible and inclusive financial system that will improve the life of millions of people," said RSK Head of Business Development, Henry Sraigman, **"**We are confident that education plays a key role in making it happen and we're glad to partner with Etherparty, an industry leader company that shares our vision."

The police have frozen two accounts of EtherParty/Vanbex co-founder Hobbs and seized the founders' two new Land Rovers, as well as ordered the founders not to sell, borrow or damage their Vancouver condominium for at least 30 days or until a further order from the court.

In 2017, Vanbex reportedly launched its cryptocurrency Etherparty (FUEL), a token that was purportedly designed to provide an ecosystem for the company's smart contracts system, promising investors massive returns. In a FUEL pre-sale, Hobbs and Cheng reportedly raised more than 30 million Canadian dollars ($22 million), which was allegedly accompanied by a sudden acquisition of substantial wealth by both founders, the document notes.[17]

The Vancouver Sun has also reported on Hobbs' alleged criminal history.[18]

---

[14] https://www.prnewswire.co.uk/news-releases/etherparty--rsk-partnership-fuels-future-adoption-of-smart-contract-technology-665645863.html

[15] https://cointelegraph.com/news/canadian-police-freezes-assets-of-fuel-token-issuers-due-to-alleged-22-million-fraud

[16] https://www.prnewswire.co.uk/news-releases/etherparty--rsk-partnership-fuels-future-adoption-of-smart-contract-technology-665645863.html

[17] https://cointelegraph.com/news/canadian-police-freezes-assets-of-fuel-token-issuers-due-to-alleged-22-million-fraud

[18] https://vancouversun.com/business/local-business/civil-forfeiture-office-seeks-assets-linked-to-alleged-30-million-cryptocurrency-scam

In 2005, he was reportedly caught in a New York hotel room in possession of 45 pounds of marijuana and $178,000 USD in cash.

As well:

"In 2008, Hobbs was convicted in Nova Scotia of possession of property obtained by crime and money laundering, a result of being found with $32,000 in a suitcase before boarding a flight to Vancouver…(and was later) convicted in Nova Scotia for drug trafficking and unlawfully producing marijuana. He received a 30-month sentence."

According to *BIV*, in the class action filed August 26th, "the plaintiffs are seeking general and punitive damages as well as restitution for benefits received by the defendants from the sale of the Fuel token and a declaration that Vanbex broke the securities act."

Moreover, RSK/RIF/IOV Labs founders misinformed investors and misrepresented during their capital raise, e.g. stating that a Series A of RSK Labs Limited would be conducted within 6 months after the capital raise, untrue information about Cactus Technologies LLP, and false financial projections. We have included a detailed overview of the alleged misinformation and misrepresentation in our letter of February 18, 2021 and its attachments.

**Theft and Misappropriation of crypto assets by RSK/RIF/IOV Labs and its Directors and Officers and Claimants can apply for a worldwide freezing injunction.**

In *Vorotyntseva v Money-4 Ltd* [19], Mr Justice Birss granted a freezing injunction against Nebus, a cryptocurrency trading company, and its directors. Ms Vorotyntseva, who wished to test Nebus's trading platform, had deposited significant quantities of Bitcoin and Ethereum cryptocurrency, worth about £1.5 million with the company. When Ms Vorotyntseva became concerned with the company's operations, and having voiced her concerns, received no credible response from the management, she promptly applied for a worldwide freezing injunction. On the evidence adduced, the court concluded that there was a real risk of assets being dissipated and granted a freezing order against the company and its directors. In the case, it was not argued that cryptocurrency did not constitute, in law, "property".

In *Robertson v Persons unknown*[20], Mrs Justice Moulder granted an asset preservation order in respect of cryptocurrency, worth about £1 million at the time, on the coin exchange, Coinbase UK Ltd, holding that there was a serious issue to be tried concerning a proprietary claim.

In *AA v Persons Unknown* [2019] EWHC 3556 (Comm), on 19 January 2020 Mr Justice Bryan specifically held, on a without notice application, that cryptoassets were "property" for the purposes of granting proprietary or freezing injunctive relief.

The Applicant sought a proprietary injunction against the First to Fourth Defendants, as well as ancillary disclosure orders against the Third and Fourth defendants, to require them to verify the identities of the customers who held the Bitcoin wallets in question (i.e. the First and Second Defendants). For the purpose of the application, which Mr Justice Bryan agreed should be heard in private and on a without notice basis (insofar as the First and Second

---

[19] *Elena Vorotyntseva v Money-4 Limited t/a Nebeus.Com, Sergey Romanovskiy, Konstantin Zaripov* [2018] EWHC 2596 (Ch)
[20] https://www.allenovery.com/en-gb/global/news-and-insights/publications/english-court-grants-asset-preservation-order-over-bitcoin

Defendants were concerned), an anonymity order was sought and granted to protect the identities of both the Insured and the Applicant. The Judge granted the Orders as sought, and permitted alternative service of the order, by email, on the Third and Fourth Defendants in the British Virgin Islands.

Shortly before the decision in *AA v Persons Unknown* (above), in November 2019 the UK Jurisdiction Taskforce ("**UKJT**") had produced a Legal Statement on Cryptoassets and Smart Contracts. The UKJT is chaired by Sir Geoffrey Vos, Chancellor. The Legal Statement provides an authoritative, albeit not binding, analysis.

Nonetheless, Mr Justice Bryan referred to the Legal Statement as being an accurate exposition of English law in *AA v Persons Unknown* (above) and said that he considered that crypto assets such as Bitcoin are "property". They meet the four criteria set out in Lord Wilberforce's classic definition of "property" in *National Provincial Bank v Ainsworth* [1965] AC 1175 as being: (i) definable, (ii) identifiable by third parties, (iii) capable in their nature of assumption by third parties, and (iv) having some degree of permanence.

That too, was the conclusion of the Singapore International Commercial Court in *B2C2 Ltd v Quoine PTC Ltd* [2019] SGHC (I) 03, and which was followed on appeal [2020] SGCA(I) 02 at [144], in which it was held that that cryptocurrencies fulfilled Lord Wilberforce's classic definition, so as to amount to "property" in a generic sense.

More recently still, in *Ruscoe v Cryptopia Ltd* (in liq) [2020] NZHC 728, the High Court of New Zealand held, after full argument, that digital assets of a cryptocurrency exchange constituted "property" and (in that case) were held on trusts for accountholders on that exchange.

In *Robertson v Persons Unknown* (above), Mrs Justice Moulder relied upon an analysis provided by a specialist company which is a provider of software to track payment of crypto currency. That analysis tracked 80 Bitcoin to a wallet/account/address held by a crypto currency or coin exchange called "Coinbase".

In theory, the tracing of crypto assets ought to be possible, given that the apparently transparent nature of the blockchain system means that anyone can obtain a copy of every transaction of that particular cryptocurrency by downloading the blockchain. To assist the application for injunctive relief in court, there are "block explorers" by which an applicant can obtain information about cryptocurrency addresses and transactions. This means that an applicant should be able to trace cryptocurrencies from one address to another in permissionless systems, although the position will of course be different in permissioned ones.[21]

## Freezing Injunction

The Supreme Court of Gibraltar has the power to order Freezing Injunctions against the assets of a party who is domiciled, resident or present within the Court's jurisdiction. There is also power to issue such orders even where the party is not domiciled, resident or present as such –

---

[21] Cryptoassets - Obtaining English Freezing and Proprietary Injunctions in Relation to Cyberfraud | Littleton Chambers

for example, where there are foreign proceedings and assets kept within Gibraltar's jurisdiction.

Practice Direction 25 to the Civil Procedure Rules lays down the standard form of Order for a freezing injunction.

### Conflict of Interest by RSK/RIF/IOV Labs and its Directors and Officers [22]

COMPANIES (MODEL MEMORANDA AND ARTICLES) REGULATIONS 2014(LN. 2014/188):

(1) If a proposed decision of the directors is concerned with an actual or proposed transaction or arrangement with the company in which a director is interested, that director is not to be counted as participating in the decision-making process for quorum or voting purposes.

(2) But if paragraph (3) applies, a director who is interested in an actual or proposed transaction or arrangement with the company is to be counted as participating in the decision-making process for quorum and voting purposes.

(3)     This paragraph applies when:

(a)     the company by ordinary resolution disapplies the provision of the articles which would otherwise prevent a director from being counted as participating in the decision-making process;

(b)     the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest; or

(c)     the director's conflict of interest arises from a permitted cause.

(4)     For the purposes of this article, the following are permitted causes–

(a)     a guarantee given, or to be given, by or to a director in respect of an obligation incurred by or on behalf of the company or any of its subsidiaries;

(b)     subscription, or an agreement to subscribe, for shares or other securities of the company or any of its subsidiaries, or to underwrite, sub-underwrite, or guarantee subscription for any such shares or securities; and

(c)     arrangements pursuant to which benefits are made available to employees and directors or former employees and directors of the company or any of its subsidiaries which do not provide special benefits for directors or former directors.

(5)     For the purposes of this article, references to proposed decisions and decision-making processes include any directors' meeting or part of a directors' meeting.

(6) Subject to paragraph (7), if a question arises at a meeting of directors or of a committee of directors as to the right of a director to participate in the meeting (or part of the meeting) for voting or quorum purposes, the question may, before the conclusion of the meeting, be referred to the chairman whose ruling in relation to any director other than the chairman is to be final and conclusive.

---

[22] COMPANIES (MODEL MEMORANDA AND ARTICLES) REGULATIONS 2014(LN. 2014/188)

(7) If any question as to the right to participate in the meeting (or part of the meeting) should arise in respect of the chairman, the question is to be decided by a decision of the directors at that meeting, for which purpose the chairman is not to be counted as participating in the meeting (or that part of the meeting) for voting or quorum purposes.

**RSK/RIF/IOV Labs and its Directors and Officers did not comply with Gibraltar LEGAL SERVICES ACT 2017[23]**

These rules are the Legal Services Act (Code of Conduct and Client Care) Rules 2017. Every Lawyer must comply with the rules of conduct and client care for Lawyers set out in the Schedule.

Regarding:

- **Joseph Peter Garcia, 3 Garden Apartment King's Wharf, Gibraltar, British, Lawyer at Isolas LLP and Board Director at RSK/RIF/IOV Labs**

Refusing instructions

4.1 Good cause to refuse to accept instructions includes a conflict of interest,  a lack of available time, the instructions falling outside the Lawyer's normal field of practice, instructions that could require the Lawyer to breach any professional obligation, and the unwillingness or inability of the prospective client to pay the normal fee of the Lawyer concerned for the relevant work.

Conflicting interests

A Lawyer must not act or continue to act if there is a conflict or a risk of a conflict between the interests of the Lawyer and the interests of a client for whom the Lawyer is acting or proposing to act.

5.4.1  Where a Lawyer has an interest that touches on the matter in respect of which legal services are required, the existence of that interest must be disclosed to the client or prospective client irrespective of whether a conflict exists.

5.4.2   A Lawyer must not act for a client in any transaction in which the Lawyer has an interest unless the matter is not contentious and the interests of the Lawyer and the client correspond in all respects.

5.4.3  A Lawyer must not enter into any financial, business, or property transaction or relationship with a client if there is a possibility of the relationship of confidence and trust between Lawyer and client being compromised.

5.4.4  A Lawyer who enters into any financial, business, or property transaction or relationship with a client must advise the client of the right to receive independent advice in respect of the matter and explain to the client that should a conflict of interest arise the

---

[23] Gibraltar LEGAL SERVICES ACT 2017 Pursuant to s16 of the Legal Services Act the LSRA with the approval of the Chief Justice and the Law Council

Lawyer must cease to act for the client on the matter and, without the client's informed consent, on any other matters. This rule 5.4.4 does not apply where:

(a)    the client and the Lawyer have a close personal relationship; or

(b)    the transaction is a contract for the supply by the client of goods or services in the normal course of the client's business; or

(c)    a Lawyer subscribes for or otherwise acquires shares in a listed company for which the Lawyer's practice acts.

5.4.5  In this rule, a Lawyer is deemed to be a party to a transaction if the transaction is between entities that are related to the Lawyer by control (including a trusteeship, directorship, or the holding of a power of attorney) or ownership (including a shareholding), or between par- ties with whom the Lawyer or client has a close personal relationship.

**Conflicting business interests**

5.5 A Lawyer must not engage in a business or professional activity other than the practice of law where the business or professional activity would or could reasonably be expected to compromise the discharge of the Lawyer's professional obligations.

5.5.1 Where a Lawyer or the Lawyer's practice provides, or intends to provide to clients, services other than regulated services, the services must:

(a)    be associated with the provision of legal services; and

(b)    be provided by the Lawyer or the Lawyer's practice or by an entity in which the Lawyer or the Lawyer's practice has a controlling interest.

**Unfair Prejudice by RSK/RIF/IOV Labs Directors and Officers under Gibraltar Law.**

RSK/RIF/IOV Labs company's affairs are being or have been conducted in an unfairly prejudicial manner (This creates a statutory remedy in Gibraltar law under sections 145- 150 of the Act).[24]

The Act has introduced protection to minority shareholders. A shareholder of a company may apply to the court by petition for an order that (i) the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of some or all of its shareholders or (ii) that an actual or proposed act or omission of the company is or would be so prejudicial.

The court, if it feels that the petition is well-founded, may make an order granting relief in respect of the matters complained of. Such relief could include but would not be limited to (i) regulating the conduct of the company's future affairs; (ii) require the company to refrain from continuing an act or to omit from doing an act complained of; (iii) authorise civil proceedings to be brought in the name and on behalf of the company; (iv) stop the company from altering its articles except with the leave of the court; and (v) provide for the purchase of the shares of any shareholders of the company by other shareholders or by the company itself.

---

[24] https://www.gibraltarlawyers.com/uploads/PDF/GibraltarPrivateLimitedCompanyHandbook.pdf

The provisions apply equally to a person who is not a shareholder of a company but to whom shares in the company have been transferred or transmitted by operation of law.

**Liability of RSK/RIF/IOV Labs Directors and Officers under Gibraltar Law.**

A company is no longer prevented from purchasing and maintaining insurance against liability and third party indemnities are allowed (Section 231 of the Act).

The previous Act provided that any provision in the articles of the company, in any contract with the company, or otherwise, exempting any director, manager or officer or auditor of the company, or indemnifying him against any liability which would otherwise attach to him in respect of any negligence, default, breach of duty or breach of trust of which he may be guilty in relation to the company, is void. The Act now clarifies that only indemnities provided by the company itself are void and further allows a company to purchase insurance for the director of the company.

**Promissory and equitable estoppel by RSK/RIF/IOV Labs and its Directors and Officers.**

Claimants can bring a claim based on her reasonable reliance on the defendant's words or actions, where the Claimants actually suffers an injury based on that reasonable reliance. So, anytime when RSK/RIF/IOV Labs and its Directors and Officers were making certain false claims (proprietary estoppel and promissory estoppel, with reference to our letter of February 18, 2021) and putative Claimants took action in their reasonable reliance on those claims to their detriment, they have a viable cause of action. Similarly, every time RSK/RIF/IOV Labs and its Directors and Officers were to collude with the intent of causing injury that, too, can become the basis for a lawsuit, and possibly criminal prosecution.

Generally, fiduciaries provide highly specialized services and are empowered by a principal that engages them to act with discretion on their behalf. They must perform their services with diligence and never place their own interests above that of the principal. These exacting obligations are required because of the inherent risk that fiduciaries could abuse the power bestowed upon them, coupled with the principal's inability to protect against the risk of such abuse.

A court could decide to expand the role of fiduciary to include RSK/RIF/IOV Labs protocol developers based on the specific facts of the case, particularly if the injuries were severe, the parties impacted were close to home, or the defendants had somehow benefited substantially from the breach.

**Responsibilities of RSK/RIF/IOV Labs and its Directors and Officers**

RSK/RIF/IOV Labs directors ignored their obligations as directors and their conduct fell well below that which was required of them.

Directors are required to exercise care, skill and diligence in the performance of their duties.

Directors' duties that form part of Gibraltar law, including that:

• Directors have, both collectively and individually, a continuing duty to acquire and maintain a sufficient knowledge and understanding of the company's business to enable them properly to discharge their duties as directors; and

• While directors are entitled (subject to the articles of association of the company) to delegate particular functions to those below them in the management chain, and to trust their competence and integrity to a reasonable extent, the exercise of the power of delegation does not absolve directors of their duty to supervise the discharge of the delegated functions.

A dual subjective/ objective test relating to the duty to exercise reasonable care, skill and diligence was codified in England through the enactment of section 174(2) of the English Companies Act 2006. Gibraltar law does not have an equivalent. However, the Corporate Governance Code for Gibraltar Collective Investment Schemes issued by the Gibraltar Funds & Investments Association[25] , although of voluntary application, imposes a dual test and this underpins not only the view of the industry on this matter but also that of the FSC, concerning the proper operation and governance of a company.

The FSC and its chief executive officer being likely better placed than the Court to determine what measures are necessary in order to protect the good reputation of Gibraltar, to protect consumers and to reduce financial crime, as well as pursuing the other regulatory objectives of the FSC.

**The Brian Weal v Financial Services Commission Case (Claim No 2015 W No 002):**

The Court endorsed the suggestion that deterrence of other directors from failing to monitor the activities of companies on whose boards they sit, is a justifiable regulatory consideration when imposing sanctions. The Court went further and confirmed that it would have upheld the imposition of even stiffer sanctions on Mr. Weal, had the chief executive officer of the FSC so determined. This was the case notwithstanding that the Court in its judgment, found that Mr. Weal's involvement in the matters complained of was less than that of Mrs. Compson, that he was not a property expert and that he was not present at a specific board meeting where the approval was given to acquire certain special purpose vehicles which held land and notably, that no investor had lost money even presumptively from his action. The Court, having indicated that the imposition of stiffer sanctions for Mr. Weal would have been supported, makes it clear that whilst the Court is willing to consider the actions of individual directing minds of an investment company, it will not be sympathetic towards a director who has seriously breached his/her duties, irrespective of specific involvement nor will it be a defence that a director has held office for a short period of time. New directors should therefore ensure that they acquire key information when they are first appointed and that they are well versed with the investment fund's history and any major events affecting the investment fund. A comprehensive and formal induction should be provided so that a new director is provided with the information he/she will need to become as effective as possible in their role within the shortest practicable time.

**Directors' duties under the Gibraltar Companies Act 2014:**

Directors must strive to ensure that their role does not become a "tick-box" function and that they are fulfilling their high-level supervisory role.

Directors must continually take active steps and apply their own judgement to satisfy themselves that the company's business is undertaken properly. It does not matter that the directors may have used their powers of delegation to delegate certain functions to other

---

[25] https://www.gfia.gi/s/Code-of-Conduct-Gibraltar-Collective-Investment-Schemes-300513.pdf

directors. The fundamental duties owed by a director remain undiminished and directors must satisfy themselves that the director who is performing a delegated function are compliant. This includes ensuring that any professional service providers appointed by such director are performing their functions in accordance with their contractual obligations.

Directors' duties are not enshrined in statue under the Law. Accordingly, they are derived from the common law and these include:

• To act honestly and in good faith.

• To act in the best interest of the company.

• To exercise reasonable care, skill and attention.

• To exercise independent judgment.

• To use the powers granted to the director for the purposes for which they were conferred and in conformity with the rules contained in the Articles and within the powers of the company contained in the memorandum.

• Not to make a personal secret profit (unless authorised).

• To avoid conflicts of interest with the company.

Under the Gibraltar Companies Act 2014, the RSK/RIF/IOV Labs directors collectively have a duty to ensure that the annual accounts, the directors' report and, where applicable, the corporate governance statement are drawn up and filed with the Registrar of Companies.

Where a conflict of interest arises, a director must declare that conflict (or potential conflict) to the rest of the board of directors. At common law, if a director allows his personal interests or his duties to another person to conflict with his duty to the company then, unless the company has a mechanism under which it can consent to the conflict, the company can avoid any relevant contract. Accordingly, most directors excuse themselves from board meetings where such conflicts may arise or abstain from participating in decisions relating to matters where a potential conflict arises.

**Misappropriation of corporate assets by RSK/RIF/IOV Labs and its Directors and Officers**

Where a director or officer of RSK/RIF/IOV Labs has misappropriated corporate assets (for example, by misapplying money) or has been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company, then that officer or director could be ordered to:

• Repay, restore or account for the money or other assets, or any part of it.

• Compensate the company for any misfeasance or breach of duty in such amount as the court considers just.

• Pay interest to the company at such rate as the court considers just (section 258, IA 2011).

• Fraudulent Conduct. A person that is or has been an officer of the company is deemed to have committed an offence if, at any time while an officer or during the 12 months preceding the commencement of the liquidation, he has:

• made or caused to be made any gift or transfer of, or charge on, or has caused, permitted or acquiesced in the levying of any execution against the company's assets;

• has concealed or removed any of the company's assets since, or within, 60 days of the date of any unsatisfied judgment or order for the payment of money obtained against the company (section 263, IA 2011)

a director could (subject to any defences of illegality) be exposed to the following civil claims:

• Damages for negligence. This cause of action is based on a breach of duty of care in not exercising its services to the company with reasonable degree of skill and care.

• Restitution in equity. If the director breached his fiduciary duties, then the company (and even shareholders in specific circumstances) could claim restitution against the director. That is he would be compelled to restore the misapplied or misappropriated money or assets.

His criminal liabilities for any misappropriation of assets could include, for example, charges on common law fraud, false accounting or theft.

After the company's insolvency, the courts could, among other things, order a director to restore the misappropriated property (section 253, Insolvency Act 2011). The remedy of restoration (or compensatory relief) is available for any contravention of voidable transaction provisions or malpractice (that is, unfair preferences, transactions at an undervalue, voidable floating charges and extortionate credit transactions). The directors could also face disqualification orders and undertakings providing that the application for disqualification is filed by the official receiver within six years from the date that the company concerned became insolvent. As for criminal liability, a person that contravenes a malpractice provision (for example, fraudulent conduct) could face, on summary conviction, a custodial term for 12 months or a fine of GB5,000, or both. On conviction on indictment, a person could face a custodial term for five years or a fine of GB10,000 or both.).

**Insurance**

Directors and officers (D&O) policies generally provide cover for negligence claims negligence (breach to perform duties with reasonable care and skill). Insurers do not typically give protection in cases of fraud, dishonesty or criminal liabilities.

**Negligence by RSK/RIF/IOV Labs and its Directors and Officers**

"There is a negligence liability only if the Claimants can show that the tortfeasor fell short of the degree of care expected of the 'reasonable person.' Only the lack of care amounts to a breach of a duty owed to the claimant will give rise to liability in negligence."[26]

Another important requirement for the tort of negligence is material damages or the claimant's loss caused by the behaviour of the tortfeasor. Moreover, the damages need to be "attributable to – or not too remote from – the defendant's breach of duty."[27]

---

[26] Jenny Steele, Tort Law: Text, Cases, and Materials (Oxford: Oxford University Press, 2017), 113.
[27] Ibid, 113-114.

It is considered as everyone's responsibility to not cause damage to others through carelessness.[28] It almost corresponds to a moral principle – do not harm your neighbour.[29] A person should take reasonable care for acts or omissions of such when a person can reasonably foresee that his behaviour could bring harm to others. The potentially injured parties are usually those who can be closely and directly affected by tortfeasor's behaviour and he knows it or should know.

an additional 'three-stage-test" consisting of foreseeability, fairness, and proximity criteria were set out in the Caparo v. Dickman case[30].

RSK/RIF/IOV Labs Directors and Officers owe the duty of care to its investors/shareholders/users/token holders due to the following reasons:

The proximity between a RSK/RIF/IOV Labs and its investors exists due to contractual relations between them. Donoghue v. Stevenson ("neighbourhood test"), as well as  Anns v Merton London Borough Council[31] case, mention the proximity as the reasonable belief that carelessness of the wrongdoer could likely cause damage to a particular person or a group of individuals or/and companies. Actions or omission of such made by RSK/RIF/IOV Labs Directors and Officers can harm its investors because the later invested under false pretences.

Not all but a lot of negative consequences can be foreseen by the Directors and Officers of RSK/RIF/IOV Labs. It would be fair and reasonable decision to admit that duty of care exists and RSK/RIF/IOV Labs is liable for its investors' losses because the later ones do not have control over the course of business, management decisions, or platform enhancement by the platforms runners' programmers.

**Breach of duty of care by RSK/RIF/IOV Labs and its Directors and Officers**

The breach of duty of care occurs when one party behaving in an unreasonable manner case foreseeable damages to the other.

Usually, the test of 'reasonable person' is used in the evaluation of defendants' behaviour.

However, if we take into consideration the actors of RSK/RIF/IOV Labs (Directors and Officers) it is clear that this test is not sufficient because involved people almost always have special and even professional knowledge or skills.

A test of 'the ordinary skilled person in the same area' first mentioned in Bolam v Friern Hospital Management Committee[32] should apply.

Cases relating to medical negligence can be applied by analogy to cryptocurrency-related claims. J. Steele writes about two concerns in such disputes: what is the correct approach to the standard of care in respect of activities which require special skills? How the court will

[28] "Duty of Care Lecture," LawTeacher.net, Accessed 1 April 2020, https://www.lawteacher.net/modules/tort-law/negligence/duty-of-care/lecture.php
[29] Donoghue v Stevenson [1932] UKHL 100 (26 May 1932), https://www.uni trier.de/fileadmin/fb5/FFA/KURSUNTERLAGEN/Anglo-Amerikanisches_Recht/Law_of_Torts/Siry-SS-2012/Donoghue_v_Stevenson__1932__UKHL_100__26_May_1932_.pdf
[30] Jenny Steele, Tort Law: Text, Cases, and Materials (Oxford: Oxford University Press, 2017), 115, 165-166.
[31] Anns v. Merton London Borough Council [1978] AC 728, http://www.e-lawresources.co.uk/cases/Anns-v-Merton-London-Borough-Council.php
[32] Jenny Steele, Tort Law: Text, Cases, and Materials (Oxford: Oxford University Press, 2017), 129.

deal with different opinions among practitioners regarding correctness and reasonableness of the defendant's actions? The 'Bolam test', however, criticized by some scientists and judges, answers these questions: the defendant "is not guilty of negligence if he has acted in accordance with a practice accepted as proper by a reasonable body of medical men skilled in that particular art."[33] Simply, when a medical professional states that he would behave as the defendant did then the defendant highly possible would escape liability. The diverging approach is shown later in the Bolitho v City and Hackney Health Authority[34]: a judge may hold that opinion of a particular professional is not reasonable.

Medical negligence cases may be of some help with cryptocurrency platforms and cryptocurrency directors negligence claims analysis, there is a substantial and troubling difference between two spheres: a lot of medical standards and instructions exist, there are regulatory bodies over medical practitioners; there is no such thing in the cryptocurrency sphere. Therefore, when judges analyse the defendant's behaviour the judgment may be fully based on the subjective opinion of another director.

The Fabian v. LeMahieu[35] case is an example of a class action brought by J. Fabian against multiple defendants with multiple claims including negligence claim. The plaintiff alleged that a cryptocurrency platform Nano, its developers, and the marketing team, a cryptocurrency exchange BitGrail located in Italy and its principles were liable for cryptocurrency theft on BitGraile.

Similarly to corpus delicti (mens rea and actus reus) in criminal law, it should be proved in court that several criteria are met regarding a delict to make a person liable for the damage.

**Breach of statutory duty by RSK/RIF/IOV Labs and its Directors and Officers**

Because RSK/RIF/IOV Labs tokens/assets/securities/activities falls under the definition of the financial instrument,  RSK/RIF/IOV Labs should comply with the European Market Infrastructure Regulation ("EMIR"),  Markets in Financial Instruments Regulation ("MiFIR"), and Markets in Financial Instruments Directive (MiFID II) and FATCA and CRS frameworks.

Policymaker intended that such breach of duty would be civilly actionable.[36] Legislation that protects investors in cryptocurrency and regulations intended to protect investors and users of cryptocurrency (consumers). There is a growing tendency in the US to bring to court violators of the Securities Act and the Securities Exchange Act who happen to be involved with cryptocurrency. American authorities are also inclined to consider ICOs as securities public offering. Therefore, many crypto actors should comply with registration and licensing requirements in the US and most of them, like RSK/RIF/IOV Labs, fail to do so.

The Roche Cyrulnik Freedman, representing Chase Williams, Alexander Clifford, and Eric Lee[37], claimed that each company publicly sells or helps in selling unregistered securities as tokens through crypto exchanges in the form of initial exchange offers or ICOs. The involved

---

[33] Ibid.

[34] Ibid, 130-132.

[35] Fabian v. LeMahieu [2019], CASE NO. 19-cv-00054-YGR

[36] Nicholas J McBride, Roderick Bagshaw, "Breach of Statutory Duty," Tort Law (Harlow: Pearson Education Limited, 2018), https://books.google.com.ua/books?id=l71dDwAAQBAJ

[37] Jeff Fawkes, "Lawsuits Filed against Binance, Block.one, BitMEX and Other Crypto-Related Companies,"

defendants presented utility tokens for sale that were unregistered securities.[38] Investors in such utility tokens were promised new benefits and these promises were never fulfilled.

One peculiar case relating to consumer protection law violation is a class action case Gevorkyan v. Bitmain Inc. et al.[39] The company and other Chinese defendants were accused of unauthorized mining by Bitmain at its clients' expanse, unjust enrichment, unfair business practices, and false advertisement.

*Statement 3.3 Isolas:*

3.3    *You have again failed to take into account that the applicable Early Contribution Agreementwith Megaladon Capital Management BV, Mark Levin and Kerem Turetgen expressly:*

**<u>Answer:</u>**

In general, you fail to comment on the agreements signed between Mark Levin and RSK Labs Limited, which clearly state the following in the recitals of the Sale Purchase Agreement signed by Mark Levin:

> *WHEREAS, the Company has authorized the sale and issuance of an aggregate of 1,760,643 shares of its Series Seed-1 Preferred Shares, Series Seed-2 Preferred Shares and Series Seed Preferred Shares (jointly, the "Shares");*

> *WHEREAS, Purchasers desire to purchase the Shares on the terms and conditions set forth herein; and*

> *WHEREAS, the Company desires to issue and sell the Shares to Purchasers on the terms and conditions set forth herein.*

Based on the above we take the position that RSK Labs Limited has sold unregistered securities in the United States of America, these unregistered securities are in our view economically linked with the RIF Labs Limited unregistered securities sale (for a description of our position on this we refer to our letters of February 18, 2021 and 16 March, 2021, including our evidence provided attachments).

In relation to the RIF Labs token sale we would like to note that the introduction and background statement of the ECA states the following:

> *RIF LABS Limited (the "**Company**") shall be conducting a smart contract based private contribution campaign ("**Token Sale**") for the purpose of raising capital that it will deploy on researching, developing and promoting the RIFOS Protocols (as defined below) and to meet various other operating expenses relating to such activities.*

---

[38] Drbyos, "Simultaneous class action lawsuits filed against 11 bitcoin companies," World Today News https://world-today-news.com/simultaneous-class-action-lawsuits-filed-against-11-bitcoin-companies/
[39] Gevorkyan v. Bitmain Inc. et al., Case 5:18-cv-07004

*In return for a contribution to the Company during the Token Sale, Contributors shall receive a cryptographic RIF token ("**RIF**") issued by the Smart Contract System (as such term is defined in clause 4.1 of the General T&Cs).*

*This Early Contribution Agreement ("**Agreement**") sets out the terms and conditions on which the Company agrees to accept, and you agree to make a contribution for the purchase of RIF.*

The ECA is referring to 'raising capital' which by default means obtaining capital from investors. It is further stated that '*in return for a contribution to the company during the token sale, contributors shall receive a cryptographic RIF token*'. At the time of contribution made to RIF Labs Limited the RIF token promised to investors was (1) not available / created and (2) RIF token had not utility at that moment. Hence, the capital raise by RIF Labs Limited was pure speculation (and still is) for investors. We invite you to read our letters of February 18, 2021 and 16 March, 2021, including our evidence provided attachments, in which we include our view on the qualification of RIF tokens.

Moreover, in your letter you are referring to the disclaimer of the ECA, which states the following:

*'Neither this Agreement nor the Project Documentation constitute a prospectus or offering document, and are not an offer to sell, nor the solicitation of an offer to buy any investment or financial instrument in any jurisdiction. RIF should not be acquired for speculative or investment purposes with the expectation of making a profit on immediate or future re-sale.'*

The statement that made this agreement is not an offer to buy any investment of financial instrument in any jurisdiction is in our view false and misleading. In this regard:

1. The sale of securities by RSK Labs Limited is by definition selling of securities, as this is clearly stated in the agreement signed with Mark Levin. Moreover, these are unregistered securities, for which no so called Reg D form has been filed with the SEC, and thus, are in immediate violation with the US Securities Act.

2. The RIF token sale qualifies as a security in all jurisdictions it has been offered. Since RIF tokens are (1) linked with RSK Labs Limited offering (which include US and non-US investors) and (2) have been sold to US and non-US investors, the determination on whether or not RIF is a security is:

   o In the United States of America (US) based on the Howey-test, which in brief can be described as an investment contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. We are confident that the SEC and US courts would follow this reasoning in the case of the RIF token sale.

   o In the European Union (EU – non-US) the RIF token sale would i.a. in our view fall within the scope of Directive 2003/71/EC. We are confident that the

EU regulator and courts would follow this reasoning in the case of the RIF token sale. that RSK/RIF/IOV Labs contracts do not comply with the Prospectus Regulation (EU) 2017/1129 of the European parliament and of the council on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC.

RSK/RIF/IOV Labs fall under the MiFiD II, the AIFMs Directive and be subjected to the Prospectus Directive.[40] RSK/RIF/IOV Labs financial products are marketed and sold in breach of the existing securities law (The Prospectus Regulation (n 176) Art. 7).

*No regulatory authority has examined or approved any of the information set out in this Agreement and/or the Project Documentation. No such action has been or will be taken under the laws, regulatory requirements or rules of any jurisdiction. The publication, distribution or dissemination of this Agreement and/or the Project Documentation does not imply that applicable laws, regulatory requirements or rules have been complied with.'*

In the disclaimer RIF Labs Limited clearly states that no regulatory authority has examined the RIF token sale agreement and/or project documentation. Moreover, RIF Labs Limited states that the publication, distribution or dissemination of this Agreement and/or the Project Documentation does not imply that applicable laws, regulatory requirements or rules have been complied with.

A reference by you to the disclaimer and any other provision in this agreement is in our view to be considered as a personal opinion, rather than actual interpretation of rules and regulation under (1) the US Securities Act and (2) All relevant EU regulation, i.a. MiFID II.

In this regard we would like to note that the sale agreement of "*the biggest of all crypto frauds.*" EOS[41] includes similar provision as the RIF Labs Limited agreement:

EOS Token Sale Agreement states that the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, express or implied, including, without limitation, any uses, purpose, attributes, functionalities, or features on the EOS Platform; that EOS Tokens purchased under this Agreement are not tokens on the EOS Platform. Buyer acknowledges, understands and agrees that buyer should not expect and there is no guarantee or representation made by Company that buyer will receive any other product, service, rights, attributes, functionalities, features or assets of any kind whatsoever, including, without limitation, any cryptographic tokens or digital assets now or in the future whether through receipt, exchange, conversion, redemption or otherwise; that purchase of EOS token are non-

---

[40] ESMA, 'ESMA alerts firms involved in Initial Coin Offerings (ICOs) to the need to meet relevant regulatory requirements', ESMA50- 157–828, (2017), accessed 23 November 2018
[41] https://www.prnewswire.com/news-releases/investors-bring-class-action-lawsuit-against-blockone-for-biggest-of-all-crypto-frauds--coin-offering-scam-netted-company-billions-301061047.html

refundable and purchases cannot be cancelled. Buyers may lose all amounts paid; and that EOS may have no value. EOS Purchase Agreement (22 June 2017)[42] .

EOS is still deemed a security by i.a. the SEC.

In general, we consider the Early Contribution Agreement as misleading and should be considered as an unfair contract. We refer to our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

*Statement 3.3.1 Isolas*

3.3.1    *contained a Disclaimer (page 7) by which contributors accepted that RIF Tokens should not be acquired for speculative or investment purposes with the expectation of making a profit on immediate or future re-sale;*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

*Statement 3.3.2. Isolas*

3.3.2.   *excluded all representations and warranties: clause 14;*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

*Statement 3.3.3. Isolas:*

3.3.3.   *limited any liability to the amount of the relevant contribution: clause 15 (thereby excluding any claim for loss of profit on resale of RIF Tokens);*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

---

[42] https://d340lr3764rrcr.cloudfront.net/purchase_agreement/EOS+Token+Purchase+Agreement+-+June+22%2C+2017.pdf

*Statement 3.3.4. Isolas:*

3.3.4. *required you to have notified any dispute within 30 days of it arising, which you clearly did not do: clause 18.4*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

*Statement 3.3.5. Isolas*

3.3.5. *contained an entire agreement clause: clause 22.6;*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

*Statement 3.3.6. Isolas*

3.3.6. *excluded liability for prior representations etc: clause 22.7;*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including the evidence provided attachments.

3.3.7. *contained acknowledgement that RIF Tokens carried significant financial, regulatory and reputational risks, including but not limited to those set out in Schedule 3: clause 9, as well as other provisions.*

**<u>Answer:</u>**

We consider this an Argumentum ad Ignorantiam. Also please read the above and our letters of February 18, 2021 and March 16, 2021, including our evidence provided attachments.

*Statement 4 Isolas*

> *We invited you to explain any alleged common interest of the various proposed Claimants that wouldentitle them to join as co-Claimants, but you have not given any adequate explanation:*

**Answer:**

A claimant can bring a bundle of claims in the name of several individual claimants through a power of attorney obtained from them. A claimant can also bring a bundle of claims in their own name as the owner of claims obtained by assignment. The lawfulness is already explained above. Claimants reserve the right, in its sole discretion, how it intends to integrate their actions with anticipated events and reactions to achieve the overarching goal of the litigation.

*Statement 4.1 Isolas*

> 4.1    *You have not explained how Megalodon Capital Management BV could be a co-Claimant when it is an entity in liquidation and which, in any event, has assigned by deed the whole of any interest or rights it might have had to Megalodon DMCC, so that on any view it has no standing to sue.*

**Answer:**

The custodian of Megalodon Capital Management B.V. is Megalodon DMCC. The entity is indeed liquidated but will be reactivated by us for a claim against RIF Labs Limited, i.e. pursuant to article 23c, book 2 of the Dutch Civil Code. Which article states that an entity can which has been liquidated in the past, can be reactivated on request; in case the entity has an outstanding receivable.

In relation to Megalodon DMCC please read our input to point 4.2.

*Statement 4.2 Isolas*

> 4.2    *You have not explained how Megalodon DMCC could be a co-Claimant when it has agreed, by way of a deed, to indemnify our Clients against any claim such as the one you wish to advance.*

**Answer:**

Article 3 of the Deed states:

3.1    The Assignor and the Assignee shall fully and effectively, indemnify IOV and its directors against all claims, liabilities, costs, expenses, damages and losses (including reputational damage) that IOV suffers or incurs **under or in connection with the**

**assignment** of the Contract after the Effective Date, whether it relates directly to the Assignee or to the Assignor or to any third parties.

3.2     The Assignor further agrees to provide IOV with a separate undertaking and indemnity, in a form agreed between the parties, in relation to any matters that may arise as a result of this assignment.

The Deed clearly limits the indemnification to the assignment only. It does not indemnify RIF Labs Limited in relation to other claims, liabilities, damages and losses for matters NOT being the actual assignment (Deed).


*Statement 4.3 Isolas*

*4.3 You further have failed to consider that the applicable Early Contribution Agreements with Megalodon Capital Management BV, Mark Levin and Kerem Turetgen expressly excluded any class or representative action*


**Answer:**

We fail to see this position 'holding' in court and feel comfortable with continuing a class-action lawsuit through a Dutch foundation (as described in our letter of March 16, 2021), in specific as the following rules apply in this regard to:

   a.  *Consumers (Mark Levin and Kerem Turetgen)*

An arbitration agreement that require parties to waive their right to proceed on a class action basis can be annulled by the national courts on the grounds that the arbitration proceedings were based on arbitration clause **as an unfair contract term** under the Council **Directive 93/13/EEC of 05/03/1993** on unfair terms in consumer contracts (see for example the European Court of Justice decision in the case Claro v. Móvil or Sebestyen, C-342/13)[43]

Under the Unfair Terms in Consumer Contracts Regulations 1999, the inclusion of an arbitration clause is considered unfair[44].

Moreover, the Netherlands has implemented an "opt-out" system in consumer class-actions. The "opt-out" system, which is used in the US, by considering the significant size of the US market, grants a right for litigants to initiate lawsuits with extremely large claims. Such claims force enterprises to seek settlement, as the risk of loss provides a great danger for the company at stake.

   b.  *Companies (Megalodon Capital Management B.V.)*

In practice, international tribunals when determining the law applicable to the merits of a dispute are influenced by the widely-accepted rules contained in those instruments. They normally also take into account any overriding mandatory rules and public policy concerns, in light of their duty to render an enforceable award, as well as the supervisory role of EU courts in annulment and enforcement proceedings of an arbitral award.

---

[43] see Directive 93/13/EEC of 05/03/1993

[44] *Mylcrist Builders Limited v Mrs G Buck [2008] EWHC 2172 TCC*

Article 28(2) of the UNCITRAL Model Law on International Commercial Arbitration[45], stipulates that "*the arbitral tribunal shall apply the law determined by the conflict of laws rules which it considers applicable.*" National arbitration laws empower arbitrators to apply directly the law (or rules of law) they deem appropriate.

*Statement 5 Isolas*

*Finally, we invited you to explain even in general terms the nature of the relief that would be sought in a lawsuit against our Clients:*

*5.1 We note the table at page 13 of your letter of the 16th March 2021 in which it appears you have attempted to set out the relief sought by various claimants against some of our Clients. However, you have failed to explain, even in the most general of terms, the basis of these claims beyond simply identifying potential defendants and the amounts claimed.*

**Answer:**

We consider this an Argumentum ad Ignorantiam. Also please read the above in relation to violation of the Securities law in the US and EU (non-US). We further invite you to read our letters of February 18, 2021 and March 16, 2021, including our evidence provided attachments for a full overview of our position in this regard.

*Statement 5.2 Isolas:*

5.2 *Whilst we welcome your clarification that you now only advance claims against IOV Labs Limited and RSK Labs Limited, we note that you have failed to set out not only the legal basis for these claims (as stated above) but the basis upon which you believe that you are entitled to include their directors as defendants.*

**Answer:**

Please read the above. We further invite you to read our letters of February 18, 2021 and March 16, 2021, including our evidence provided attachments for a full overview of our position in this regard.

*Statement 5.3 Isolas:*

5.3 *In any event, it is clear that our Client IOV Labs Limited has adhered to the terms of the applicable Early Contribution Agreements with Megalodon Capital Management BV, Mark Levin and Kerem Turetgen and they have received the contracted amount of RIF Tokens and that, in reality no loss has been suffered.*

---

[45] 1985-UNCITRAL-Model-Law-on-International-Commercial-Arbitration.pdf (iaa-network.com) 2006-UNCITRAL-Model-Law-on-International-Commercial-Arbitration.pdf (iaa-network.com)

**Answer:**

We refer to the position described by us in our letter of February 18, 2021, March, 16 2021 and this letter in relation to the ECA and violations.

Moreover, in relation to your comment made: *'in reality no loss has been suffered'* we would like to note the following:

In relation to RSK Labs Limited significant losses have been suffered, i.a., as evidenced by:

- Mark Levin invested 22.0761 bitcoin into RSK Labs Limited based on misinformation and false promises. His investment:
    - did not lead to the promised series A by RSK Labs Limited;
    - has lost more than 90% of the btc amount invested;
    - he never received an overview of use of proceeds;
    - he never received the excessive capital RSK Labs Limited promised him;
    - he never received any payment from the promised profit split distribution in Ginger Developments.

In relation to RIF Labs Limited significant losses have been suffered, i.a., as evidenced by:

- Mark Levin invested 400 bitcoin into RIF Labs Limited based on misinformation and false promises. After his investment:
    - he never received an update on project progress;
    - he never received an overview of use of proceeds;
    - the RIF Tokens has lost more than 90% of its value - calculated based on the bitcoin amount invested;
    - based on the current btc price the RIF tokens are still more than 90% down in a bull market;
- Kerem Turetgen invested 50 bitcoin into RIF Labs Limited based on misinformation and false promises. After his investment he never received a deliverable of the RIF tokens purchased by him.
- Megalodon Capital Management B.V. invested 300 bitcoin into RIF Labs Limited based on misinformation and false promises. After this investment;
    - it never received an update on project progress;
    - it never received an overview of use of proceeds;
    - the RIF Tokens has lost more than 90% of its value - calculated based on the bitcoin amount invested;
    - based on the current btc price the RIF tokens still are more than 90% down in a bull market.

RSK Labs Limited and RIF Labs Limited combined raised close to 25,000 bitcoin. The approx. value for investors in bitcoin is a loss of 90% of the total value invested.

In the cryptocurrency markets, there are NO comparable projects which raised an amount at a current bitcoin value of approx.. US$ 1,500,000,000, and had such a low market cap as RIF Labs Limited.

Moreover, RIF Labs Limited founders have been calling the community to stay invested in the project as believers would be rewarded (we refer to our letter of February 18, 2021 and its

attachments); which is a false statement considering the loss suffered by investors (previous and current).

*Statement 5.4 Isolas:*

*5.4 You have written two letters totalling some 99 pages and yet your only response to our invitation to explain even in the most general terms the nature of the claims or relief that would be sought in a lawsuit against our Clients is an encouragement for our Clients to negotiate a settlement of what, from your letters, is presented as a hopelessly vague and unmeritorious claim.*

## **Answer:**

We assume the above reflects this need. From your answers and from this comment it is clear that you have not read the letters and multiple attachments sent by us in detail. The letters including the claims and attachments with evidence to our claims far exceeds the 99 pages.

The letter sent by you on March 31, 2021, clearly shows, you have not read our allegations against your clients and evidence provided by us in detail.

For example, you are referring to an ECA, which (1) is not relevant for the share purchase agreement signed under United States Law by Mark Levin and (2) as described in our letter, the jurisdiction would be based on EU law, considered to be the Netherlands.

In your view and your opinion our claims and letters are hopelessly vague and unmeritorious claim. In our view, we feel comfortable with the claims and the positions taken by us and have a well-documented file.

As mentioned in our letter of March 16, 2021. In brief, in case we do not reach a settlement, the following next steps will be taken:

- Reactivation of Megalodon Capital Management B.V. out of liquidation;
- Setting up a RSK and RIF claim foundation for filling collective claim in which former and previous stakeholders would be invited to join;
- The claim would aim for the full amount of the RSK Labs Limited capital raise and the RIF Labs Limited capital raise. We would further file a claim on the missed profit split on Ginger Developments Limited Development Limited (which would be part of the RSK Labs claim). The claims would be:
    - o RSK Labs Limited capital raise claim at approx. 800 bitcoin, the key arguments for this claim are described in our letter of February 18, 2021, which includes (but is not limited to) a violation of the US Securities Act.
    - o Ginger Developments Limited missed revenue, which was agreed between RSK Labs Limited with all external shareholders who invested in RSK Labs Limited. The agreement stated 40% of the transaction fees of the RSK blockchain. The calculation for this is US$ 0.03 x 100 transactions per second for 2 years (but will need to be determined by an independent auditor) would amount into approx. US$ 189,216,00 of which Ginger Developments Limited shareholders are eligible to 40%, which is US$ 75,686,400. Our claim in relation to Ginger Developments would be for the full amount of US$

> 75,686,400 (which is subject to change depending on the outcome of the audit).
> - o RIF Labs Limited capital raise claim would be for the full amount of bitcoin raised, which is approx. 23,000 bitcoin. The key arguments for this are described in our letter of February 18, 2021 but includes (but are not limited to) a violation of the EU Capital markets and consumer law legislations and the US Securities Act.
> - o The amount the foundation would approx. claim would be: 25,000 bitcoin (note that this claim amount may deviate depending on the outcome of the audit for Ginger Developments and the appetite of stakeholders joining the mass claim).

- Note that the above claim will not be limited to RSK Labs Limited and RIF Labs Limited, but we will also be holding all directors personally liable.
- Moreover, we will also file a claim against Isolas LLP, as the law firm providing and approving the RSK Labs Limited and Ginger Development Limited scheme and for the fact that an Isolas LLP partner (Joseph Garcia) is part of the board of directors of RIF Labs Limited, which is in our view a conflict of interest. We refer to attachment 1.


**ULTIMATUM**

Claimant look forward to hearing from you within the next **14 days** and expect to receive a detailed and reasonable offer to settle. In case Claimant does not receive a reaction from you to its satisfaction before the **7th of May 2021** Claimant reserves the right to proceed with the aforementioned actions (including serving you a summons) without any notification in advance.

We consider that this correspondence provides sufficient information to enable you and your clients to commence investigations and to put a valuation upon the claim.

This correspondence is not intended to have the formal status of a pleading and, therefore, we reserve the right to provide further information under each of the headings above in due course.

**Document Retention Notice**

In the meantime, please be advised to maintain, and not to destroy, any documents or other records, electronic or otherwise, that are pertinent to the issues raised in this letter, including any so-called "ephemeral media" such as texts, messaging application messages, etc.

**Final remarks**

Claimant aims to recoup its losses which are caused by the wrongdoings of RSK/RIF/IOV Labs. Claimant expects to be compensated appropriately. Claimant is willing to take all necessary steps required to hold you accountable for your actions in case you do not provide a solution that Claimant seems fit.

You may contact us by e-mail (rsk@megalodon.ae).

We will await your written response.

Yours faithfully,

E.A. van Goor LL.M.
Mark Levin
Kerem Turetgen
Megalodon Capital Management B.V.
Megalodon DMCC

# EXHIBIT 4



DLA Piper Nederland N.V.
Amstelveenseweg 638
1081 JJ Amsterdam
P.O. Box 75258
1070 AG Amsterdam
The Netherlands

T +31 20 541 9949
F +31 20 541 9999
W www.dlapiper.nl

**Isolas LLP**
**Attn:** Mr. James Montado
Portland House
Glasis Road, GX11 1AA Gibraltar

and

**RSK Labs Limited**
**Attn:** Diego Gutierrez Zaldivar and Ruben Ariel Altman
Billinghurst 1193, 4th floor Apt B (1174),
City of Buenos Aires, Argentina

and

**Estudio Levene**
J.M. Gutierrez 3765, 7th floor, Office 701,
City of Buenos Aires, Argentina

and

**IOV Labs Limited (RIF Labs Limited)**
Suite 23 Portland House Glacis Road,
GX11 1AA Gibraltar

and via e-mail:

**RIF Labs**: contributors@rifbyrsk.org
**RSK Labs**: dgz@rsk.co; ruben@rsk.co;
clevene@estudiolevene.com
**Isolas LLP**: info@isolas.gi; james.montado@isolas.gi
debbie.spencer@isolas.gi  karan.aswani@isolas.gi
emma.lejeune@isolas.gi
**Malcolm Stephen David Pallé**:
malcompalle@coinsilium.com;
**Eddy Travia**: eddytravia@coinsilium.com;
**Alejandro Maria Aberg Cobo**: alex@iovlabs.org;
alex@rifos.org
**Wayne Leslie Almeida**: wayne@fid.gi; peter@fid.gi
**Joseph Peter Garcia**: joey.garcia@isolas.gi
**Diego Gutierrez Zaldivar**: dgz@rsk.co; gz@iovlabs.org
**Sergio Lerner**: sergio@iovlabs.org
**Gabriel Alejandro Kurman**: gk@rsk.co; gk@iovlabs.org
**Ruben Ariel Altman**: ruben@rsk.co
**Adrian Eidelman**: adrian@iovlabs.org
**Adrian Garelik**: adrian@flixxo.com; legal@flixxo.com

**Your Ref:**

**Our Ref:**
JGA/JGO/437312/1
NLM/13189001.1

10 September 2021

advocaten
notarissen
belastingadviseurs

DLA Piper Nederland N.V. is registered
with the Trade Register of the Chamber
of Commerce under number 34207878.

DLA Piper Nederland N.V. is part of
DLA Piper, a global law firm, operating
through various separate and distinct
legal entities.

A list of offices and regulatory information
can be found at www.dlapiper.com.

NL switchboard:
+31 20 541 9888



DLA Piper Nederland N.V.
Amstelveenseweg 638
1081 JJ Amsterdam
P.O. Box 75258
1070 AG Amsterdam
The Netherlands

T +31 20 541 9949
F +31 20 541 9999
W www.dlapiper.nl

**RE:   FORMAL NOTICE MEGALODON E.T. TO RIF LABS AND RISK LABS E.T.**

Dear Sirs & Madams,

1. We act as counsel for Megalodon DMCC (**"Megalodon"**), Esteban Arturo van Goor (**"Van Goor"**) and Mark Levin (**"Levin"**) (together the **"Claimants"**). On behalf of the Claimants, we hereby formally give notice of the dispute which has arisen between the Claimants and:
   - RIF Labs Limited, later renamed to IOV Labs Limited (**"RIF Labs"** or **"IOV Labs"**);
   - RSK Labs Limited (**"RSK Labs"**);
   - Fiduciary Trust Limited (as member of RIF Labs);
   - Ginger Developments Limited (**"Ginger Developments"**);
   - Malcolm Steven David Pallé (as board director and advisor of RIF Labs and as board director of Coinsillium, which received investments from RIF Labs (making RIF Labs a shareholder of Coinsillium));
   - Eddy Travia (as regional director and advisor of RIF Labs and founder and board director of Coinsillium, which received investments from RIF Labs (making RIF Labs a shareholder of Coinsillium));
   - Alejandro Maria Aberg Cobo (as board director and advisor of RIF Labs);
   - Wayne Leslie Almeida (as company manager of RIF Labs);
   - Joseph (Joey) Peter Garcia (as board director and advisor of RIF Labs);
   - Diego Gutierrez Zaldivar (as co-founder of both RSK Labs and RIF Labs);
   - Fiduciary Management Limited (as secretaries of RIF Labs);
   - Sergio Lerner (as co-founder of RSK Labs and RIF Labs and Chief Scientist of RIF Labs);
   - Gabriel Alejandro Kurman (as co-founder of RSK Labs and RIF Labs and the main contact for the fundraising);
   - Ruben Ariel Altman (as co-founder of RSK Labs);
   - Adrian Eidelman (as co-founder of RSK Labs and Chief Technical Officer of RIF Labs); and
   - Adrian Garelik (as co-founder of RSK Labs) (together the **"Defendants"**).

2. The Claimants have several contractual and non-contractual claims against the Defendants, which will be addressed in this formal notice.

   *Facts*

3. On or around May 2017, Levin invested 22.0761 bitcoin in RSK Labs Limited (**"RSK Labs"**) on the basis of a series seed preferred share purchase agreement dated 23 March 2017 (the **"SPA"**).

advocaten
notarissen
belastingadviseurs

DLA Piper Nederland N.V. is registered
with the Trade Register of the Chamber
of Commerce under number 34207878.

DLA Piper Nederland N.V. is part of
DLA Piper, a global law firm, operating
through various separate and distinct
legal entities.

A list of offices and regulatory information
can be found at www.dlapiper.com.

NL switchboard:
+31 20 541 9888



JGA/JGO/437312/1
NLM/13189001.1
Continuation 3
10 September 2021

4. On or around 23 May 2018, Megalodon Capital Management B.V. (**"Megalodon B.V."**) and Levin entered into early contribution agreements (the **"Early Contribution Agreements"** or together with the SPA the **"Investment Agreements"**) with RIF Labs pursuant to which Megalodon and Levin acquired a number of cryptographic RIF tokens from RIF Labs against payment of 300 respectively 400 bitcoin. As you are already aware, Megalodon B.V. has assigned all its rights under the Early Contribution Agreements to Megalodon.

5. The goal of RIF Labs is described in the Early Contribution Agreement as follows:[1]

> *"RIF LABS Limited (the "Company") shall be conducting a smart contract based private contribution campaign ("Token Sale") for the <u>purpose of raising capital that it will deploy on researching, developing and promoting the RIFOS Protocols</u> (as defined below) and to meet various other operating expenses <u>resulting to such activities</u>."* (emphasis added)

6. In addition, the intended functionality of RIF, has been set out in (amongst other places) Schedule 1 to the Early Contribution Agreements:[2]

> *"RIF's principal purpose is therefore to enable users to activate and consume the RIFOS Services that are made available by RIFOS Service Providers implementing the RIFOS Protocols".*

*Description claims*

7. After the Defendants raised capital through RIF Labs, neither RIF Labs nor its founders, applied the raised funds for *"researching, developing and promoting the RIFOS Protocols"* or to pursue the functionality as set out in Schedule 1 to the Early Contribution Agreements.[3] That no research or development has taken place is evidenced by for example the contents (or better said lack of content) of the Github page (see link): https://github.com/riflabs. Github is a host for software development. If the above-described goal was pursued, RIF Labs would be expected to have made lots of contributions of its technology, coding projects and apps to this platform. However, (i) no such contributions have been made by any of the Defendants (for example not by Chief Scientist Sergio Lerner or Chief Technical Officer Adrian Eidelman); and (ii) the page does not have any (zero) public members. That no promotion has taken place either is for example clear from the social media accounts of the Defendants, which do not include any such promotions.

8. The Claimants have suffered damages by the fact that funds have not been used for the above-described goal. Funds generated by their investment have been

---

[1] Early Contribution Agreement, Introduction and Background.

[2] Early Contribution Agreement, Schedule 1.

[3] Early Contribution Agreement, Introduction and Background and Schedule 1.



JGA/JGO/437312/1
NLM/13189001.1
Continuation 4
10 September 2021

withdrawn from RIF Labs and RSK Labs for unknown or unwarranted usage. A substantial amount of bitcoin has been withdrawn from the bitcoin contribution wallets. With regard to RSK Labs, an amount of 665 bitcoin was raised and the wallet currently only holds 0.003 bitcoin. With regard to RIF Labs, an amount of 21,113 bitcoin (as well as Ethereum) was raised and currently the wallet only holds around 3,426.49 bitcoin.[4] For part of this, it is unclear what these funds have been used for. No transparency has been given to the investors on investments that the Defendants were planning to make. Also no explanation or disclosure has been provided to the investors after the amounts were actually invested.

9.  For the other part, it has become clear that the funds have been used for a different use than was presented by the Defendants (as can be seen in the citation above), i.e. "*capital that it will deploy on researching, developing and promoting the RIFOS Protocols (as defined below) and to meet various other operating expenses resulting to such activities.*" An example of this is the acquisition of social media platform, Taringa, which has nothing to do with smart-contracting and creating technology on a blockchain. This acquisition (including the purchase price) was not disclosed to the investors. The Claimants believe this unauthorized usage of the funds to be fraudulent and finds it has been misled to make their investments under false pretences.

10. If the Claimants had known that the goals set in the contracts would not be pursued and instead their investment would be used for unrelated projects, the Claimants would not have invested in RIF Labs and RSK Labs.

11. Further misleading information has also been provided concerning promises in relation to the distribution of profits. A shareholding and distribution of profits generated by Ginger Developments was promised to the early investors of RSK Labs (under which Levin). However, no shareholding was provided and no profits have been paid. Levin is to be compensated for the profits he was promised but never received.

12. Moreover, the Defendants have orchestrated a smear campaign which has been conducted against Megalodon and its founders through websites and chats. These campaigns were focused on damaging Megalodon's reputation. This has caused slander and defamation towards Megalodon and its founders. Megalodon is to be compensated for the damage it has suffered due to this smear campaign.

13. In addition to the above, the Claimants have suffered damages by the following actions (or inactions) of the Defendants:
    -   The conduct of an unregistered sale of securities.
    -   Laundering funds from an international fraud scheme that scammed bitcoins from investors.
    -   Promises with regard to projects and listing on exchanges which never occurred.

---

[4] Wallet can be viewed via: 3FiMKffg2kY2Pi2Kebn2HZqN7m6kEcNUMk | Blockchain Explorer.



JGA/JGO/437312/1
NLM/13189001.1
Continuation 5
10 September 2021

- The non-disclosure of audited financial statements. These have neither been deposited by the Defendants nor have they been provided to the investors.
- The whitepaper shared with RSK Labs' shareholders and investors included the assignment of all IP's, brands and knowledge of RSK Labs Limited to RIF Labs limited. This assignment has not taken place.
- Partnerships have been claimed with entities (e.g. Bitclub and EtherParty), which are fraudulent and thus those partnerships were technically non-existent.

*Relief*

14. The Claimants claim relief in relation to the wrongdoings set out above. The Defendants have failed to deliver in accordance with the terms of the Investment Agreements (by not pursuing the described goal and instead using the funds for other purposes). This constitutes as a breach of contract and is fraudulent. In addition, the Claimants have been misled by the Defendants and have entered into the Investment Agreements under false pretences. Both the deception when entering into the Investment Agreements and the default and fraud under those contracts, allow the Claimants to invoke their (statutory) right to terminate the Investment Agreements.

15. The Claimants hereby invoke this (statutory) right to terminate the Investment Agreements. This termination leads to the obligation for the Defendants to return any benefits they have received under these Investment Agreements. In this light, the Claimants claim a refund of the bitcoin invested in RSK Labs and RIF Labs.

16. In addition, the Claimants claim compensation for the damages they have suffered concerning the related incidents. We will elaborate more on the requested relief below.

17. More precisely, in relation to the investment made by Levin in RSK Labs, the relief claimed is:
    o Refund of the invested 22.0761 bitcoin;
    o Payment of damages, i.e. the promised payments by Ginger Developments, on profitability charts shared by RSK Labs and as well presented at the North American Bitcoin conference held in Miami in 2017 and 2018, which are currently estimated at USD 983,923 (Mark Levin's stake of: USD 0.03 times 100 transactions per second for two years (USD 189,216,000) of which Ginger Development was eligible for 40% (USD 75,686,400)).
    In relation to the investment made in RIF Labs, the relief claimed is:
    o Refund of the invested 700 bitcoin;
    o Compensation of damages related to slander and defamation, which is currently estimated at the equivalent value of 150 bitcoins.

18. This notice can be considered as a formal notice under the Investment Agreements. The Claimants expect the wrongdoings to be remedied and



JGA/JGO/437312/1
NLM/13189001.1
Continuation 6
10 September 2021

compensated for. In light hereof, the Claimants propose to have a meeting to discuss the dispute with the Defendants and request the Defendants to inform the Claimants on their willingness to attend such meeting and engage in such discussion. If the Defendants do not appear willing to engage in discussions in order to come to an amicable solution or if the discussions do not lead to such amicable solution within 30 days, the Claimants will initiate arbitration and / or court proceedings against the Defendants.

19. Claimants further note that they have been approached by regulatory institutions such as the Federal Bureau of Investigation (FBI) and the Commodity Futures Trading Commission (CFTC), requesting information concerning the Defendants. In the event the Defendants do not appear to be willing to actively work on coming to a solution to this dispute, Claimants will not hesitate to provide the requested information to these (and / or other) regulatory institutions.

Yours sincerely,

**MICHIEL COENRAADS**
**Advocaat – Partner**
**DLA PIPER NEDERLAND N.V.**

michiel.coenraads@dlapiper.com